**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **ENTRI LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:24-cv-00569-AJT-WEF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GODADDY.COM LLC,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | <u>**Redacted - Public**</u> |
| | ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................... 1

PARTIES ................................................................................................................... 5

JURISDICTION AND VENUE ............................................................................... 5

FACTUAL BACKGROUND .................................................................................... 5

I.      Organizations of All Sizes Rely on Custom Domains to Interface with the
        Public and Connect with their Audiences.................................................... 5

II.     There Are Countless Options to Enhance Custom Domains through Third-
        Party Applications. ....................................................................................... 6

III.    To Integrate a Custom Domain with a Third-Party Application, Users Must
        Configure the Domain's DNS Settings. ...................................................... 10

IV.     GoDaddy Developed the Domain Connect Protocol to Simplify the Process of
        DNS Configuration for Custom Domains.................................................... 13

V.      Entri Further Simplified, Standardized, and Expanded Automated DNS
        Configuration for Custom Domains with Entri Connect............................ 14

VI.     The Demand for Entri Connect Has Been Significant. ................................ 17

VII.    Entri Connect Facilitates a More Open Internet in which Custom Domain
        Owners Have More Choice When It Comes to Third-Party Applications.... 21

ENTRI'S INTERACTIONS WITH GODADDY ................................................... 21

VIII.   After Discussions with GoDaddy, Entri Agreed to Use the Domain Connect
        Protocol to Configure DNS Settings for GoDaddy Domains. ........................ 21

IX.     GoDaddy Abruptly Stopped Onboarding Domain Connect Templates for New
        Entri Customers. .......................................................................................... 23

X.      GoDaddy Announced Its New Policy Prohibiting Users with GoDaddy
        Domains from Configuring DNS Settings via Entri. ..................................... 24

XI.     GoDaddy Enforced Its New Policy in Several Ways. ................................... 25

        A.      GoDaddy Deleted Previously Onboarded Templates from Entri's SaaS
                Customers. ......................................................................................... 25

        B.      GoDaddy Threatened Entri's SaaS Customers if they Continued to Allow
                GoDaddy Domain Customers to use Entri. .......................................... 26

    C.    *GoDaddy Targeted Entri's Business Model with Unnecessary, Pretextual, and Hidden Changes to Its API Terms of Use.* ........................................ 27

    D.    *GoDaddy Implemented a Variety of Unnecessary and Pretextual Measures Designed to Prevent GoDaddy Domain Customers from Using Entri.* ..... 28

**XII.   GoDaddy Then Informed SaaS Companies that Automated DNS Configuration for GoDaddy Domain Customers Would be Available *Only* if SaaS Companies Worked Directly With (and Paid) GoDaddy.** .................... 30

**GODADDY'S UNLAWFUL NEGATIVE TIE** ........................................................ 31

**XIII.   The Two Relevant Markets Here are the Market for Custom Domains and the Market for Domain Integration Services.** .................................................. 32

**XIV.   GoDaddy Has Tremendous Market Power in the Market for Custom Domains.** ....................................................................................................... 33

**XV.   GoDaddy Has Expressly Conditioned Its Provision of Domain Registration Services on Its Custom Domain Users' *Not* Relying on Entri for Domain Configuration.** .................................................................................................. 36

**XVI.   Less Restrictive Means Are Feasible to Achieve Any Legitimate Interests Advanced by the Tie.** ......................................................................................... 36

**XVII.   Entri Has Suffered Damages and Antitrust Injury as a Result of GoDaddy's Negative Tie.** ..................................................................................................... 38

**GODADDY'S FRIVOLOUS THREATS OF LITIGATION** ................................................. 40

**XVIII.   GoDaddy Threatened Lanham Act Claims Where There Is No Risk of Confusion.** ........................................................................................................... 40

**XIX.   GoDaddy Threatened Intellectual Property Claims Where There Is No Intellectual Property at Issue.** .......................................................................... 42

**XX.   GoDaddy Threatened Breach of Contract Claims Where Entri Never Agreed to the Terms.** ....................................................................................................... 43

**XXI.   GoDaddy Threatened Computer Fraud and Abuse Act ("CFAA") Claims Where There Is Neither Hacking Nor Technological Harm.** .......................... 43

**CAUSES OF ACTION** .................................................................................................... 45

## INTRODUCTION

1.     Founded in 2021, Entri is a small tech company with an innovative solution to a known problem in the world of website infrastructure.

2.     Millions of individuals and small companies rely on their websites to connect with fans and customers, reach a broader audience, and grow their businesses.  Website owners invest heavily in their online presence, often turning to third-party applications to add features such as a unique web design, an online payment portal, or an accompanying custom email domain.

3.     A crucial hurdle to creating a successful website is connecting the owner's domain (i.e., their web address) with these third-party applications.  A website owner may have a domain and may, for instance, also have an account with Square, the online payment processing company.  But for his Square account to work with his domain, he must ensure there is a valid and stable connection between the two.

4.     This connection is accomplished through something called DNS records—alphanumeric coding that dictates where on the web a customer is directed when he types in a domain address. To connect custom domains and third-party applications, the user must update these DNS records in the behind-the-scenes settings of his domain provider.

5.     This is a complex process that often eludes small business owners and others not versed in computer programming or web design.  At best, individuals attempting to update their own DNS settings waste valuable time and patience navigating the process.  At worst, they make errors that break their website and web presence entirely.

6.     This is the problem Entri set out to solve, and it did so with Entri Connect.  Entri Connect automates the process of updating a website owner's DNS settings.  All a website owner needs to

1

do is launch Entri Connect within the third-party application of his choice, authorize Entri to update his settings for him, and the settings are automatically configured correctly.

7.      This saves time—not only for the website owner, but also for the third-party applications who no longer need to field support calls from confused website owners struggling with unfamiliar acronyms and coding.  As a result, the demand for Entri Connect has been significant and the solution has been onboarded by many of the world's leading software applications to make their customers' lives easier.

8.      Entri Connect also benefits domain registrars—the companies that sell and register custom web addresses, or "domains"—as it allows their customers to create a professional web presence with fewer headaches and to more easily integrate innovative third-party applications.

9.      Because of this, domain registrars have proven enthusiastic supporters of Entri—with one notable exception: GoDaddy.

10.     GoDaddy is the world's largest domain registrar by far.  With 85 million custom domains registered, GoDaddy is more than *five times* larger than its next closest competitor.  While GoDaddy does not own the websites associated with these 85 million domains, its role as their official domain registrar gives it significant control over a truly remarkable swath of the Internet.

11.     Entri Connect has supported domains registered on GoDaddy since its inception, using Entri's proprietary configuration systems.  Shortly after Entri Connect's launch, GoDaddy saw the value of Entri Connect and the two companies entered a partnership together to allow thousands of users with GoDaddy-registered domains to update their DNS setting with a simple 3-click process.

12.     But as Entri grew in popularity, GoDaddy saw an opportunity to use its tremendous size to its advantage.  In late 2023, GoDaddy abruptly changed its stance on Entri Connect.  GoDaddy

began telling third-party applications that their users with GoDaddy-registered domains would no longer be permitted to use Entri Connect; it updated the company's Terms of Use to preclude customers from authorizing Entri to update settings on their behalf; and it implemented a series of technological measures designed to cause Entri Connect to malfunction when used by GoDaddy customers.

13.     There is no legitimate reason for GoDaddy's about-face.  Entri Connect is secure and safe—a big reason it is trusted by some of the world's most sophisticated tech companies.  And on information and belief, GoDaddy had never experienced any security related issues stemming from Entri in all its months working with the company.  GoDaddy's proffered justifications for excluding Entri are pretext.

14.     Indeed, immediately after seeking to block Entri Connect, GoDaddy revealed its true motivation.  Instead of Entri Connect, GoDaddy customers would be required instead to use *Domain Connect*, a more rudimentary and scarcely adopted protocol designed by GoDaddy years ago to solve the same problem as Entri Connect.

15.     GoDaddy had previously designed Domain Connect as an open standard, free to access and available for all to implement into their applications as they saw fit.

16.     But Entri Connect is a far superior and more sophisticated product.  For one, it is a fully developed application rather than just a protocol (which is essentially just a programming language).  And more importantly, Entri Connect works with a much broader range of software applications and domain registrars than Domain Connect does.

17.     Unsurprisingly then, a GoDaddy representative conceded to Entri that third party software applications preferred to offer their end users Entri Connect over Domain Connect *80% of the time*.

