**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ENTRI, LLC,

     Plaintiff,

vs.

GODADDY.COM, LLC,

     Defendant.

Case No. 1:24-cv-00569-AJT-WEF

<u>**REDACTED - PUBLIC**</u>

**DEFENDANT GODADDY.COM, LLC'S BRIEF**
<u>**IN SUPPORT OF ITS MOTION TO DISMISS COUNTS I, V, AND VI**</u>

6709366

TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND .....................................................................................................3

      A.    GoDaddy is a Domain Registrar ................................................................3

      B.    GoDaddy's In-House Domain Connect Protocol Configures DNS
            Settings.......................................................................................................4

      C.    Entri's Aggregator Program, Entri Connect, Integrates with
            GoDaddy's Domain Connect Protocol to Configure DNS Settings ....................5

      D.    Because of Technical Complexity, GoDaddy No Longer Supports
            DNS Configuration through Aggregators ...........................................................6

      E.    Entri Violates GoDaddy's Terms of Use ............................................................7

      F.    Entri Seeks to Coerce Business Relationship Through Legal Action.................7

III.  ENTRI'S ANTITRUST AND TORTIOUS INTERFERENCE CLAIMS
      MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM ...................................8

      A.    Legal Standard .......................................................................................8

      B.    Count I: Entri's Antitrust Claim Must Be Dismissed ...........................................9

            1.    Entri Does Not Plausibly Allege a Negative Tying Antitrust
                  Claim.......................................................................................................9

                  a)    Entri Has Not Plausibly Alleged an Agreement
                        Conditioning Purchase of the Tying Product on an
                        Agreement Not to Purchase the Tied Product.............................9

                  b)    Entri Has Not Plausibly Alleged that GoDaddy
                        Possesses Sufficient Economic Power .......................................13

            2.    Entri Does Not Plausibly Allege an Unlawful Restraint of
                  Trade ......................................................................................................14

                  a)    There was No Agreement Between GoDaddy and
                        SaaS Companies.........................................................................15

                  b)    There is No Unreasonable Restraint on Trade in the
                        Market for Domain Configuration Services ...............................17

            3.    Entri Fails to Allege a Cognizable Antitrust Injury ...............................19

<u>TABLE OF CONTENTS (cont.)</u>

<u>Page</u>

C.   Count V: Entri's Tortious Interference with Contract Claim Must Be Dismissed ...........................................................................20

D.   Count VI: Entri's Tortious Interference with Business Expectancy Claim Must Be Dismissed ...................................................23

IV.   CONCLUSION...........................................................................25

6709366

TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Girl, LLC v. Nameview, Inc.*,
   381 F. Supp. 2d 876 (E.D. Wis. 2005) ................................................................................. 3, 14

*Am. Online, Inc. v. Huang*,
   106 F. Supp. 2d 848 (E.D. Va. 2000) ...................................................................................... 3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................ 8

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) .............................................................................................................. 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 8, 15, 17

*Belmora LLC v. Bayer Consumer Care AG*,
   987 F.3d 284 (4th Cir. 2021) ................................................................................................ 24

*Byam v. Ocean Enter. 589, LLC*,
   2024 WL 773576 (4th Cir. Feb. 26, 2024) ........................................................................... 22

*Chistoni v. HSBC Bank USA, N.A.*,
   2017 WL 1963902 (E.D. Va. May 11, 2017) ....................................................................... 21

*Com. Data Servers, Inc. v. IBM Corp.*,
   262 F. Supp. 2d 50 (S.D.N.Y. 2003) .................................................................................... 18

*Cvent, Inc. v. Eventbrite, Inc.*,
   739 F. Supp. 2d 927 (E.D. Va. 2010) ................................................................................... 11

*DataCell ehf. v. Visa, Inc.*,
   2015 WL 4624714 (E.D. Va. July 30, 2015) ........................................................................ 14

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) .......................................................................................... 17, 19

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*,
   684 F.2d 1346 (7th Cir. 1982) .............................................................................................. 10

*Dream Big Media Inc. v. Alphabet Inc.*,
   2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ............................................................... 12, 19

*Duggin v. Adams*,
   234 Va. 221 (1987) ............................................................................................................... 20

TABLE OF AUTHORITIES (cont.)

Page(s)

*Eastman Kodak Co v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ................................................................................................. 13

*Estate Const. Co. v. Miller & Smith Holding Co., Inc.*,
    14 F.3d 213 (4th Cir. 1994) ..................................................................................... 15

*Hayes v. Maryland Transit Admin.*,
    2023 WL 8829260 (D. Md. Dec. 21, 2023) ............................................................. 11

*HCI Techs., Inc. v. Avaya, Inc.*,
    446 F. Supp. 2d 518 (E.D. Va. 2006) ...................................................................... 13

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018) ................................................................. 10, 11

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*,
    924 F.2d 539 (4th Cir. 1991) ..................................................................................... 9

*Lee Pappas Body Shop, Inc. v. State Farm Mut. Auto. Ins.*,
    2021 WL 3609296 (E.D. Va. Aug. 13, 2021) ..................................................... 22, 24

*Machovec v. Council for Nat. Reg. of Health Serv. Providers in Psychology, Inc.*,
    616 F. Supp. 258 (E.D. Va. 1985) ........................................................................... 16

*Mansfield v. Anesthesia Assocs., Ltd.*,
    2008 WL 1924029 (E.D. Va. Apr. 28, 2008) ..................................................... 21, 23

*Masco Contractor Servs. E., Inc. v. Beals*,
    279 F. Supp. 2d 699 (E.D. Va. 2003) ...................................................................... 18

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984) ........................................................................................... 15, 16

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ....................................................................................................... 9

*Network Sols., Inc. Umbro Int'l,
    Inc.*, 529 S.E. 2d 80 (Va. 2000) ................................................................................. 3

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
    670 F. Supp. 1313 (D. Md. 1986) ............................................................................ 13

*Nortec Commc'ns, Inc. v. Lee-Llacer*,
    548 F. Supp. 2d 226 (E.D. Va. 2008) ................................................................. 20, 21

<u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*Oksanen v. Page Mem. Hosp.*,
   945 F.2d 696 (4th Cir. 1991) .................................................................................................. 17

*Peterson v. Cooley*,
   142 F.3d 181 (4th Cir. 1998) .................................................................................................. 21