18.     Feeling threatened, GoDaddy set about subverting this clear consumer preference. In addition to prohibiting its customers from using Entri Connect, GoDaddy announced that third-party applications would now need to pay for the use of Domain Connect—notwithstanding GoDaddy's long touting its decision to make the protocol open source.

19.     In another attempt to keep its customers away from Entri Connect, GoDaddy has threatened Entri with legal action, theorizing a host of frivolous claims in a transparent scare tactic.

20.     Entri is not scared, but ignoring GoDaddy is also not possible. In a properly functioning market, the preferences of both end users and third-party applications would drive suppliers' behavior. But GoDaddy is a behemoth. Its control of the domain registration market allows it to bend dynamics in other markets to its will.

21.     As a result of GoDaddy's anticompetitive and unlawful behavior, competition in the market for domain configuration services has been significantly restrained. Entri has lost sales, experienced decreased domain configuration volume, and seen its reputation as a viable solution tarnished by GoDaddy's actions.

22.     Despite its size, GoDaddy has always held itself out as a champion of small business. "We're on a mission," the company claims, "to empower our worldwide community of 21 million customers—and entrepreneurs everywhere—by giving them all the help and tools they need to grow online."[1] But its behavior suggests otherwise. Through its campaign to block and exclude Entri Connect, GoDaddy is actively keeping its customers from a tremendously helpful tool simply because GoDaddy wants to advantage its own inferior product.

---

[1] GoDaddy, *About Us*, https://aboutus.godaddy.net/about-us/overview/default.aspx (last visited July 7, 2024).

23.     Actions speak louder than words.  This lawsuit seeks to hold GoDaddy accountable for its actions.

## PARTIES

24.     Plaintiff Entri LLC is a Virginia limited liability company with its principal place of business in Loudoun County, Virginia. Entri has four members who reside in Virginia, New York, and California.

25.     Defendant GoDaddy.com LLC is a Delaware limited liability company with its principal place of business in Maricopa County, Arizona.

## JURISDICTION AND VENUE

26.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as Entri has alleged federal causes of action.  Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Entri's claims under state law as they share a common nucleus of operative fact with the federal claims.

27.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties.

28.     Venue is proper in this district under 28 U.S.C. § 1391 because the claims asserted in this action arose in this district and a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**I.     Organizations of All Sizes Rely on Custom Domains to Interface with the Public and Connect with their Audiences.**

29.     Now more than ever, businesses and organizations of all kinds need a presence in the digital ecosystem.  The starting point for this presence is most often a public-facing website.

30.     To provide visitors with a recognizable and consistent interface, businesses often benefit from selecting a unique and memorable URL, known as a "custom domain."  As GoDaddy explains: "Whether you're creating a personal website or launching a new business, buying a domain name is the first step in establishing a successful online presence."[2]

31.     Though companies such as GoDaddy often describe users as "buying" domain names, the truth is that users actually *lease* them through a domain registrar.  The domain registrar is merely the custodian of the domain on behalf of the registrant.  Domain registrars are companies that have been accredited by the Internet Corporation for Assigned Names and Numbers (ICANN), an international nonprofit organization, to perform the function of registering a domain name and assigning it a unique IP address.

32.     By way of example, to create its website www.entri.com, Entri first had to register that domain name with a domain registrar.  Entri currently uses the domain registrar Cloudflare.  And for a recurring fee, Cloudflare ensures that the domain www.entri.com, as well as its corresponding IP address, are registered to Entri LLC.

33.     Though Entri does not technically "own" the domain, it has the right to control the domain for the duration of its lease and to make decisions about what users see when they navigate to that domain on the Internet.

## II.   There Are Countless Options to Enhance Custom Domains through Third-Party Applications.

34.     The process of building an online presence does not end with registering a custom domain, however.  Registering a custom domain reserves a place—an IP address—within the Internet's

---

[2] GoDaddy, *Domains*, https://www.godaddy.com/domains (last visited July 7, 2024).

infrastructure.  It does nothing to design and shape the experience of a visitor who navigates to that domain.

35.     Designing the website that will be visible at that domain is a complex process that requires technical skills and experience with programming and coding.  Because most owners of custom domains do not have the requisite skills to design a website on their own, they turn to third-party website building services that, to varying degrees, simplify and automate the process of designing a website via an online application.

36.     User-friendly and automated website builders are examples of what are known as "SaaS" companies.  "SaaS" stands for software-as-a-service.

37.     Wix is an example of website builder SaaS company.  Users who wish to use Wix's services navigate to Wix.com, where they are guided through the process of designing a personalized website.  An example of what users see when they navigate to Wix.com is below.



Source: www.wix.com/design

38.     There are many other types of SaaS companies that allow users to enhance their custom domains with additional features, such as solutions for email, marketing, e-commerce, and more.

7

39.     Neo is an example of a SaaS company that offers domain-based email services for business that want custom email addresses to match their custom domain.  A website owner who wants to be able to send and receive emails using their custom domain—User@entri.com, for instance—navigates to neo.space, where they are guided through the process of establishing an email environment to match their custom domain.   An example of what users see when they navigate to neo.space is below.



<u>Source</u>: www.neo.space

40.     A business that wants to add the option for customers to buy and pay for products on its website can turn to a SaaS company offering online payment processing applications.

41.     Square is an example of a SaaS company that provides payment processing services. Square affords its customers the opportunity to seamlessly integrate digital commerce solutions into their custom domain for a professional and secure user interface.  An example of what a user sees when navigating to Square's website is below.



<u>Source</u>: squareup.com/us/en/online-store

42.     A custom domain owner may also decide to offer content in the form of online classes or modules.  Kajabi is a SaaS company that guides its users through this process as seen below.



<u>Source</u>: https://kajabi.com/features/online-courses

43.     And finally, a business that wants to expand its marketing and drive engagement with its customer base can turn to Mailchimp, a SaaS company that offers customizable solutions for newsletters and direct email marketing from a custom domain address, as seen below.



<u>Source</u>: www.mailchimp.com

44.     These are illustrative examples only.  There are thousands of SaaS companies that market services to be used in conjunction with custom domains.  Individuals and businesses of all sizes rely on these companies' offerings to customize, enhance, and drive online traffic to their websites.

**III.     To Integrate a Custom Domain with a Third-Party Application, Users Must Configure the Domain's DNS Settings.**

45.     To work properly with a user's website, a SaaS company's application must be integrated into that user's custom domain.

46.     When a user designs a website using Wix, for instance, he does so on Wix's online platform.  Similarly, when a user creates an account with Square, he does so on Square's own website.  And so on.

47.     Custom domain integration refers to the process of connecting the third-party SaaS application with the user's website.  With proper integration, the website a user has designed using a third-party website builder will display when visitors navigate to the user's custom domain.  And when a visitor to that website clicks on the link to pay for something, Square's payment processing service will function within that user's domain rather than directing the customer to an external payment site.

48.     Custom domain integration relies on DNS, which stands for the Domain Name System. As GoDaddy explains it: "You can think of DNS like a phone book."[3]  Just as a phone book provides the contact information associated with an individual, DNS "maps the domain name to the data required to interact with services for the domain."[4]  "Using DNS, we can enter easily remembered, text-based domain names and reach machine-readable internet addresses."[5]

49.     When a site owner wants to connect the services of a third-party SaaS company to his custom domain, he must update the domain's DNS records.  At a basic level, this ensures that a visitor that enters the text-based domain name into a web browser sees all the data associated with that website, including the third-party services the domain owner has chosen.

50.     Because modern websites are so complex, there are more than 30 types of DNS records that correspond to different domain features.  Integrating the capabilities of SaaS applications into a custom domain may therefore require updating several DNS records to ensure that the applications work as intended.

51.     Updating DNS records is complicated.  Traditionally, such records had to be updated manually.  An owner of a custom domain would need to log into his account with his DNS Provider (which is typically the same company as his domain registrar), navigate to the page containing DNS records, and manually edit those records with a precise Resource Record (RR).  For domain owners without coding or programming experience, this is a complex and daunting process that frequently leads to errors.

---

[3]  GoDaddy, *GoDaddy DNS and Domain Connect* (Jan. 8, 2020), available at https://www.godaddy.com/resources/skills/dns-domain-connect.
[4] *Id.*
[5]  GoDaddy, *What is the domain name system (DNS)?* (Sept. 15, 2014), available at https://www.godaddy.com/resources/skills/what-is-the-domain-name-system.