*Sallen v. Corinthians Licenciamentos LTDA*,
   273 F.3d 14 (1st Cir. 2001) ...................................................................................................... 3

*Sambreel Holdings LLC v. Facebook, Inc.*,
   906 F. Supp. 2d 1070 (S.D. Cal. 2012) ........................................................................... 11, 12

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ............................................................................................... 8, 16

*Serv. & Training, Inc. v. Data Gen. Corp.*,
   963 F.2d 680 (4th Cir. 1992) ................................................................................................ 9, 10

*Shapiro v. General Motors Corp.*,
   472 F. Supp. 636 (D. Md. 1979) ............................................................................................ 20

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ................................................................................................... 8

*Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*,
   815 F.2d 1407 (11th Cir. 1987) ............................................................................................. 10

*Turner v. Va. Dep't of Med. Assistance Servs.*,
   301 F. Supp. 3d 637 (E.D. Va. 2018) .................................................................................... 19

## I.     **INTRODUCTION**

After a year of unsuccessfully trying to get Defendant GoDaddy.com, LLC ("GoDaddy") to agree to a licensing deal to permit Plaintiff Entri, LLC's ("Entri") aggregator program—Entri Connect—to configure GoDaddy domains, Entri has now turned to antitrust law to try to compel a result it could not obtain through arms-length negotiation.   Entri's antitrust theory is that GoDaddy, by updating its terms of use to prohibit aggregator programs, has somehow engaged in an illegal "negative tying" scheme; and GoDaddy, by communicating that change to the software companies using Entri's aggregator, has coerced these software companies into an illicit agreement to exclude Entri from the domain configuration market.   Based on these theories, Entri's First Amended Complaint ("FAC") brings an antitrust claim for alleged violations of Section 1 of the Sherman Act (Count I).   Entri also asserts claims for tortious interference with current and prospective contracts based on GoDaddy's communications to software companies regarding its updated terms of use (Counts V and VI).   Each of these claims must be dismissed for failure to state a claim.

*First*, Entri's "negative tying" antitrust theory fails because Entri has not alleged an agreement that conditions the registration of domains with GoDaddy (the "tying" product) on the buyer forgoing the purchase of Entri's aggregator product (the "tied" product).   Such an agreement is a factual impossibility, as Entri's aggregator product is licensed by third-party software companies, not end customers who registered domains with GoDaddy.   GoDaddy cannot coerce its customers into forgoing the purchase of a product not offered to them for sale.   Even if GoDaddy's customers could buy Entri's product, GoDaddy lacks sufficient market power to stop them from doing so: Entri alleges GoDaddy has only 19% to 24% market share, and GoDaddy's customers may freely switch to another domain registrar—as Entri itself did—if they desire to use Entri's product.

6709366

*Second*, Entri's "agreement in restraint of trade" antitrust theory fails because Entri has alleged no facts demonstrating concerted action by GoDaddy and the software companies to exclude Entri from the market for domain configuration services.  Rather, Entri alleges that GoDaddy independently updated its terms of use and implemented several technical measures to prevent its users from accessing Entri's product.  GoDaddy's mere after-the-fact communication of these changes to software companies does not establish an agreement to exclude Entri.  Nor does Entri allege any facts supporting its identified competitive harms: decreased consumer choice and increased prices.  Quite the contrary, Entri brags that software companies have largely refused to pay for GoDaddy's in-house configuration product and have continued using Entri's product, undermining any contention that consumers cannot access Entri's product and must buy GoDaddy's in-house product at supra-competitive prices.

*Finally*, Entri's tortious interference claims fail because GoDaddy merely communicated its new policy to software companies; this does not constitute improper means necessary to maintain a tortious interference claim.  Moreover, Entri fails to identify whether the contracts allegedly interfered with were terminable at will, and whether GoDaddy had any knowledge that Entri had prospective contracts with the software companies that GoDaddy communicated with after updating its terms of use.  These are necessary elements for tortious interference claims under Virginia law.

For these reasons, and the other reasons explained below, Entri's antitrust and tortious interference claims (Counts I, V, and VI) must be dismissed for failure to state a claim.

6709366

## II.   BACKGROUND

### A.     GoDaddy is a Domain Registrar.

The internet is a network of interconnected computers. *See Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 18-19 (1st Cir. 2001). To navigate the internet, each interconnected computer must have a unique numeric address, known as an Internet Protocol or "IP" address. *See Am. Online, Inc. v. Huang*, 106 F. Supp. 2d 848, 851 (E.D. Va. 2000).  IP addresses are strings of numbers that are difficult to remember, but the "Domain Name System" (DNS) allows a more easily remembered word or phrase—the "domain name"—to be associated with an IP address. *See* FAC, Dkt. 22 ¶ 30.[1] Use of domain names thus makes it easier to navigate to a particular website.  For instance, rather than needing to remember a complex list of numbers, you need only enter "GoDaddy.com," the domain name, into a web browser to navigate to GoDaddy's website.

To obtain a domain name, users rely on companies called domain "registrars."  The domain registrar market is fragmented, and GoDaddy is one of many domain registrars.  *Id.* ¶¶ 31, 149. The registrar function is passive: a registrar's computers receive requests to register domain names and, if no one has yet registered those domains, the registrar's computers can automatically handle the registration. *See Am. Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876, 879 (E.D. Wis. 2005). For a fee and pursuant to a registration agreement, the registrar will associate the domain name with an accompanying IP address and make it available to the DNS, rendering it an operational internet address. *See Network Sols., Inc. Umbro Int'l, Inc.*, 529 S.E. 2d 80, 84-86 (Va. 2000).  Once

---

[1] Many of the "facts" presented in this Background section are based on Entri's allegations in the FAC.  Consistent with the standard of review on a motion to dismiss, GoDaddy accepts those allegations as true for purposes of this motion, but GoDaddy neither concedes nor admits that Entri's allegations are accurate.

6709366

registered, the registrant can use the domain name and select what visitors see when they navigate to that domain on the internet. FAC, Dkt. 22 ¶ 33.  GoDaddy does not sell or own the domain names that customers register with GoDaddy.  Rather, GoDaddy and other registrars merely facilitate the registration of the domain names to their customers (the domain registrants).  *Id.*  After registering domains with GoDaddy, users are free to switch to an alternative registrar. Indeed, Entri itself switched from GoDaddy to Cloudflare for its own domain name, entri.com. *See id.* ¶ 153.