52.     To make matters worse, each domain registrar not only has its own user interface for updating DNS records, but also uses distinct terminology and different rules.  To demonstrate this point, the Figure below shows the interface of four different domain registrars: (clockwise from top left) IONOS, Hover, GoDaddy, and Cloudflare.



53.     SaaS companies often provide their customers with written instructions and step-by-step guidance for updating DNS records.  The figure below is an excerpt of such guidance offered by Mailchimp.



54.     Nonetheless, confusion often persists, and customer support professionals both at SaaS companies and domain registrars frequently field time-consuming calls from users seeking guidance on DNS record management.

**IV.     GoDaddy Developed the Domain Connect Protocol to Simplify the Process of DNS Configuration for Custom Domains.**

55.     The challenges with DNS record management were plain to see.  As GoDaddy explained in a 2019 blog post:

> A few years ago we noticed something at GoDaddy. Third party services for email (e.g. O365 or G Suite) or web hosting (e.g. Squarespace or Shopify) were becoming more popular, and our customers were struggling to properly configure DNS. Even with the best instructions, this continues to be a high barrier for many users. They struggle with making these changes. So services end up not being configured.[6]

56.     To address this concern, GoDaddy teamed up with several other industry players to create a protocol called Domain Connect.

---

[6]     GoDaddy, *Creating the Domain Connect Standard* (April 25, 2019), available at https://www.godaddy.com/resources/news/domain-connect

57.     A protocol functions like a common language, and the goal of Domain Connect was to give domain registrars and third-party SaaS companies an agreed-upon standard to make updating DNS records more user friendly.   Using the Domain Connect protocol, third-party SaaS companies can create "templates" that contain the DNS record changes required for the application to function properly within a custom domain.

58.     The creators of Domain Connect, including GoDaddy, made the protocol an open standard. It is published under a license held by the Massachusetts Institute of Technology and the latest version of the specification can be accessed for free at domainconnect.org.

59.     Domain Connect has a number of crucial limitations, however.   Chief among them, it requires adoption of the protocol by the DNS Provider.  If a user's DNS provider has not adopted the protocol—if the DNS provider is not speaking the common language, in other words—then Domain Connect offers no advantage and the user must revert to manual configuration.  Presently, only four DNS providers actively use Domain Connect.  Furthermore, two of those four—IONOS and Cloudflare—have actually opted to create a custom integration method with Entri.

60.     In addition, Domain Connect is an open-source protocol, not an application.  This means that a SaaS company that wishes to enable its users to update DNS records via Domain Connect must design, build, operate, and maintain an in-application user interface using that open-source protocol.  This is costly and time consuming.

**V.     Entri Further Simplified, Standardized, and Expanded Automated DNS Configuration for Custom Domains with Entri Connect.**

61.     In 2021, Entri launched Entri Connect, a program that can be used within SaaS companies' online applications to further streamline and automate the process by which their users update DNS records for purposes of custom domain integration.

14

62.     Entri Connect was developed independently by Entri's own engineers.  In doing so, Entri did not rely on the Domain Connect protocol.

63.     Once Entri Connect is enabled, an Entri modal (a small window that displays atop the application) will launch within the SaaS company's application when the user is ready to link the service at issue to his custom domain.  The user (a custom domain owner), regardless of which registrar they use, will then be guided through a uniform process of updating DNS records, step by step.

64.     An example of the Entri modal seen by users of ███████ is below.



65.     After the user types in the custom domain they wish to connect with ████████'s service, Entri Connect automatically analyzes the domain to detect the DNS provider.  In the example below, Entri has detected that the user's DNS provider is Hover.



66.     Once the DNS provider is detected, the user is prompted to log in to his account with that DNS provider.  Entri makes clear to the user at this stage that he is authorizing Entri to perform the domain integration on his behalf.  For security reasons, Entri never stores the user's log-in information.  An example of the log-in screen is below.



67.     Once the user has logged in to his DNS provider account, Entri automatically updates the DNS records as required for the SaaS company's services to work with the user's custom domain. While this process is ongoing, the user sees the following screen.



68.     When the automated process of updating the user's DNS records is complete, the user will receive confirmation within the Entri modal, as reflected below, and then is free to return to the SaaS company's application.



69.     As the above makes clear, Entri significantly streamlines and simplifies the process of DNS configuration for users seeking to connect SaaS company applications to a custom domain.

**VI.   The Demand for Entri Connect Has Been Significant.**

70.     Since its launch, Entri has gained significant traction.  Dozens of leading SaaS companies have implemented Entri Connect to allow their users to automatically update DNS records.

71.     The reception has been overwhelmingly positive.  A software developer at ███, for instance, called Entri Connect "a game-changing solution for custom domains."

72.     In addition to creating a seamless and intuitive process for the end user, Entri Connect also cuts down dramatically on the amount of time that SaaS companies must spend troubleshooting their users' efforts to manually update DNS records.  As the CEO of one such SaaS company, ███, wrote: "DNS configuration used to be a necessary evil for our users to launch their store. After adding Entri to our application, we saw an uptick in launched stores and a 70% decrease in support tickets."

73.     A Product Leader at ███, a website builder focused on sophisticated web development agencies, has echoed this sentiment: "We want to give the best user experience that we can, and we know DNS is an issue that leads to support tickets.  It's difficult for agencies to handle DNS configuration, and the experience is better with Entri."

74.     Entri Connect is also easy to implement.  Entri estimates that SaaS companies typically spend between 1 and 2 hours integrating Entri Connect into their applications.  And if the Entri Connect modal requires updating or maintenance, it is Entri that handles that process.

75.     This ease of implementation gives Entri Connect a significant advantage over Domain Connect.  The latter provides SaaS companies access to an open-source protocol they must use themselves to design and maintain a user interface, while the former gives them an out-of-the-box solution and ongoing support.

76.     Contrast the above images of the Entri modal with the following images.  These images depict the sort of in-application modal that SaaS companies using the Domain Connect protocol need to design, build, and maintain themselves.  The following example is from HubSpot, a SaaS

company that does not use Entri.  HubSpot designed and built the modal below using the Domain Connect protocol.





77.     With Entri Connect, SaaS companies do not need to design their own bespoke in-application process like HubSpot's.

78.     Entri Connect has another distinct advantage over Domain Connect, and that is its reach. While the Domain Connect protocol may currently be used to update DNS records with only four DNS providers actively using the protocol, Entri Connect may be used with more than forty.

79.     The breadth of DNS providers whose domains are compatible with Entri is attributable to the design—and specifically, the flexibility—of Entri Connect.  Entri Connect allows end users to automatically configure their DNS records regardless of whether they are using the Domain Connect protocol.

80.     Entri is not suggesting—and has never suggested—that GoDaddy is obligated to work *with* Entri. From 2021 to April 2022, Entri supported users with DNS records at GoDaddy-registered domains using its own systems and processes for configuring DNS records. From April 2022 to January 2024, it used Domain Connect, in accordance with GoDaddy's preferences. Either is acceptable.  But what GoDaddy cannot lawfully do is threaten Entri's customers or attempt to restrict Entri from assisting end users in setting up their stated DNS configuration preferences.

**VII.   Entri Connect Facilitates a More Open Internet in which Custom Domain Owners Have More Choice When It Comes to Third-Party Applications.**

81.     By lowering technical barriers, Entri Connect allows the owners of custom domains to take advantage of more of what the Internet has to offer.  A small business owner, for instance, can register a custom domain with one of dozens of DNS providers, and then easily rely on one company for website design, another for domain-based email, another for e-commerce, another for email marketing, and still others for more advanced features.

82.     Without Entri Connect, such a user would need to manually update DNS records for each such service.  This complicated step acts as a disincentive to integrating multiple services into a custom domain.  And Domain Connect does not solve this problem in the same way, as the end user must have registered his domain with one of the four participating DNS providers *and also* be using one of the SaaS companies that have adopted the protocol and designed user interfaces.

83.     In short, with Entri Connect, owners of custom domains have greater freedom of choice and access to a wider array of services.  They can easily update and configure the DNS records at the custom domains they lease without depending on the serendipity of their DNS provider and their SaaS company of choice using the same protocol.

## ENTRI'S INTERACTIONS WITH GODADDY

**VIII.  After Discussions with GoDaddy, Entri Agreed to Use the Domain Connect Protocol to Configure DNS Settings for GoDaddy Domains.**

84.     Upon the launch of Entri Connect in 2021, Entri began enabling end users of SaaS company applications to configure DNS records for custom domains for which GoDaddy served as the custodian.