**B.     GoDaddy's In-House Domain Connect Protocol Configures DNS Settings.**

To enable certain functions or designs on their domains, users of domains may turn to third-party software companies that provide various domain services ("SaaS Companies").  *Id.* ¶¶ 35-36.  For instance, domain users might rely on a SaaS Company's application to process payments or issue newsletters.  *See id.* ¶¶ 34, 43.  To function, the applications must be integrated with the user's domain.  *Id.* ¶ 47.  Integration requires updating the domain's DNS records to ensure all the applications are properly mapped to the domain and all the necessary data appears when a user navigates to the domain.  *Id.* ¶ 49.

In the past, updating domain records was solely a manual process: registrants would have to log into their account with their domain registrar and update the DNS records for each SaaS Company based on the instructions from that company. *Id.* ¶ 53.  To simplify this process, GoDaddy developed the Domain Connect protocol. *Id.* ¶ 56.  Domain Connect established a common language, providing third-party SaaS Companies with an agreed-upon standard to use for updating DNS records of domains registered with GoDaddy. *Id.* ¶ 57.  Using Domain Connect, SaaS Companies can create templates that contain the required DNS record changes for the application to function properly with domains. *Id.*

C.   **Entri's Aggregator Program, Entri Connect, Integrates with GoDaddy's Domain Connect Protocol to Configure DNS Settings.**

In 2021, Entri launched Entri Connect. *Id.* ¶ 61.  Entri Connect is a program that can be used by SaaS Companies to automate the process by which users of domains update DNS records. *Id.*  Once a SaaS Company purchases and enables Entri Connect, domain users may navigate to the SaaS application to update their DNS records.  *Id.* ¶ 63.  From within the SaaS application, domain users enter their domain into the Entri Connect window.  *Id.*  Entri Connect will then detect the registrar associated with the domain, request the domain user's registrar account credentials, and automatically update the DNS records. *Id.* ¶¶ 65-67. Products like Entri Connect are known as "aggregators." *Id.* ¶ 101.

Entri Connect is sold to SaaS Companies and only accessed by end consumers who register domains within the SaaS application; domain registrars (e.g., GoDaddy) and registrants (e.g., GoDaddy's customers) do not buy Entri Connect.  *Id.* ¶ 70 ("SaaS companies have implemented Entri Connect"); *id.* ¶ 74 ("SaaS companies typically spend 1 and 2 hours integrating Entri Connect into their applications"); *id.* ¶ 75 (Entri Connect "provides SaaS companies . . . an out-of-the-box solution and ongoing support"); *see also* Entri Terms of Use ("We license our technology to Application Developers . . ."), available at https://www.entri.com/tos (last visited on July 30, 2024).

When Entri initially released Entri Connect, GoDaddy's users would log into Entri Connect from the relevant SaaS application and authorize the program to automatically update DNS records. *Id.* ¶ 85.  At first, Entri Connect accomplished this without use of GoDaddy's Domain Connect protocol. *Id.*  Beginning in April 2022, after conversations with GoDaddy representatives, Entri agreed that Entri Connect would use the Domain Connect protocol to configure DNS records for GoDaddy domains.  Entri and GoDaddy subsequently signed a one-year Domain Connect

5

Licensing Agreement, whereby Entri agreed to send GoDaddy templates, consistent with the Domain Connect protocol, that set forth the required DNS settings for a particular SaaS company's application. *Id.* ¶¶ 86-88.  GoDaddy would then onboard that template, which would allow Entri Connect to configure DNS records between a specific SaaS Company and GoDaddy domains. FAC ¶¶ 87-88.  Under the License Agreement, Entri paid GoDaddy a fee to use the Domain Connect protocol, and a fee every time a template was updated.

      **D.**      **Because of Technical Complexity, GoDaddy No Longer Supports DNS Configuration through Aggregators.**

Once the License Agreement expired on April 7, 2023, GoDaddy and Entri engaged in further discussions regarding a continued business relationship and licensing agreement. FAC ¶¶ 94-97.  During these negotiations, Entri aggressively pushed GoDaddy for various concessions regarding exclusivity.  In September 2023, Entri's CEO, Abe Storey, repeatedly requested that GoDaddy agree to a three-year agreement under which GoDaddy would make Entri its exclusive aggregator and would agree to highlight Entri as the preferred option in working with GoDaddy for all template updates. Entri also pushed for GoDaddy to adopt the so-called "Universal Template," which would require an extensive re-write of GoDaddy's product template and extensive testing due to the widespread effect of the changes. FAC ¶ 93.  Entri's offer was untenable, but GoDaddy nonetheless continued good-faith negotiations and even circulated a proposed agreement on October 24, 2023, without the aforementioned requirements. *See* FAC ¶¶ 96–97.  Entri balked at GoDaddy's offer, and the parties' negotiations subsequently fell apart. *Id.* ¶ 98.

Given Entri's unreasonable demands, including their technical complexity, GoDaddy opted against using Entri for DNS configuration.  On January 11, 2024, GoDaddy sent Entri a termination letter making clear that the Domain Connect Licensing Agreement expired and Entri's

access to Domain Connect was terminated. FAC ¶ 102. GoDaddy then forwent use of Entri Connect and instead chose, as it had done previously, to support direct integration through its in-house Domain Connect protocol. FAC ¶¶ 100-101. GoDaddy took several steps to implement this change, such as informing SaaS companies to use Domain Connect for DNS integration, removing old Entri Connect templates from its platform, and updating its "GoDaddy API Terms of Use Agreement" to prohibit Entri Connect from using GoDaddy's Application Programming Interfaces ("API"). *Id.* ¶¶ 101, 106, 118-119.

**E.      Entri Violates GoDaddy's Terms of Use.**

Entri continued to use GoDaddy's API to perform DNS configuration despite GoDaddy's termination of the Licensing Agreement and GoDaddy's Terms of Use prohibiting such practice. Moreover, the Entri Connect portal mimicked the look and feel of GoDaddy's log-in credential page and contained the GoDaddy name and mark, intending to mislead and confuse GoDaddy domain registrants into believing that Entri and GoDaddy had an ongoing business relationship (they did not). *See* FAC ¶¶ 184, 186. To protect its intellectual property and correct the false impression given to GoDaddy domain registrants, GoDaddy sent Entri a cease-and-desist letter on March 7, 2024. *See* FAC ¶ 181. Still, Entri continues to publicly represent that it supports automatic DNS configuration with GoDaddy domains. *See* Automatic DNS Configuration Support, available at https://developers.entri.com/provider-list (last visited July 30, 2024).