85.     These end users logged in to their GoDaddy accounts using the Entri modal and authorized Entri to automatically update the DNS records.  Initially, Entri Connect accomplished this without the use of the Domain Connect protocol.

86.     Entri Connect can work in a number of different ways, however—one of them being using the language of the Domain Connect protocol.  And in April 2022, after conversations with representatives of GoDaddy, Entri agreed that Entri Connect would use the Domain Connect protocol to configure DNS records for GoDaddy domains.  To that end, Entri and GoDaddy signed an Open-Source Domain Connect Agreement.

87.     Pursuant to that Agreement, when a new SaaS company wished to use Entri Connect, Entri sent to GoDaddy a "template," consistent with the Domain Connect protocol, that set forth the required DNS settings for that SaaS company's application.  GoDaddy would then onboard that template, which would allow Entri Connect to work as intended with GoDaddy-registered domains.

88.     This process unfolded seamlessly on hundreds of occasions, including well after the initial one-year term of the Agreement expired in April 2023.  As neither GoDaddy nor Entri terminated the Agreement, it remained in effect by virtue of the acceptance of this continued performance.

89.     By July 2023, Entri's use of the Domain Connect protocol with GoDaddy had accelerated to such a degree that GoDaddy requested that the parties create a shared Slack channel to streamline communications.

90.     On information and belief, not once during the period in which GoDaddy was onboarding Domain Connect templates from Entri did GoDaddy or its customers experience any problems as a result of Entri Connect.  In fact, aside from GoDaddy's steadily increasing delay in onboarding the templates, the relationship worked flawlessly.

IX.    **GoDaddy Abruptly Stopped Onboarding Domain Connect Templates for New Entri Customers.**

91.    In August 2023, however, just one month after it had asked Entri to set up a shared Slack channel, GoDaddy abruptly changed course.

92.    GoDaddy representative Robert Philip communicated to Entri via Slack that "[a]ll Domain Connect [sic] asks are currently on hold. Resources are at a premium and the DNS team is extremely busy. You may post your requests in here, but we will not act on them at this time."

93.    In response, Entri proposed multiple technical solutions to eliminate or significantly reduce any burden on GoDaddy staff and personnel.  Chief among these solutions was the so-called "Universal Template," which Entri had created to facilitate DNS configuration regardless of DNS provider.   Other DNS providers, including IONOS and Cloudflare, had adopted the Universal Template with great success.  These efforts were rebuffed or ignored by GoDaddy.

94.    On August 28, 2023, Entri was introduced to Carissa Pompei, GoDaddy's Director of Business Development. On August 31, Ms. Pompei proposed that, going forward, Entri pay GoDaddy a "license fee" to continue using Domain Connect—notwithstanding the fact that GoDaddy itself touts Domain Connect as an "open standard" and, as the DNS provider, GoDaddy does not own the domain that Entri seeks to configure.

95.    In the spirit of partnership, Entri acquiesced and the two sides began negotiating a new agreement to that effect.

96.    On October 16, 2023, the parties agreed to the terms of a deal over email.  GoDaddy representative Robert Philip acknowledged in writing that the key terms to the deal were agreed upon and that GoDaddy had not been honoring the prior agreement with Entri. Specifically, he wrote: "It appears that we are closing in on a revised agreement between GoDaddy and Entri.  In

preparation of that amendment, let's start to put together a list of asks from Entrii [sic] over the past downtime."

97.     But the contract that GoDaddy sent did not reflect the agreed-upon terms.  And when Entri pointed this out, negotiations fell apart.

98.     In November 2023, GoDaddy, without explanation, stopped responding to Entri altogether. Entri made multiple attempts to reengage with GoDaddy.  All were ignored.

**X.     GoDaddy Announced Its New Policy Prohibiting Users with GoDaddy Domains from Configuring DNS Settings via Entri.**

99.     On information and belief, GoDaddy's explanation that it could no longer onboard Domain Connect templates from Entri due to limited resources was pretextual.  GoDaddy simply wanted to make it more difficult for Entri to operate.

100.    In or around December 2023, GoDaddy formulated and announced a new policy: customers who purchased their domains through GoDaddy would not be permitted to use Entri Connect to update and configure their DNS records.

101.    GoDaddy communicated this new policy to SaaS companies that had previously integrated the Entri Connect modal into their applications, including ███████ ███████ ███  and ███████. To ███ GoDaddy wrote: "We are not working with any aggregator services, like Entri, and the only way to have GoDaddy Domain Connect is via direct integration."

102.    On January 11, 2024, GoDaddy provided notice that it was terminating its April 2022 agreement with Entri.  This termination was supposedly effective immediately, notwithstanding its 60-day termination notice requirement for each party. The notice informed Entri that it no longer had access to Domain Connect—again, notwithstanding that Domain Connect is an "Open Standard."

24

103.     After receipt of the January 11 notice, Entri stopped using Domain Connect to automatically configure GoDaddy-registered domains and has not done so since.

**XI.     GoDaddy Enforced Its New Policy in Several Ways.**

104.     Following the announcement of its new policy, GoDaddy has engaged in a multifront campaign to restrict its own domain customers from using Entri Connect.

105.     These efforts are an attempt by GoDaddy to subvert consumer choice, stifle innovation, and prop up an inferior service.  They are ongoing to this day.

### A. _GoDaddy Deleted Previously Onboarded Templates from Entri's SaaS Customers._

106.     First, GoDaddy deleted all the Domain Connect templates it had previously onboarded from Entri.  These templates allowed SaaS companies' end users to automatically configure their DNS records for GoDaddy domains, and because the templates were created using the Domain Connect protocol, they would have functioned with or without Entri Connect.

107.     By deleting the templates, GoDaddy created interruptions for its own domain customers, who suddenly found themselves without their preferred means to automatically update DNS records.

108.     GoDaddy also negatively impacted major SaaS companies with whom GoDaddy presumably partners in other contexts, as those SaaS companies suddenly found themselves back to square one and without the in-application domain integration solution they had selected for their end users.

109.     GoDaddy also disadvantaged itself.  By deleting the templates, GoDaddy was creating more work for itself if it wanted to re-onboard those SaaS companies using Domain Connect in the future.

110.    GoDaddy's logic in deleting them is therefore difficult to understand unless viewed as a means of purposely displacing Entri Connect for its domain customers.

### B.  *GoDaddy Threatened Entri's SaaS Customers if They Continued to Allow GoDaddy Domain Customers to Use Entri.*

111.    GoDaddy also affirmatively reached out to SaaS companies with whom Entri had contracted and not only told them that GoDaddy would no longer permit its domain customers to use Entri Connect, but also suggested to those SaaS companies that Entri Connect was illegal.

112.    In or around February 2024, for instance, a GoDaddy representative told ▮▮▮▮ that Entri Connect would no longer work with GoDaddy domains and implied that Entri Connect was illegal.

113.    In or around February 2024, a GoDaddy representative also told ▮▮▮▮ that that they had "disabled all DNS templates that Entri had previously onboarded" and that "[t]he only way to connect GoDaddy domains via Domain Connect is with a direct relationship going forward."

114.    In or around February 2024, a GoDaddy representative similarly told ▮▮▮▮ that Entri Connect would no longer work with GoDaddy domains.

115.    On information and belief, GoDaddy reached out during this same period to several other SaaS companies, including ▮▮▮▮ , ▮▮▮▮ and ▮▮ , and informed them that Entri Connect was no longer a viable option for end users with GoDaddy domains.

116.    One SaaS company described its conversation with GoDaddy as follows:

> Transparently, [GoDaddy] had like kind of like scare tactic meeting where they got [] aggressive with us… The tone of the meeting was so negative that it like left us scarred… it was just like so unpersonable [sic] and so mean, to the point where we were like, we didn't do anything, um so anyways, we just wanted to circle back with you all. I don't know if you're hearing this from others. I'm imagining you are, based on the tone of their conversation, it clearly sounds like they're trying to monetize something that they haven't monetized before, and they're trying to claw back as much of the [] revenue as they can, but [] we've enjoyed working with you all, and we really like your product, so, like, we're hoping to continue to use it, but also, in the middle of our day to day, kind of being pulled aside and being scolded, we're a little bit taken aback.