**F.      Entri Seeks to Coerce Business Relationship Through Legal Action.**

Entri has resorted to the courts to accomplish what it could not through arms-length negotiations with GoDaddy. Entri filed its original complaint on April 8, 2024. *See* Dkt. 1. On July 11, Entri filed its First Amended Complaint, the operative complaint in this action, asserting antitrust claims. *See* Dkt. 22.

In its First Amended Complaint, Entri contends that GoDaddy, by updating its terms of

service to prohibit Entri Connect, has engaged in a "negative tying" scheme, and, by merely communicating its updated policy to various SaaS companies, has imposed an unreasonable restraint of trade, all in violation of Section 1 of the Sherman Act (Count I).  Entri further contends that GoDaddy has tortiously interfered with Entri's existing and prospective contracts with SaaS companies through its communications related to its updated terms of use (Counts V and VI).[2]  These allegations fail to state a claim.

## III.   **ENTRI'S ANTITRUST AND TORTIOUS INTERFERENCE CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.**

### A.   **Legal Standard.**

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff must thus "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Conclusory allegations and "formulaic recitation[s] of the elements of a cause of action will not do."  *Id.* at 678-79.  The Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 678.  "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense."  *Ashcroft*, 556 U.S. at 663-64.  Pleading "[a] more complex case like one involving antitrust violations will require more detail."  *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)).

---

[2] Entri also asserts several claims for declaratory judgment (Counts II, III, and IV), which are not the subject of this motion to dismiss.

**B.      Count I: Entri's Antitrust Claim Must Be Dismissed.**

Entri proceeds on two theories of antitrust liability: (1) negative tying and (2) restraint of trade.  FAC ¶¶ 211-224.  Both theories, as alleged in Entri's complaint, are legally and factually deficient, and must be dismissed for failure to state a claim.

1.      Entri Does Not Plausibly Allege a Negative Tying Antitrust Claim.

Entri cannot state a tying claim under the Sherman Act unless it plausibly alleges four elements: "(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) [GoDaddy's] possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce." *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992).  Entri's negative tying claim must be dismissed because Entri fails to allege facts supporting the second and third elements.

*a)      Entri Has Not Plausibly Alleged an Agreement Conditioning Purchase of the Tying Product on an Agreement Not to Purchase the Tied Product.*

To satisfy the second element, Entri must allege the existence of an agreement that conditions the purchase of the tying product—GoDaddy's domain registration services—on an agreement not to purchase the tied product—Entri Connect. FAC ¶ 213.  This is a "[f]undamental[]" antitrust requirement because, "for there to be a violation of § 1 of the Sherman Act[,] two or more persons must act in concert." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 542 (4th Cir. 1991).  Entri thus must allege that GoDaddy coerces the "buyer" of the tying product to purchase or forgo purchasing the tied product. *See, e.g.*, *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958) ("a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied)

9

product, or at least agrees that he will not purchase that product from any other supplier."); *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1415 n.15 (11th Cir. 1987) (antitrust plaintiff must "show that the buyer of the tied package was forced or coerced to buy the tied product").

When the buyer of the tying product is not also in the market for the tied product, an antitrust claim premised on a tying theory fails because a coerced "agreement" cannot exist. *See Serv. & Training*, 963 F.2d at 685-86 (tying claim failed because buyers of the tying product "do not even purchase repair services"—the tied product); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 960 (N.D. Ill. 2018) (dismissing negative tying claim because "dealers buy the tying product (DMS) but not the tied product (integration services)"). This is true even when the buyer of the tying product receives some benefit from the tied product; if the buyer of the tying product is not making a "significant economic decision" about whether to buy the tied product, a tying theory fails. *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir. 1982) (holding it is "anomalous to treat the patient as a buyer" of anesthesia services when the patient "receives the service but does so without making any significant economic decision" as to who provides them).

The FAC fails to satisfy this second element. Entri alleges that there is "a coerced agreement between GoDaddy and *its domain registration customers* not to use Entri Connect." FAC ¶ 213 (emphasis added). This allegation undermines Entri's negative tying claim because GoDaddy's domain registration customers do not purchase licenses for Entri Connect. To the contrary, Entri repeatedly alleges that SaaS companies—not end users—purchase licenses for Entri Connect. *See, e.g.*, *id.* ¶ 61 (Entri Connect is "a program that can be used *within SaaS companies'* online applications" (emphasis added)), ¶ 70 ("Dozens of leading SaaS companies

10

have implemented Entri Connect"), ¶ 74 ("Entri estimates that SaaS companies typically spend between 1 and 2 hours integrating Entri Connect into their applications"), ¶ 76 (Entri Connect "provides SaaS companies . . . an out-of-the-box solution and ongoing support"). Even Entri's own website and terms of use make clear that Entri Connect is a product for license by SaaS companies, not by the end consumer registering domains with registrars like GoDaddy. *See* https://www.entri.com/ ("The easiest way for *your users* to set up custom domains," "Obtain SSL certificates for *your customers* effortlessly"); https://www.entri.com/tos ("*We license our technology to Application Developers* [] to help make both your and their work easier by enabling you to connect with your Domain Name System ('DNS') provider with the Application in just a few clicks.").[3] The lack of overlap between buyers of the tying product and buyers of the tied product requires dismissal of Entri's claim. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 960.

Even if this defect were not dispositive (it is), Entri's allegations still fail to satisfy the second element of a tying claim because Entri does not plausibly allege that GoDaddy "conditions the purchase" of its services on an agreement not to buy Entri's services in a manner prohibited by the Sherman Act. To the contrary, GoDaddy merely sets the terms on which others can access its platform, which is permissible.