117.    Once again, GoDaddy's actions are difficult to interpret other than as a purposeful effort to undermine and exclude Entri.  GoDaddy's suggestion that Entri Connect is illegal is utter pretext and was levied only as a scare tactic to slow Entri's growth.  GoDaddy's actions also demonstrate that it had knowledge of Entri's customer relationships, and that it knew its actions would negatively affect those relationships.

### C.    *GoDaddy Targeted Entri's Business Model with Unnecessary, Pretextual, and Hidden Changes to Its API Terms of Use.*

118.    GoDaddy also changed the Terms of Use (TOU) for its Application Programming Interface (API) in an effort to target and exclude Entri.  GoDaddy did so unilaterally and without any notice to Entri or other third parties.

119.    In February or March 2024, for instance, GoDaddy inserted new language into its TOU designed to prohibit use of "aggregator" services like Entri—which is the label GoDaddy uses for companies like Entri.  This "aggregator" moniker for Entri is inaccurate or, at least, imprecise. GoDaddy appears to use the label because Entri Connect is able to facilitate DNS configuration across a range of different DNS providers and protocols.  But Entri's provision of its services to a range of customers is not aggregation in any normal sense of that word, and there is nothing untoward about Entri offering its services widely.

120.    Entri's investigation reveals that GoDaddy fraudulently misrepresented the "Last Revised" date on its API TOU after making the foregoing changes aimed at Entri.  Despite the changes, GoDaddy's API TOU still claimed to have been "last revised" on March 1, *2023*.

121.    On information and belief, on or about March 29, 2024, GoDaddy again made unannounced changes to its API TOU, and again misrepresented the true date when these changes occurred. These changes also purposely targeted Entri.  The most recent iteration of the API TOU now has the following new provision: "Users or other entities shall not charge any fees, require

any payment or compensation, or otherwise offer a service behind a paywall that uses any part of the GoDaddy API or offer any services or products that use or rely on the GoDaddy API, including any services or products offered to users by third parties."  The current date of the last revision is now inaccurately listed as March 1, 2024.

### D. *GoDaddy Implemented a Variety of Unnecessary and Pretextual Measures Designed to Prevent GoDaddy Domain Customers from Using Entri.*

122.    Finally, GoDaddy implemented a number of technological measures designed to restrict end users with GoDaddy domains from accessing Entri Connect within SaaS company applications.

123.    In August 2023, a GoDaddy representative wrote to Entri in the companies' shared Slack channel that it was placing "[a]ll Domain Connect asks . . . on hold," adding that "we will not act on them at this time."

124.    In January 2024, minutes after sending Entri a letter terminating the parties' prior agreement, GoDaddy purged all previously onboarded templates.  This caused every end user using a GoDaddy domain to receive the following error message when attempting to update DNS records via Entri Connect.



125.    After receipt of the January 2024 communication from GoDaddy, Entri resumed the same

automation process it had used to service end users from 2021 to April 2022, before the parties signed their Open-Source Domain Connect Agreement.

126.    On information and belief, since 2021, GoDaddy has been using third-party Kasada.io as a form of prophylactic software tool to restrict certain types of automated conduct on its platform. On information and belief, in February 2024, GoDaddy adjusted its settings with Kasada.io to specifically target Entri.  GoDaddy deployed Kasada.io with the intent of blocking their custom domain customers from using Entri Connect.  If Kasada.io detected an automated process like Entri Connect, the user would receive the following error message.



127.    In April 2024, GoDaddy went a step further and disabled its Developer API for all customers without providing any notice.  This was another attempt to prevent Entri Connect from working with GoDaddy domains.

128.    Crucially, the above steps were not taken with any legitimate safety or security goal in mind, nor has GoDaddy communicated any reasonable basis to Entri.  Any suggestion to the contrary is pretext.

129.    Entri Connect works by automating the steps that all custom domain owners *must* take if they want to integrate their domains with third-party SaaS applications.  Entri Connect only does

what GoDaddy domain customers are *required* to do themselves in order to set up their custom domains.

130.    When a GoDaddy domain customer uses the Entri Connect modal to log in to his GoDaddy account, he is expressly authorizing Entri to take the required steps on his behalf.  Entri is merely a conduit for an end user to configure the DNS settings for a custom domain.  And when that user enters his GoDaddy password to log in, Entri never, under any circumstances, stores or records the username, the password, or any form of personally identifiable information.  GoDaddy's attempts to technologically restrict consumers from using the most efficient and user-friendly process to configure their custom domains are part of an effort to undermine and exclude Entri Connect.

**XII.    GoDaddy Then Informed SaaS Companies that Automated DNS Configuration for GoDaddy Domain Customers Would be Available *Only* if SaaS Companies Worked Directly With (and Paid) GoDaddy.**

131.    After announcing and enforcing this new policy prohibiting its domain customers from using Entri Connect, GoDaddy made the alternative clear to SaaS companies and their end users: "The only way to connect GoDaddy domains via Domain Connect is with a direct relationship going forward."

132.    "We are not working with any aggregator services, like Entri," GoDaddy told another Entri customer, "and the only way to have GoDaddy Domain Connect is via direct integration."

133.    But GoDaddy took the policy one step further, announcing that it would begin *charging* for the use of the open-source Domain Connect protocol.  "We've been providing Domain Connect for free for most service providers since inception," GoDaddy explained.  "Due to various factors, we have made the difficult decision to introduce a pricing structure for our services."

134.    This was a significant change.  Unlike Entri Connect, which is an application that Entri has designed, and now supports and maintains, Domain Connect is just a protocol—and a supposedly

open-source one at that.  It is not owned by GoDaddy and GoDaddy does not offer any sort of modal (like Entri does).  Rather, SaaS companies that wish to use Domain Connect must build and design an in-application modal themselves.

135.    GoDaddy's decision confounded many in the industry, including members of the team that designed the Domain Connect protocol and had worked to ensure that it remained true to the developers' vision of an open standard.

136.    After communicating to SaaS companies that GoDaddy domains would no longer work with Entri, GoDaddy attempted to convert many of them to paying customers of GoDaddy's own Domain Connect services.  This was met with extremely limited success.  SaaS companies have overwhelmingly declined to pay GoDaddy for these services.  SaaS companies GoDaddy has attempted to convert have largely declined, opting instead to remain with Entri even with the substantial uncertainty surrounding Entri Connect and GoDaddy domains.

**GODADDY'S UNLAWFUL NEGATIVE TIE**

137.    GoDaddy's policy of prohibiting its domain customers from using Entri Connect constitutes an unlawful tie, which is a per se violation of Section 1 of the Sherman Act.  More specifically, GoDaddy imposes upon its customers a directive that if they have a domain registered with GoDaddy, they will not use Entri Connect for automatic domain configuration.

138.    This sort of directive is what courts have dubbed a "negative tie."  Rather than conditioning the sale of one product on the sale of another product, a negative tie conditions the first sale on an agreement *not to* complete the second.

139.    As set forth below, each of the elements of a negative tying arrangement is satisfied here.

**XIII.    The Two Relevant Markets Here are the U.S. Market for Custom Domains and the Market for Domain Integration Services.**

140.    First, there are two separate products and distinct product markets.  The first is the nationwide market for custom domain registration suitable for building a custom website infrastructure.  This is the market that individuals and entities turn to when they want to buy—or more specifically, lease and register—a custom domain to establish a professional online presence.

141.    Customers buy custom domains for a number of reasons.  They may wish to start a website, of course.  They could also be purchasing one domain to automatically forward to another.  Or they could be investing in domains they believe will hold some future value.

142.    Every custom domain must be registered after it is leased, and only a domain registrar accredited by ICANN may provide this domain registration service.

143.    The second market is the nationwide market for domain configuration services.  This is the market to which owners of custom domains turn for assistance configuring their DNS records to allow their custom domains to integrate properly with third-party applications.

144.    As GoDaddy explains, the aim of products in the domain configuration market is to "allow[] customers to set up these applications without having to worry about the specifics of the DNS records.  A 'one click' configuration."[7]

145.    These two products are distinguishable in the eyes of consumers.  Moreover, there is separate and independent demand for the two services.

146.    Domain configuration services are not required for a customer to purchase and register a custom domain.  As detailed above, a user can opt to configure DNS manually.  And although this

---

[7] *Id.*

is a complicated task for the average layperson, many developers building complex websites from scratch do just that.

147.    Moreover, there is no need for domain configuration services to be supplied by one's domain registrar.  Indeed, the intense demand for Entri Connect proves this point, as Entri is not a domain registrar.