Two cases illustrate this point. The first is *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012). That case involved Facebook's decision "to offer its website only to users who would agree not to use [the plaintiff's software] services." *Id.* at 1080. Like

---

[3] The Court may take judicial notice of and rely on the information on Entri's public website. *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 n.2 (E.D. Va. 2010) (taking judicial notice of Terms of Use on public website when deciding motion to dismiss); *see also Hayes v. Maryland Transit Admin.*, 2023 WL 8829260, at *3 (D. Md. Dec. 21, 2023) ("In ruling on a motion to dismiss . . . the court may properly take judicial notice of matters of public record.").

Entri, the plaintiff there argued that this constituted an unlawful negative tie. The court disagreed and dismissed the plaintiff's antitrust claim. *Id.* The court held that Facebook "has a right to dictate the terms on which it will permit its users to take advantage of the Facebook social network" because "[t]here is no fundamental right to use Facebook." *Id.* The court added that Facebook was not "preclud[ing] its users from maintaining [the plaintiff's] applications for use on other websites," so consumers could either "comply with Facebook's terms" or "opt to use other social networking sites." *Id.*

The second case—*Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022)—reached the same outcome on similar facts. It involved Google's Terms of Service, which prohibited "customers from using any component of Google's digital-mapping API services with mapping services provided by non-Google firms." *Id.* at *3. The plaintiff alleged this constituted a negative tie. The court rejected that assertion and dismissed the antitrust claim. It held that "Google has the right to dictate the terms on which it will permit its customers to use and display its mapping services," and that "customers [who] do not want restrictions on mapping API services" can "use another mapping service." *Id.*

Entri's allegations here mirror the allegations at issue in *Sambreel* and *Dream Big Media* and the same fate that befell those claims should follow here. GoDaddy does not prohibit use of Entri Connect with other domain registrars, a fact the FAC concedes. *See* FAC ¶ 93 (alleging Entri Connect is in use by IONOS and Cloudflare). Instead, GoDaddy merely set the terms on which users can access GoDaddy's services, which is GoDaddy's prerogative. Those who do not like GoDaddy's terms of use can simply switch to a different domain registrar, as Entri concedes is not only possible, but recently accomplished. *See* FAC ¶ 153. Entri's allegations thus cannot constitute an unlawful negative tie, which requires dismissal of Entri's antitrust claim.

12

      *b)*     *Entri Has Not Plausibly Alleged that GoDaddy Possesses*
                    *Sufficient Economic Power.*

To satisfy the third element, Entri must allege that GoDaddy has "appreciable economic power in the tying market" such that it can "force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992). "The existence of such power ordinarily is inferred from the seller's possession of a *predominant share* of the market." *Id.* (emphasis added). Applying that principle, antitrust claims have failed where the defendant did not have a majority of the market share. *See, e.g.*, *HCI Techs., Inc. v. Avaya, Inc.*, 446 F. Supp. 2d 518, 522 (E.D. Va. 2006) (finding defendant's market share of "approximately 20%" to be "hardly sufficient to establish the requisite monopoly market power . . . to sustain a tying claim"). Indeed, that the defendant's product or service "may be popular . . . does not translate into" sufficient economic power, particularly when there are "many" other services "that are interchangeable with the [defendant's services]." *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1328 (D. Md. 1986).

Entri alleges that GoDaddy has between 19% and 24% of the "domain registration market." FAC ¶¶ 148–150. While Entri also puts forward various other "market power" metrics—including that "between 35% and 50%" of certain SaaS companies' end users have GoDaddy-registered domains (*id.* ¶ 154)—these metrics are irrelevant because the only pertinent inquiry is GoDaddy's market power in the market at issue, which Entri defines as "the domain registration market." *Id.* ¶ 214. GoDaddy's share of that market is not predominant enough to clothe it with sufficient economic power for purposes of an antitrust claim. *See HCI Techs.*, 446 F. Supp. 2d at 522.

At any rate, Entri's allegations about GoDaddy's "market share" are misleading. Unlike the products or services at issue in most tying antitrust claims, domain names are not products owned by registrars like GoDaddy, as Entri concedes. Rather, GoDaddy and other registrars

facilitate the registration of domain names—owned by registries—by end users.  *See* FAC ¶¶ 31–33.  Put differently, so long as a domain name is available, an end user could go to any registrar to register that domain name.  *See, e.g.*, *Am. Girl, LLC*, 381 F. Supp. at 879 ("Registrars accept domain name registrations on a first-come, first-served basis.").  Even after doing so, a user can switch registrars.  Indeed, Entri itself alleges that it recently switched from GoDaddy to Cloudflare for its own domain name, entri.com.  *See id.* ¶ 153.  As a result, GoDaddy's alleged "market share" is simply the result of free consumer choice and the popularity of GoDaddy's services, not a reflection of power over a finite and static market.  If GoDaddy implements terms that its end users do not like, they can simply switch to a different registrar—just as Entri recently did.  Nothing binds them to GoDaddy, as the FAC's allegations show, which undermines Entri's allegations of economic power.

### 2. Entri Does Not Plausibly Allege an Unlawful Restraint of Trade.

Entri's claim under Section 1 of the Sherman Act based on an agreement in restraint of trade must be dismissed unless Entri alleges: "(1) an agreement in the form of a contract, combination or conspiracy and (2) an unreasonable restraint on trade." *DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714, at *8 (E.D. Va. July 30, 2015).  Entri's allegations fail to establish both elements.  *First*, there is no agreement between GoDaddy and the SaaS companies to exclude Entri, as GoDaddy made the independent decision to prohibit its users from accessing aggregators. *Second*, GoDaddy's refusal to support Entri Connect on its platform is not an unreasonable restraint on trade, as the only alleged economic harm is to Entri, a competitor, and not to competition generally.

14

a)      *There was No Agreement Between GoDaddy and SaaS Companies.*

Entri's restraint of trade claim must be dismissed because the complaint fails to allege any facts establishing an agreement between GoDaddy and the SaaS companies to exclude end users from accessing Entri Connect.  *See Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). Entri must allege with specificity that there was "a meeting of the minds" between GoDaddy and a specific SaaS company to exclude Entri. *See id.*; *Estate Const. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 221 (4th Cir. 1994) ("[T]o adequately allege an antitrust conspiracy, the pleader must provide . . . some details of the time, place and alleged effect of the conspiracy.").  But Entri's allegations make clear that GoDaddy acted independently to prohibit its users from accessing Entri.  *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed.").