**XIV.    GoDaddy Has Tremendous Market Power in the U.S. Market for Custom Domains.**

148.    GoDaddy is the undisputed market leader in the domain registration market.  GoDaddy itself proudly touts itself as "the world's largest domain registrar," with "20+ million customers" across "84+ million domains."[8]

149.    Even more striking than its outsized share is GoDaddy's size relative to other players. Consider the following figure, which charts GoDaddy registered domains against the registered domains from GoDaddy's 19 next closest competitors as of 2020.



Source: Carolina Aguerre, *The Legacies of Long Tail and the Unfolding of Consolidation and Concentration in the Top-Level Domain Sector*, 8 J. OF CYBER POLICY, 218, 230 (2023).

---

[8] GoDaddy, *Domain Names,* https://www.godaddy.com/domains (last accessed July 7, 2024).

150.    Remarkably, GoDaddy's global share has grown significantly since 2020.  In its most

recent 10-K filing, GoDaddy wrote:

> We are a global leader in domain name registration, with approximately 85 million
> domains under management as of December 31, 2023. Based on information
> reported in VeriSign's most recent Domain Name Industry Brief, this represented
> approximately 24% of the approximately 360 million domain names registered
> worldwide as of December 31, 2023.[9]

151.    GoDaddy's share of the relevant market here—the U.S. domain registration market—is

significantly higher.  On information and belief, GoDaddy's share of the U.S. domain registration

market is greater than 40%.

152.    A large portion of international domain registrars are not reasonable substitutes for

GoDaddy because their user interfaces and customer support offerings appear in foreign languages.

They also frequently lack the features that U.S. customers rely on from a domain registrar, such as

domain extensions appropriate for a U.S. business (e.g., .com, .net), web hosting capabilities,

sufficient privacy protection, and customer service.

153.    GoDaddy protects its share by making it very cumbersome for customers to switch to a

different domain registrar.  While registering a domain with GoDaddy is "super easy,"[10] cancelling

is much more difficult and frequently requires multiple touch points, including by phone—a tactic

known as "dark patterns."  Case in point: Entri itself recently switched its domain registrar from

GoDaddy to Cloudflare, and the process required three separate phone calls between Entri and

GoDaddy's customer service team.  If Entri, a company that specializes in custom domains and

website infrastructure, cannot easily switch, the switching costs for everyday consumers must be

substantially higher.

---

[9]    *See*    GoDaddy,    2023    Form    10-K,    available    at
https://s23.q4cdn.com/406380394/files/doc_financials/2022/ar/godaddy_arsfiling.pdf
[10] GoDaddy, *Domain Names,* https://www.godaddy.com/domains (last accessed July 7, 2024).

154.    Entri has seen evidence of GoDaddy's market power firsthand.  SaaS companies with which Entri has worked have remarked that a significant number of the custom domains owned by their end users are registered with GoDaddy—between 35% and 50%.  And Entri's own analysis confirms that, for some of its third-party SaaS company customers, as many as 95% of end users are using GoDaddy-registered domains.

155.    The impact of GoDaddy's dominance is clear.  If users of domains registered with GoDaddy are precluded from using Entri Connect, the value proposition for Entri Connect goes down considerably as vast numbers of end users will be unable to use the Entri Connect modal.

156.    An email Entri received from ▇▇▇—an entity with whom Entri does business—in March 2024 demonstrates this troubling dynamic perfectly.  After Entri offered ▇▇▇ a discount of 50% during the period it could not support automatic configuration for GoDaddy-registered domains because of GoDaddy's actions, ▇▇▇ rejected it as insufficient *expressly* because of GoDaddy's size:

> Most importantly, the GoDaddy issue impacts far more than 25% of the domains for ▇▇▇  In actuality, it makes up the majority. Coupling this with an uncertain timeline and little information on the root cause of this solution, there is a growing fear among senior leadership that this issue will arise again or never resolve. Finally, as you know, the procurement process for vendors comes at high costs. As such, when a vendor can only provide a partial solution, it's difficult to justify the resources to maintain such a vendor in lieu of an all-in-one solution. . . . If we cannot reach a solution, ▇▇▇ will be forced to exercise our termination for convenience right, which would need to be exercised by the end of this week (3/31).

157.    Another customer expressed virtually identical concerns: "On the domain side, we just got word that Entri cannot support GoDaddy domains . . . .  Is this true and can you provide more context?  GoDaddy is ~35% of our connections so it is a pretty big deal."

158.    Entri has heard similar messages from other SaaS companies consistently since GoDaddy announced its plan to unlawfully exclude Entri Connect.  This confirms that GoDaddy's economic

power in the domain registration market allows GoDaddy to appreciably restrain free competition in the market for domain configuration services.

159.    Put another way: Entri's experience with its customers demonstrates that GoDaddy has the unique ability to force SaaS companies and their end users to behave in ways that are inconsistent with how they would ordinarily act in a free market.  Entri's customers and prospects have expressly told Entri as much.

**XV.    GoDaddy Has Expressly Conditioned Its Provision of Domain Registration Services on Its Custom Domain Users' *Not* Relying on Entri for Domain Configuration.**

160.    As set forth above, GoDaddy has expressly conditioned its provision of domain registration services on its customers not being able to use Entri Connect for domain configuration.

161.    GoDaddy has communicated and enforced this policy in the manner set forth above, including through SaaS companies that typically control the end users' access to domain configuration services.  Even in this scenario, however, it is the end user who is the victim of the unlawful tie.  Regardless of which entity pays for and implements the domain configuration services at issue, it is the end user who actually uses the service, whose needs drive the design, and for whose benefit the product is offered.

**XVI.    Less Restrictive Means Are Feasible to Achieve Any Legitimate Interests Advanced by the Tie.**

162.    Any purported justification—such as data security or resource allocation—for GoDaddy's actions is pretext and belied by their actions.

163.    To begin, dozens of other DNS providers allow their domain customers to configure DNS settings using the configuration service of their choice.  And they do so with tremendous efficiency and success.

164.    GoDaddy was perfectly happy, for instance, to onboard hundreds of Domain Connect templates for SaaS companies working with Entri over a period of nearly two years.  Entri is not aware of any security issues stemming from end users' use of Entri Connect to integrate their GoDaddy-registered domains.

165.    Further, Entri is now using the same automation process that it used prior to signing its Open-Source Domain Connect Agreement in April 2022. At the time, GoDaddy expressed no objection to this automation process, and never alleged that Entri had acted without authorization or that Entri had caused it harm in configuring DNS settings prior to the parties working together between April 2022 and January 2024.

166.    If resource allocation were the issue, moreover, GoDaddy would not have deliberately deleted the existing templates when it decided to stop working with Entri.  Not only were these templates working perfectly for important SaaS company customers and their end users, but they were also written using the Domain Connect protocol that GoDaddy prefers.  Deleting them only created more work for the supposedly time-strapped DNS department.

167.    Even if these concerns were legitimate, moreover, the unlawful tie is not the least restrictive means of advancing them.

168.    For one, GoDaddy *already has* a formal process whereby its domain registration customer can delegate the function of setting up a domain to a third party.  GoDaddy expressly tells its customers that they "can invite a delegate (like your web designer or developer) to access the GoDaddy products in your account."[11]

---

[11]   GoDaddy, *GoDaddy Help: Invite a delegate to access my GoDaddy account*, https://www.godaddy.com/help/invite-a-delegate-to-access-my-godaddy-account-12376 (last accessed July 7, 2024).

169.    As a matter of principal, therefore, GoDaddy has demonstrated that it has no objection to customers authorizing agents to change settings on their behalf.  GoDaddy's antagonism toward Entri is due solely to Entri's competitiveness.

170.    If security concerns were an issue, moreover, GoDaddy could require so-called "aggregators" to meet clearly defined standards.

171.    And to solve GoDaddy's resource woes, the company could require a usage fee—similar to the one Entri already agreed to pay—for any work required by GoDaddy to review and onboard the templates.

172.    These commonsense solutions—in which GoDaddy appears to be uninterested—would preserve consumer choice and ensure that the domain configuration services market is functioning in a competitive manner.

## XVII.    Entri Has Suffered Damages and Antitrust Injury as a Result of GoDaddy's Negative Tie.

173.    As a nascent competitor in the domain configuration market, Entri has suffered both damages and antitrust injury as a result of GoDaddy's unlawful negative tie.

174.    Because of GoDaddy's tremendous market power, at least one Entri customer, ████ ended its relationship with Entri.