Entri alleges that "certain SaaS companies, including but likely not limited to ███ and ███," were coerced by GoDaddy to deny their end users access to Entri Connect. FAC ¶ 220.  Entri, however, does not allege any facts demonstrating *how* GoDaddy coerced these companies to enter such an agreement, or *when* these companies approved this agreement.[4]  For instance, Entri alleges that a "GoDaddy representative told ███ that Entri Connect would no longer work with GoDaddy domains." FAC ¶ 114.  The complaint does not allege that GoDaddy also demanded that ███ cease using Entri Connect, nor does it specify

---

[4] Entri alleges that one unnamed SaaS company described its meeting with GoDaddy regarding Entri Connect as having a "negative" "tone." FAC ¶ 116.  This one meeting with a negative tone is apparently Entri's only allegation suggesting that GoDaddy attempted to coerce the SaaS Companies.  Notwithstanding that this unidentified company's account fails to describe any request or demand from GoDaddy regarding its use of Entri Connect, the unpleasant meeting apparently had no impact on use of Entri's product.  As stated in Entri's complaint, the company told Entri after the meeting it "really like[s] your product" and was "hoping to continue to use it." *Id.*  Clearly, there was no meeting of the minds between GoDaddy and this anonymous company.

6709366

███████ response to GoDaddy's communication or any other facts demonstrating an agreement. The complaint also has no allegations of communications or other dealings between GoDaddy and ████. And GoDaddy's open-ended reference to other potential agreements with "certain SaaS companies" lacks the requisite specificity to establish an anticompetitive agreement. *See SD3, LLC*, 801 F.3d at 422 ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

Instead, the allegations in the complaint make clear that GoDaddy independently enacted policy and technological changes preventing end users from accessing Entri Connect. *See* FAC ¶ 12 (GoDaddy "updated the company's Terms of Use to preclude customers from authorizing Entri" and "implemented a series of technological measures designed to cause Entri Connect to malfunction."); FAC ¶ 137 ("GoDaddy imposes upon its customers a directive . . . they will not use Entri Connect."). GoDaddy's independent decision to prohibit Entri from its platform is not actionable. *Monsanto*, 465 U.S. at 761 ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.").

Understandably, GoDaddy communicated its new policy to the SaaS companies so they could adjust how their GoDaddy-registered users update DNS records. *See* FAC ¶¶ 100-101. But mere communication of the policy does not suggest a preceding agreement to exclude Entri. *See Machovec v. Council for Nat. Reg. of Health Serv. Providers in Psychology, Inc.*, 616 F. Supp. 258, 267 (E.D. Va. 1985) ("[Th]e mere exchange of information is insufficient to prove a [antitrust] conspiracy."). Nor does the SaaS companies' compliance with GoDaddy's policy transform GoDaddy's conduct into "concerted action" necessary for liability. *See Monsanto*, 465 U.S. at 761 ("[T]he manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to

16

avoid termination."). Such reactive conduct is not actionable absent specific allegations of an antitrust conspiracy. *See Twombly*, 550 U.S. at 554 (parallel conduct "without more" does not establish antitrust conspiracy). There are no such allegations here.

        *b)*      *There is No Unreasonable Restraint on Trade in the Market for Domain Configuration Services.*

Even if there were an agreement (there was not), Entri's restraint of trade claim must still be dismissed because the complaint fails to establish any harm to competition; the only alleged harm is to Entri itself. *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) ("[A] plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury.").

Analyzing whether a restraint is unreasonable begins "by identifying the ways in which a challenged restraint might possibly impair competition." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002). Once the potential harm is identified, the inquiry then turns to "whether that harm is not only possible but likely and significant, which requires examination of market circumstances." *Id.* Entri contends that GoDaddy is "restrain[ing] trade in the market for domain configuration services" by reducing "choices for end users" and "increasing prices." FAC ¶¶ 179, 221. This conclusory contention is unsupported and belied by the rest of Entri's allegations.

*First*, there has not been a reduction of choice for end users of domain configuration services. Entri brags that, despite GoDaddy's efforts to restrict Entri Connect, "SaaS companies . . . remain with Entri even with the substantial uncertainty surrounding Entri Connect and GoDaddy domains." FAC ¶ 136. In other words, the SaaS Companies who "typically control the end users' access to domain configuration services" have not been dissuaded from using Entri Connect despite its incompatibility with GoDaddy domains. FAC ¶ 161. And GoDaddy users who desire to use Entri Connect may switch to any of the registrars that comprise most of the

17

domain registration market. FAC ¶ 149.  Entri itself was able to switch from GoDaddy to Cloudflare by making just three phone calls.  FAC ¶ 153; *see Com. Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 68 (S.D.N.Y. 2003) (granting summary judgment against antitrust plaintiff because he "has not provided any evidence of . . . high switching costs"). GoDaddy's prohibition of Entri is thus procompetitive because rival registrars may gain market share by offering their users access to Entri Connect.

*Second*, no allegations support Entri's contention of price increases in the market for domain configuration services.  Despite charging for its own configuration service, Entri faults GoDaddy for attempting to monetize its Domain Connect protocol that it previously offered for free.  But no allegations show that GoDaddy can charge supra-competitive prices for Domain Connect.  In fact, Entri's complaint does not even specify whether Domain Connect is more or less expensive than Entri Connect.  *See* FAC ¶¶ 131-136.  Moreover, Entri's boastful allegations again doom its price increase contention: according to Entri, GoDaddy's "attempt[s] to convert" SaaS companies "to paying customers of GoDaddy's own Domain Connect services" were "met with extremely limited success," and "SaaS companies have overwhelmingly declined to pay GoDaddy for these services." FAC ¶ 136.  By Entri's admission, GoDaddy has failed to monetize Domain Connect, let alone at supra-competitive prices.

At bottom, Entri's complaint is not that competition has been harmed, but that it has suffered personal harm. *See, e.g.*, FAC ¶¶ 173-178 (Entri has "lost volume and revenue because of GoDaddy").  Such personal harms are not actionable as unreasonable restraints on trade. *See Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 706 (E.D. Va. 2003) (dismissing restraint of trade claim because it amounts to a "mere allegation that [defendants] violated the

antitrust laws as to a particular plaintiff and commodity"). Entri's restraint of trade claim must be dismissed.