175.    Others, including ████████ initially declined to move forward and delayed in signing with Entri, also citing the instability of Entri's relationship with GoDaddy.

176.    Entri has also been forced to give concessions, in the form of substantial monetary discounts, to existing SaaS company customers for the same reason.  Among these existing customers were ████████ ████ ██ ████ ████ ██████ ████ ████ ████ ██ ████ ████████ █████ ██ ████ █████ ██████ ████ ████████ and ████████

177.    Entri has also lost volume and revenue because of GoDaddy's unlawful tie, as certain SaaS companies pay Entri based on the number of custom domains configured through Entri Connect each month.  Many end users with GoDaddy-registered domains have been blocked from using Entri Connect via the methods described above, and some SaaS companies, including █████ and █████ chose not to offer end users with GoDaddy-registered domains the option of using Entri.

178.    The below is an excerpt from an article available from the online help center at █████ which directs users with GoDaddy-registered domains to revert to the manual process for configuring DNS settings, thereby harming Entri's brand and cutting into its revenue.



Note: Entri no longer supports the one-click domain connection with GoDaddy. If you're using GoDaddy as your domain provider, please follow the manual connection process as listed below.

179.    There has also been harm to competition in the domain configuration market more broadly. GoDaddy's efforts to exclude Entri have led to fewer choices for end users, and GoDaddy has followed up on those efforts by increasing prices—indeed, by charging for the first time ever—for use of a vastly inferior service.  These are classic competitive harms of the sort the antitrust laws were designed to eradicate.

## GODADDY'S FRIVOLOUS THREATS OF LITIGATION

180.    GoDaddy has also threatened Entri with litigation in a further effort to prevent Entri Connect from reaching GoDaddy customers.

181.    On March 7, 2024, GoDaddy sent Entri a "pre-litigation demand" directing Entri to "immediately cease and desist from its unauthorized efforts to utilize the GoDaddy Domain Connect web-based flow and API."   The letter alleged, among other things, "[i]mproper and unlicensed use of the GoDaddy API and GoDaddy's intellectual property in support of Entri's commercial activities in violation of GoDaddy's API Terms of Use ('API TOU'), Sections 32 and 43(a) of the Lanham Act, the Computer Fraud and Abuse Act, codified at 18 U.S.C. §1030 (the 'Computer Fraud and Abuse Act'), and GoDaddy's common law rights."

182.    Each of these assertions is a deeply flawed and pretextual distraction from GoDaddy's unlawful and anticompetitive scheme.

## XVIII.    GoDaddy Threatened Lanham Act Claims Where There Is No Risk of Confusion.

183.    GoDaddy's threatened claim under the Lanham Act could not survive because there is no risk of any confusion stemming from Entri's limited use of the GoDaddy marks.

184.    Prior to January 11, 2024, Entri users with GoDaddy-registered domains would see the GoDaddy logo when prompted to log in to their account.   An example of what such a user would see is below.

40



185.   The above use of the GoDaddy logo would not confuse any reasonable person or lead anyone to assume that GoDaddy and Entri are affiliated.  Indeed, Entri is unaware of even a single instance of consumer confusion—for either GoDaddy or any of the other dozens of DNS providers with which Entri Connect works.

186.   Nonetheless, in January 2024, Entri stopped displaying the actual GoDaddy logo in an abundance of caution.  An example of the screens a user with a GoDaddy-registered domain would now see is below.



41

187.   Entri also prominently displays the following disclaimer:

Entri LLC is not affiliated with or sponsored by GoDaddy.  "GoDaddy" is a registered trademark of Go Daddy Operating Company, LLC.  Use of the registered trademark is only used as necessary to clearly identify the relevant services and is not intended to imply or suggest any affiliation, sponsorship, endorsement, or business relationship with GoDaddy.com, LLC or its affiliated entities.

188.   Entri used the GoDaddy mark because it was the only plausible way to alert Entri customers of the service it provides, and to make clear that the users were in fact logging in to a separate service.

189.   Entri's use of the GoDaddy mark constitutes nominative fair use.

190.   Entri has never had any intent to mislead any shared customers and on information and belief, no individuals have in fact been misled or confused by Entri's use of GoDaddy's mark. Rather Entri's customers know that it is a domain configuration software solutions provider and that GoDaddy is a domain registrar, and that the two businesses are unaffiliated.

191.   Consequently, Entri's use of GoDaddy's mark causes no likelihood of confusion.

**XIX.   GoDaddy Threatened Intellectual Property Claims Where There Is No Intellectual Property at Issue.**

192.   The intellectual property claims referenced in GoDaddy's pre-litigation demand are similarly frivolous.

193.   As an initial matter, it is unclear precisely what "intellectual property" GoDaddy is referencing.

194.   If it is the Domain Connect protocol to which GoDaddy refers, this argument is a nonstarter.  Domain Connect is an avowedly open standard offered for free online.

195.     If, on the other hand, GoDaddy aims to suggest a property interest in the customers'

domains or domain names, this argument also fails.  The domain names belong to the customers

themselves. Indeed, GoDaddy has often relied on this same argument to defeat other legal claims

when it defended itself in the past.  And the domain itself is leased to the customer, with GoDaddy

serving only as the registrant.

## XX.     GoDaddy Threatened Breach of Contract Claims Where Entri Never Agreed to the Terms.

196.     The breach of contract claim GoDaddy outlines based on the API TOU also fails.

197.     Entri was never a party to this API TOU. Upon information and belief, it never consented

to, clicked through, or agreed to this purported contract.  Before March 7th, 2024, Entri was never

even aware of the document.

198.     There has been no meeting of minds between Entri and GoDaddy with respect to the API

TOU.

199.     Indeed, Entri is not even aware of which *version* of the TOU GoDaddy is suggesting it

breached.  GoDaddy first intimated that Entri breached the API TOU in a cease-and-desist letter

sent in early March 2024.  *After* that date, GoDaddy made a number of pretextual, targeted, and

unilateral amendments to the TOU, without providing notice to Entri and misrepresenting the date

of revision in the process.

200.     Entri cannot be said to have breached terms that GoDaddy has purposely made a moving

target.

## XXI.     GoDaddy Threatened Computer Fraud and Abuse Act ("CFAA") Claims Where There Is Neither Hacking Nor Technological Harm.

201.     Finally, GoDaddy's invocation of the CFAA is simply another effort to exclude Entri from

the domain configuration market.

202.    The CFAA is an anti-hacking statute; it was not drafted to empower those with market power to exclude new entrants.

203.    Automation, without harm, is not hacking.  Relief under the CFAA is available only where there is technological harm. Here, there is no technological harm to GoDaddy's "computer data, programs, systems, or information services," as required by the CFAA.

204.    Entri is not harming any computer system.  Rather, Entri Connect simply automates the domain configuration requests of users who are also GoDaddy's customers.

205.    Indeed, the domain configuration process that Entri automates would be *required* of GoDaddy customers, irrespective of whether Entri existed. If GoDaddy genuinely believed that the simple act of updating DNS records caused technological harm, it would not include more than 2,388 support documents on its online knowledge base explaining to users how to manually configure their domain with DNS.[12]

206.    What is more, the relevant computers likely do not belong to GoDaddy.  The relevant point of authorization for Entri end users is account.godaddy.com/sso.godaddy.com.  Upon information and belief, this portal uses Akamai computers for the Content Delivery Network ("CDN"), and GoDaddy uses Amazon Web Services and its computers for its cloud computing associated with the log-in portal.

207.    Entri's experiences with other DNS providers and domain registrars further confirms the lack of any harm.  Indeed, Entri is unaware of any suggestion from any individual or entity that any actual harm has resulted from the use of Entri Connect to any data, program, or computer system.

---

[12] GoDaddy, *Search Results*, https://www.godaddy.com/help/search?q=dns&types=Article& types =Video (last accessed July 8, 2024).

208.     On the contrary, other industry players, including software engineers with substantial experience, have advised Entri that automating the process of updating a domain's DNS records does not cause any technological harm to the computer systems of the DNS provider at issue.

209.     Furthermore, another leading DNS provider, IONOS, has advised Entri that automating the process of updating a domain's DNS records does not cause any technological harm to the computer systems of the DNS provider at issue.

210.     Succinctly, GoDaddy's CFAA threats lack factual and legal merit.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Violation of Sherman Act, Section 1, 15 U.S.C. § 1

<u>Negative Tying</u>

211.     Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

212.     Domain registration and automated domain configuration are two separate services constituting two distinct product markets.