3.    Entri Fails to Allege a Cognizable Antitrust Injury.

"[O]nce a plaintiff demonstrates a violation of § 1 [of the Sherman Act], he must prove that he suffered an antitrust injury: the type of injury that the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Turner v. Va. Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 646 (E.D. Va. 2018). "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original); *see also Dickson*, 309 F.3d at 206 (defendant's conduct "must harm the competitive *process* and thereby harm consumers"; mere "harm to one or many competitors will not suffice"). Entri's antitrust claim must be dismissed for lack of antitrust injury.

Even if Entri had plausibly alleged that GoDaddy's conduct constitutes an unlawful negative tie or restraint of trade (it has not), any harm to Entri flows from GoDaddy lawfully exercising its right to determine its terms of service. *See Dream Big Inc.*, 2022 WL 16579322, at *3 ("Google has the right to dictate the terms on which it will permit its customers to use and display its mapping services."). Moreover, demand for Entri is reduced only among GoDaddy users, while demand in the broader market for domain configuration services is unaffected. *See* FAC ¶ 136 (SaaS companies have largely continued to offer Entri). And this reduction in demand may prove temporary, as GoDaddy users are free to change domain registrars. In short, Entri fails to allege harm caused by anticompetitive conditions within the broader market for domain configuration services.

Entri's harms are also attenuated from the alleged negative tie and restraint of trade.  *See Shapiro v. General Motors Corp.*, 472 F. Supp. 636, 660 (D. Md. 1979) ("The alleged antitrust violation must yield an injury which is 'direct' and not 'incidental.'").  As to tying, Entri alleges "a coerced agreement between GoDaddy and its domain registration customers not to use Entri Connect."  FAC ¶ 213.  But all the injuries identified by Entri were caused by the economic decisions of the SaaS Companies, not the domain users. *See* FAC ¶ 174 ("at least one Entri customer, ███, ended its relationship with Entri"); FAC ¶ 175 ("Other [potential Entri customers] . . . delayed in signing with Entri"); FAC ¶ 176 (Entri gave "concessions . . . to existing SaaS company customers" to win their business).  As to restraint of trade, Entri alleges SaaS companies, ███ and ████, were coerced into agreeing not to offer Entri Connect to their users. *Id.* ¶¶ 177, 220.  But the FAC alleges that GoDaddy independently implemented policy and technology measures that made Entri Connect incompatible with GoDaddy domains. *See id.* ¶¶ 12, 137.  Any harm to Entri thus flows from GoDaddy's independent actions, not concerted action with ███ and ████.

## C.     Count V: Entri's Tortious Interference with Contract Claim Must Be Dismissed.

To state a claim for tortious interference with contract, Entri must plausibly allege four elements: (1) "the existence of a valid contractual relationship," (2) GoDaddy's "knowledge of the relationship," (3) "intentional interference inducing or causing a breach or termination of the relationship," and (4) "resultant damages."  *Duggin v. Adams*, 234 Va. 221, 226 (1987).  Under Virginia law, Entri must also identify whether the contract purportedly interfered with was "terminable at will."  *Nortec Commc'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 232 (E.D. Va. 2008).  If it was, then Entri must also plausibly allege that GoDaddy "employed improper methods" to interfere with it.  *Duggin*, 234 Va. at 228.  Improper methods include "illegal or

independently tortious conduct," as well as "unfair competition or unethical conduct." *Mansfield v. Anesthesia Assocs., Ltd.*, 2008 WL 1924029, at *4 (E.D. Va. Apr. 28, 2008).  The quintessential "[e]xamples" of improper methods are "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Peterson v. Cooley*, 142 F.3d 181, 187 (4th Cir. 1998).

For at least two reasons, Entri's claim for tortious interference with contract must be dismissed.

*First*, Entri does not identify whether the contracts GoDaddy purportedly interfered with were terminable at will.  Indeed, Entri provides almost no details about its supposed contractual relationships.  Entri merely alleges in conclusory fashion that it "has valid contractual relationships with many SaaS companies," and that the contracts GoDaddy supposedly "interfered with" were "Entri's contracts with ███, ███, and ███." FAC ¶¶ 246, 248.  But Entri does not allege when it entered into these contracts, what their terms were, or (critically) whether they could be terminated at will.  Entri's failure to identify whether these contracts were terminable at-will thus "make[s] it impossible for the Court to determine the applicable analysis" under Virginia law. *Nortec*, 548 F. Supp. 2d at 232.  This requires dismissal. *See id.* (dismissing tortious interference with contract claim when plaintiff "failed to allege whether or not the contract was at-will").

*Second*, assuming the contracts at issue were terminable at will, Entri does not plausibly allege that GoDaddy used "improper methods" to interfere with them.  While Entri alleges that GoDaddy interfered with Entri's contracts "through 'scare tactics,' legal threats, and coercion," Entri supplies no facts to support that allegation.  FAC ¶ 49.  This "unadorned conclusory allegation[]" should therefore be disregarded. *See Chistoni v. HSBC Bank USA, N.A.*, 2017 WL

1963902, at \*2–3 (E.D. Va. May 11, 2017) (granting motion to dismiss "because the conclusory allegations . . . fail to satisfy the pleading standard"); *see also Byam v. Ocean Enter. 589, LLC*, 2024 WL 773576, at \*1 (4th Cir. Feb. 26, 2024) (courts need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

Entri's conclusory allegation of GoDaddy's purportedly improper conduct is particularly deficient because Entri's other allegations undermine it.  For instance, the only conduct Entri alleges GoDaddy directed towards ▓▓▓▓—one of the SaaS companies whose contract with Entri GoDaddy supposedly interfered with—is that GoDaddy "communicated" its "new policy" that users "would not be permitted to use Entri Connect to update and configure their DNS records." FAC ¶¶ 100–101; *see also id.* ¶ 112 (alleging that "a GoDaddy representative told ▓▓▓▓ that Entri Connect would no longer work with GoDaddy domains").[5]  But GoDaddy communicating its new policy and stating truthfully that Entri Connect could no longer be used under that new policy cannot constitute improper conduct as a matter of law.  *See, e.g.*, *Lee Pappas Body Shop, Inc. v. State Farm Mut. Auto. Ins.*, 2021 WL 3609296, at \*7 (E.D. Va. Aug. 13, 2021) ("A truthful statement . . . cannot rise to the level of improper conduct[]" because "it is within Defendants' rights to communicate truthful information to its customers.").