213.     GoDaddy has conditioned the provision of its dominant domain registration platform on the use of its domain registration software services and/or the non-use of Entri's domain configuration software services.  This constitutes a coerced agreement between GoDaddy and its domain registration customers not to use Entri Connect.

214.     GoDaddy has sufficient market power in the domain registration market to restrain trade in the relevant market for domain configuration software services.

215.     Customers of GoDaddy's domain registration services are being improperly denied access to the full suite of choices when it comes to automated domain configuration.

216.     Entri has lost sales, configuration volume, and revenue as a result of this unlawful tie.

217.     GoDaddy's unlawful negative tie is a per se violation of Section 1 of the Sherman Act.  In the alternative, even if evaluated under the Rule of Reason, GoDaddy's unlawful negative tying arrangement is still unlawful and it results in a substantial restraint of trade in the market for automated domain configuration services.

218.     There is no valid justification for GoDaddy's unlawful negative tying arrangement, and even if there were, less restrictive means are available.

Agreement in Restraint of Trade

219.     Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

220.     Owing to its market power in the market for domain registration services, GoDaddy has been able to force certain SaaS companies, including but likely not limited to ██████ and ██████ to deny their end users the ability to access automated domain configuration services via Entri Connect.  This constitutes an unlawful coerced agreement between GoDaddy and these SaaS companies not to offer Entri Connect.

221.     This unlawful agreement substantially restrains trade in the market for domain configuration services.

222.     Entri has lost sales, configuration volume, and revenue as a result of these unlawful coerced agreements.

223.     GoDaddy's unlawful coerced agreements are a per se violation of Section 1 of the Sherman Act.  In the alternative, even if evaluated under the Rule of Reason, GoDaddy's unlawful coerced agreements are still unlawful and result in a substantial restraint of trade in the market for automated domain configuration services.

224.     Entri prays for reliefs as set forth below.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment That Entri Has Not Violated the CFAA

225. Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

226. An actual controversy exists between Entri and GoDaddy. On March 7, 2024, GoDaddy sent Entri a letter that it described as a "pre-litigation demand." The letter twice states that further access of GoDaddy's systems would constitute a violation of the CFAA.

227. Upon information and belief, GoDaddy has already threatened Entri's business and its customers by suggesting that Entri's conduct is illegal.

228. Plaintiff seeks a declaration that its simple automated process for configuring domain settings for its end users does not constitute a violation of the CFAA, as there is no technological harm to GoDaddy's "computer data, programs, systems, or information services."

229. Plaintiff seeks a declaration that its simple automated process for configuring domain settings for end users does not constitute a violation of the CFAA, because it is not acting without authorization or exceeding authorized access when effectuating the stated DNS configuration settings of end users using their valid login credentials with their permission to access domains to which they are legally entitled to access.

230. Entri prays for relief as set forth below.

## THIRD CLAIM FOR RELIEF
### Declaratory Judgment that Entri Has Not Breached GoDaddy's API Terms of Use

231. Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

232.     An actual controversy exists between Entri and GoDaddy. On March 7, 2024, GoDaddy sent Entri a letter that it described as a "pre-litigation demand." The letter twice alleges that Entri's domain configuration software solutions are in breach of a purported API Terms of Use.

233.     Entri was never a party to this purported contract and never had notice of this contract before March 7, 2024.

234.     GoDaddy has already threatened Entri's business and, upon information and belief, threatened its customers by suggesting that Entri's conduct is illegal.

235.     Entri seeks a declaration that no valid contract was formed between the parties. Entri has not agreed to, and is not subject to, the API Terms of Use. It did not check a box or click a button indicating consent to the API Terms of Use. It is not a party to any contract with GoDaddy incorporating the API Terms of Use. When GoDaddy first provided notice of the API Terms of Use on March 7th, 2024, Entri expressly repudiated the proposed contract and the terms within it.

236.     Entri seeks a declaration that the purported contract is null and void due to GoDaddy's fraud. On information and belief, GoDaddy repeatedly misrepresented the date to the public and Entri regarding when it updated the API Terms of Use.

237.     Entri seeks a declaration that any purported contractual amendment is void for lack of consideration.

238.     Entri prays for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Judgment that Entri's Current Customer Log-in Portal Does Not Violate Sections 32 and 43(a) of the Lanham Act**

239.     Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

240.     An actual controversy exists between Entri and GoDaddy.

241.    On March 7 2024, GoDaddy sent Entri a letter that it described as a "pre-litigation demand." The letter twice alleges that Entri's customer log-in process violates Sections 32 and 43(a) of the Lanham Act.

242.    GoDaddy has already threatened Entri's business and, upon information and belief, threatened its customers by suggesting that Entri's conduct is illegal.

243.    Entri seeks a declaration that its current customer log-in portal does not violate Sections 32 and 43(a) of the Lanham Act.

244.    Entri prays for relief as set forth below.

### FIFTH CLAIM FOR RELIEF
### Tortious Interference with a Contract

245.    Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

246.    Entri has valid contractual relationships with many SaaS companies whose end users have custom domains registered with GoDaddy.

247.    GoDaddy is aware of these contractual relationships, because Entri and GoDaddy had a mutual working relationship between April 2022 and January 2024, where they collaborated on providing customer services to these clients.

248.    On information and belief, GoDaddy has purposely interfered with and has attempted to induce a breach of several of these contracts through "scare tactics," legal threats, and coercion, and other improper and unlawful tactics.  These contracts include, but are not limited to, Entri's contracts with ██████ ████████ and ██████

249.    GoDaddy's conduct has caused Entri clients to terminate their contractual relationships with Entri.

250.    To many other clients, Entri has been forced to offer substantial monetary and other concessions and has suffered damages as a result.

251.    Entri prays for relief as set forth below.

**SIXTH CLAIM FOR RELIEF**
**Tortious Interference with a Business Expectancy**

252.    Entri realleges and hereby incorporates by reference all preceding paragraphs as though set fully forth herein.

253.    Entri had prospective contractual relationships with several SaaS companies whose end users have custom domains registered with GoDaddy.

254.    GoDaddy is aware of these contractual relationships, because Entri and GoDaddy had a mutual working relationship between April 2022 and January 2024.

255.    Upon information and belief, GoDaddy has purposely interfered with several of these prospects through "scare tactics," legal threats, and coercion, and other improper and unlawful tactics. These prospects include, but are not limited to, ██████ ████████ ███ and ████████

256.    GoDaddy's actions caused Entri to lose out on some prospects and significantly delayed Entri's ability to make certain other sales.  Entri has suffered damages accordingly.

257.    Entri prays for relief as set forth below.

**PRAYER FOR RELIEF**

Plaintiff Entri demands a jury trial on all causes of action for which a jury is permitted, and prays for judgments against Defendant GoDaddy as follows:

1.  For preliminary injunctive relief, pursuant to Fed. R. Civ. P. 65, to prevent GoDaddy for restricting Entri's access to its customers' domains.

2.  For any and all damages proximately caused by GoDaddy's unlawful negative tie.

3.  For any and all damages proximately caused by GoDaddy's unlawful restraint of trade.

4.  For any and all damages proximately caused by GoDaddy's interference with Entri's existing contracts and business expectancies.

5.  For a declaration that GoDaddy shall not be permitted to restrict its domain registration customers for using Entri's products or services to automatically configure their DNS settings.

6.  For a declaratory judgment that Entri has not violated the CFAA, that its customer login does not violate the Lanham Act, and that it has not breached GoDaddy's API Terms of Use Agreement.

7.  For an award of Entri's attorneys' fees and costs incurred in pursuing these claims as permitted by law.

8.  For any additional monetary and injunctive relief as the Court deems just and proper.


Dated: July 11, 2024                            Respectfully Submitted,

                                                */s  Nicholas J. Giles*
                                                Nicholas J. Giles (VSB No. 86584)
                                                Garrett H. Hooe (VSB No. 83983)
                                                Gateway Plaza
                                                800 East Canal Street
                                                Richmond, VA 23219
                                                Phone: (804) 775-4760
                                                Fax: (804) 698-2040
                                                ngiles@mcguirewoods.com

                                                *Attorneys for Plaintiff Entri LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 11th day of July, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all counsel of record in this case.


<u>/s   Nicholas J. Giles</u>
Nicholas J. Giles

*Attorney for Plaintiff Entri LLC*