Entri's allegations about ▓▓▓▓ and ▓▓▓▓—the only two other SaaS companies whose contracts Entri alleges that GoDaddy interfered with—similarly involve only legal and truthful conduct by GoDaddy.  *See* FAC ¶ 113 (alleging "a GoDaddy representative also told ▓▓▓▓ that they had 'disabled all DNS templates that Entri had previously onboarded' and that '[t]he only

---

[5] Entri also alleges that GoDaddy somehow "implied that Entri connect was illegal," but does not identify what GoDaddy supposedly said, when GoDaddy said it, or how GoDaddy drew this implication.  FAC ¶ 112.  The absence of any details to support this allegation renders it conclusory and insufficient to support Entri's claim.  *See Byam*, 2024 WL 773576, at \*1.

way to connect GoDaddy domains via Domain Connect is with a direct relationship going forward"), ¶ 115 (alleging that GoDaddy told ▮▮▮ that "Entri Connect was no longer a viable option for end users with GoDaddy domains").[6]

As a result, Entri's failure to plausibly allege that GoDaddy used "improper methods" to interfere with its contractual relationships requires that its tortious interference with contract claim be dismissed.

### D.    Count VI: Entri's Tortious Interference with Business Expectancy Claim Must Be Dismissed.

To state a claim for tortious interference with a business expectancy, Entri must plausibly allege five elements: (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit"; (2) GoDaddy's "knowledge of the relationship or expectancy"; (3) a reasonable certainty "that absent intentional misconduct, [Entri] would have continued in the relationship or realized the expectancy"; (4) GoDaddy interfered with the relationship or expectancy using "improper methods"; and (5) resulting damages. *Mansfield*, 2008 WL 1924029, at *6.

Entri's claim for tortious interference with a business expectancy must be dismissed for at least two reasons.

*First*, for all the reasons explained earlier, Entri does not plausibly allege that GoDaddy interfered with any of Entri's business relationships or expectancies using "improper methods." *Supra* § III.D.  Entri merely repeats the same conclusory allegation for this claim as it asserted for

---

[6] Entri alleges that a "SaaS company" told Entri about a "scare tactic meeting" it had with GoDaddy.  FAC ¶ 116.  This does not salvage Entri's claim.  Entri does not identify this SaaS company, allege that it had a contractual relationship with Entri, or even that this relationship was terminated.  *See id.*  Regardless, nothing in Entri's summary of this "conversation with GoDaddy" borders on unlawful or otherwise improper conduct, so it cannot satisfy the "improper methods" element of Entri's claim.  *See id.*

23

its tortious interference with contract claim.   *See* FAC ¶ 255 (alleging that "GoDaddy has purposely interfered with several of these prospects through 'scare tactics,' legal threats, and coercion, and other improper and unlawful tactics").   But once again, the only alleged conduct by GoDaddy involving the four business expectancies Entri identifies— ███████   ████████ and  ███████  (FAC ¶ 255)—is the legal and truthful act of communicating GoDaddy's new policy.   *See id.* ¶¶ 114–15 (alleging that GoDaddy told ████████████, and "other SaaS companies" that "Entri Connect would no longer work with GoDaddy domains").   This cannot constitute "improper methods" as a matter of law.   *Lee Pappas Body Shop*, 2021 WL 3609296, at *7.

*Second*, Entri does not plausibly allege that GoDaddy knew of any of Entri's prospective business expectancies.   The only basis for GoDaddy's knowledge that Entri identifies is that "Entri and GoDaddy had a mutual working relationship between April 2022 and January 2024."   FAC ¶ 254.   But Entri does not allege that it *ever* told GoDaddy about a prospective business relationship, much less the four specific prospective relationships at issue.   To the contrary, Entri's allegations about GoDaddy's "working relationship" with Entri show only that, *after* Entri established a contractual relationship with a SaaS company, Entri then approached GoDaddy to create a custom "template" that could be used with that SaaS company.   *See id.* ¶¶ 86–90.   Entri does not identify even a single time it told GoDaddy about one of Entri's potential future business expectancies with a SaaS company before Entri established a relationship with that SaaS company.   Entri's allegations thus do not show that GoDaddy knew about Entri's prospective business expectancies, which dooms Entri's claim.   *See Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297–98 (4th Cir. 2021) (tortious interference with prospective economic advantage claim

failed when plaintiff failed to "establish[]" that defendant "had knowledge of its business expectancy").

## IV.  <u>CONCLUSION</u>

For more than a year, Entri has sought to pressure GoDaddy to agree that Entri may monetize its Entri Connect product on GoDaddy's platform.  Entri has now turned to the courtroom to compel what it could not obtain through arms-length negotiations.  Entri's attempt to use antitrust law as a sword against a competitor, when it exists as a shield for competition, must be rejected.  Nor can Entri turn GoDaddy's decision to implement new terms of use for access to its platform into tortious interference.  GoDaddy respectfully requests that the Court dismiss Counts I, V, and VI of Entri's FAC with prejudice.

Dated:  July 30, 2024                    Respectfully submitted,


                                        /s/ Douglas J. Dixon_____
                                        Douglas J. Dixon (*pro hac vice*)
                                        Andrew K. Walsh (*pro hac vice*)
                                        Justin M. Greer (*pro hac vice*)
                                        Erik C. Savitt (*pro hac vice*)
                                        Hueston Hennigan LLP
                                        620 Newport Center Dr., Suite 1300
                                        Newport Beach, CA 92660
                                        Phone: (949) 229-8640
                                        Fax: (888) 866-4825
                                        ddixon@hueston.com


                                        /s/ Chad E. Kurtz_____
                                        Chad E. Kurtz
                                        VA Bar No. 88863
                                        COZEN O'CONNOR
                                        1200 19th Street NW, Suite 300
                                        Washington, D.C. 20036
                                        Tel: (202) 463-2521
                                        Fax: (202) 640-5939
                                        ckurtz@cozen.com

                                        *Attorneys for Defendant GoDaddy.com, LLC*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2024, a true and correct copy of the foregoing was served using the Court's CM/ECF system, with electronic notification of such filing to all counsel of record.

/s/ Chad E. Kurtz
Chad E. Kurtz
*Attorney for Defendant GoDaddy.com, LLC*