**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ENTRI LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Civil Action No. 1:24-cv-00569** |
| | ) | |
| | ) | **Oral Argument Requested** |
| **GODADDY.COM LLC,** | ) | |
| | ) | |
| Defendant. | ) | **PUBLIC VERSION - REDACTED** |
| _____ | ) | |

**ENTRI LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS ENTRI'S FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

I.      ENTRI SOLVES A PROBLEM ............................................................................. 3

II.     GODADDY ACTS TO EXCLUDE ENTRI AND PAD ITS OWN POCKETS ................... 4

STANDARD OF REVIEW ............................................................................................... 6

ARGUMENT .................................................................................................................... 6

I.      ENTRI HAS PLAUSIBILY ALLEGED A SHERMAN ACT VIOLATION ..................... 6

     A.    Entri Has Plausibly Alleged GoDaddy's Unlawful Negative Tie ................. 7

          i.    *Courts Have Sustained Claims of Negative Tying on Similar Facts* ..................... 7

          ii.   *Entri's Allegations Plausibly Establish the Four Elements of a Negative Tying Claim* ....................................................................................... 11

               1.  Entri has plausibly alleged that GoDaddy conditions the use of its domain registration services on its customers not using Entri Connect ......... 12

                      i.   *The same website owners use domain registration services as use domain configuration services* ........................................... 13

                      ii.  *GoDaddy's policy is a tying arrangement, not mere unilateral action* ....................................................................................... 16

               2.  Entri has plausibly alleged that GoDaddy has market power in the U.S. domain registration market ........................................................ 19

          iii.  *GoDaddy's Justifications for its Unlawful Conduct Are Outside the Pleadings and Irrelevant at this Stage* ............................................ 22

     B.    Entri Has Plausibly Alleged GoDaddy's Agreement in Restraint of Trade ............. 22

          i.    *GoDaddy Coerced Agreements with Third-Party Application Developers* ....................................................................................... 23

          ii.   *GoDaddy's Coerced Agreements Unreasonably Restrained Trade in the Market for Domain Configuration Services* ................................ 24

     C.    Entri Has Plausibly Alleged Antitrust Injury ........................................... 26

II.     ENTRI HAS PLAUSIBLY ALLEGED ITS TORTIOUS INTERFERENCE CLAIMS .. 27

     A.    Entri Has Plausibly Alleged Tortious Interference with Contract ........................... 27

     B.    Entri Has Plausibly Alleged Tortious Interference with Its Business Expectancies ................................................................................... 29

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).................................................................................................6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983)..............................................................................................25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).........................................................................................6, 23

*Belmora LLC v. Bayer Consumer Care AG,*
987 F.3d 284 (4th Cir. 2021) ...............................................................................30

*BookLocker.com, Inc. v. Amazon.com, Inc.,*
650 F. Supp. 2d 89 (D. Me. 2009) ..................................................................16, 20

*Butler v. United States,*
702 F.3d 749 (4th Cir. 2012) ...........................................................................6, 22

*Constr. Engr. Consultants, Inc. v. Steel Sols., Inc.,*
No. 08-0086, 2009 WL 10733733 (E.D. Va. May 13, 2009) ................................28

*Crownalytics, LLC v. SPINS LLC,*
No. 22-01275, 2023 WL 3071192 (D. Colo. Apr. 25, 2023).............................8, 9, 11, 12, 15

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
36 F.3d 1147 (1st Cir. 1994)...................................................................................7

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
313 F. Supp. 3d 931 (N.D. Ill. 2018) ..............................................................15, 16

*Dickson v. Microsoft Corp.,*
309 F.3d 193 (4th Cir. 2002) ................................................................................22

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.,*
684 F.2d 1346 (7th Cir. 1982) ..............................................................................16

*Dream Big Media Inc. v. Alphabet Inc.,*
No. 22-02314, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ........................17, 18

*Dream Big Media Inc. v. Alphabet Inc.,*
No. 22-02314, 2023 WL 8285808 (N.D. Cal. Nov. 30, 2023) ..............................18

*Dream Big Media Inc. v. Alphabet Inc.*,
No. 22-02314, 2024 WL 3416509 (N.D. Cal. July 15, 2024) ...............................................18

*Duggin v. Adams*,
234 Va. 221 (1987) ...............................................................................................................29

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ...............................................................................................21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)...........................................................................................3, 7, 8, 11, 20, 21

*Falls Church Bratwursthaus, Inc. v. Bratwursthaus Mgmt. Corp.*,
354 F. Supp. 1237 (E.D. Va. 1973) ......................................................................................12

*Glob. Tel\*Link Corp. v. JACS Sols. Inc.*,
No. 23-0179, 2023 WL 8918281 (E.D. Va. Dec. 27, 2023)...................................................27

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
721 F.3d 264 (4th Cir. 2013) (en banc) .................................................................................6

*Greater Divide, Inc. v. Lippe Taylor Grp., LLC*,
No. 21-0137, 2022 WL 18671061 (E.D. Va. Sept. 26, 2022) ................................................29

*HCI Techs., Inc. v. Avaya, Inc.*,
446 F. Supp. 2d 518 (E.D. Va. 2006) ...................................................................................21

*Heartland Payment Sys., Inc. v. MICROS Sys., Inc.*,
No. 07-5629, 2008 WL 4510260 (D.N.J. Sept. 29, 2008)................................................14, 15

*Houck v. Substitute Tr. Servs., Inc.*,
791 F.3d 473 (4th Cir. 2015) .................................................................................................6

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006)...............................................................................................................10

*Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.*,
158 F. App'x 413 (4th Cir. 2005) ....................................................................................23, 24

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)................................................................................................................16

*Kickflip, Inc. v. Facebook, Inc.*,
999 F. Supp. 2d 677 (D. Del. 2013)................................................................................18, 19

*Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*,
821 F. Supp. 1201 (E.D. Mich. 1993).................................................................................24

*Lucasys Inc. v. PowerPlan, Inc.*,
   576 F. Supp. 3d 1331 (N.D. Ga. 2021) ...................................................................9, 10, 27

*McCleary-Evans v. Maryland Dep't of Transp.*,
   780 F.3d 582 (4th Cir. 2015) ...................................................................................6

*McMillan v. Dollarr Thrifty Auto. Group, Inc.*,
   No. 09-01195, 2010 WL 11566256 (E.D. Va. Feb. 23, 2010) ................................29

*Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*,
   828 F.2d 1033 (4th Cir. 1987) ................................................................................22

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984).................................................................................................23

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958).....................................................................................................11

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
   670 F. Supp. 1313 (D. Md. 1986) ...........................................................................21

*Nortec Commc'ns, Inc. v. Lee-Llacer*,
   548 F. Supp. 2d 226 (E.D. Va. 2008) .....................................................................28

*Nutrients Plus, LLC v. Huber*,
   No. 19-0102, 2019 WL 8888176 (E.D. Va. June 25, 2019) ...................................29

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).................................................................................................24

*Priority Auto Grp., Inc. v. Ford Motor Co.*,
   757 F.3d 137 (4th Cir. 2014) ..................................................................................28

*RealPage, Inc. v. Yardi Sys., Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) .....................................................8, 13, 19, 20, 21, 24

*Sambreel Holdings LLC v. Facebook, Inc.*,
   906 F. Supp. 2d 1070 (S.D. Cal. 2012).......................................................17, 18, 19

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ...................................................................................6

*Serv. & Training, Inc. v. Data Gen. Corp.*,
   963 F.2d 680 (4th Cir. 1992) .......................................................................11, 12, 13, 15

*Systemcare, Inc. v. Wang Lab'ys Corp.*,
   117 F.3d 1137 (10th Cir. 1997) ..............................................................................23

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*,
    No. 22-1648, 2024 WL 2785142 (N.D. Ill. May 30, 2024)..........................................9, 11, 27

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)..................................................................................26

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001)..................................................................................8

*United States v. Yellow Cab Co.*,
    332 U.S. 218 (1947)..................................................................................3

**Statutes**

The Sherman Act,
    15 U.S.C. § 1 ..................................................................................7, 22

**Other Authorities**

GoDaddy DNS and Domain Connect, GoDaddy,
    https://www.godaddy.com/resources/skills/dns-domain-connect (last visited
    Aug. 24, 2024) ..................................................................................14

Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law: An Analysis of Antitrust Principles and Their Application*
    (4th ed. 2015)..................................................................................24

## INTRODUCTION

Behind every website is a series of alphanumeric codes known as DNS records. DNS stands for Domain Name System, and it is often analogized to a phone book. When an individual at a computer types a web address into a browser, DNS records translate the text address into an IP address. Just as a phone book reveals where someone lives or how they can be reached, DNS records reveal which servers contain the website's data. But modern websites are complex and frequently incorporate services from a range of third-party applications for features like payment processing and marketing tools. With this increased complexity, websites require more complex DNS records to function. Traditionally, website owners had to update DNS records manually. For individuals and small businesses without programming experience, however, this could prove confusing and cumbersome. The result was (at best) frustration and wasted resources, or (at worst) broken websites and missed opportunities.

Entri was founded to solve this problem. The company's flagship product, Entri Connect, automates the process of updating DNS records. A website owner seeking to integrate a third-party application with their custom domain need only authorize Entri and the previously manual process is completed automatically, within minutes and with just a few clicks. Since its founding in 2021, Entri has proven tremendously popular. Indeed, some of the world's most innovative tech companies—from website builders to email security firms—now provide Entri Connect to their customers directly, enabling seamless DNS configuration when those customers integrate applications into their custom domains.

To this point, this is a story about successfully innovating to meet a market need. But there is an unfortunate flipside that innovation all-too-often invites. As the largest seller of custom domains in the U.S. (and the world), GoDaddy had a front row seat to Entri's rise. And

as GoDaddy's domain customers increasingly configured their DNS records automatically via Entri Connect, GoDaddy took note. Though it was not required, GoDaddy initially chose to work *with* Entri and helped to facilitate the configuration process for those domains registered with GoDaddy. But as Entri grew, GoDaddy abruptly changed its mind. Instead of working with Entri, GoDaddy decided to block it, announcing a new policy that customers of its domain registration services would no longer be permitted to use Entri Connect to configure their own DNS records. Instead, GoDaddy announced, they could only use GoDaddy's *own* domain configuration service, Domain Connect. GoDaddy communicated this policy to third-party applications, threatening them if they did not help to enforce it, and rolled out technical measures designed to make Entri Connect malfunction. And in an effort to make Entri voluntarily comply with the policy, GoDaddy sent a cease-and-desist letter with pretextual legal demands. The policy, and GoDaddy's multifront campaign to enforce it, remains ongoing today.

GoDaddy's prohibition on its customers' use of Entri Connect, and its funneling of those customers to GoDaddy's own competing product, is classic tying behavior. The Sherman Act has long been held to forbid both affirmative ties—conditioning the provision of product A on the taking of product B—as well as so-called *negative* ties—conditioning the provision of product A on an agreement *not* to take product B from a rival. GoDaddy's conduct falls squarely in the latter camp and courts have routinely sustained complaints proceeding on this same theory and on remarkably similar facts. In an effort to enforce its ban, GoDaddy has also committed further violations of the law—coercing an unlawful agreement out of third-party application providers, and tortiously interfering with Entri's actual and expected business partners.

Faced with allegations of its wrongdoing, GoDaddy tries three tacks to evade responsibility. First, it takes refuge in formalism. This is no tie, GoDaddy insists, because the

users of websites do not *pay* to use Entri Connect. But neither the law nor the facts support this arbitrary distinction, and in all events, the Sherman Act "is aimed at substance rather than form." *United States v. Yellow Cab Co.*, 332 U.S. 218, 227 (1947); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992) ("formalistic distinctions . . . are generally disfavored in antitrust law"). Next, it recasts its actions as mere unilateral business decisions it is entitled to make for itself. But the problem for GoDaddy is it relies on cases involving Google and Facebook—already inapposite to begin with—that have been roundly criticized and rejected as unpersuasive. And though GoDaddy characterizes this suit as an attempt by Entri to "coerce" a business relationship, it is GoDaddy that first turned to the law, threatening pretextual claims under the Computer Fraud and Abuse Act and other laws and wielding them as an anti-competitive sword. And finally, GoDaddy simply ignores Entri's well-pled allegations, injecting its own "facts" that are neither in the complaint nor true. None of these efforts is persuasive. GoDaddy's Motion to Dismiss should be denied.[1]

## BACKGROUND

### I.   ENTRI SOLVES A PROBLEM.

Website owners frequently rely on third-party applications to enhance their websites with custom designs and advanced features like payment processing. First Amended Complaint (FAC), D.E. 23, ¶¶2–3, 35, 41.[2] Countless examples of such third-party applications, often referred to as SaaS ("software-as-a-service") companies, offer "solutions for email, marketing, e-commerce, and more." ¶38; *see* ¶¶36–44. For a domain to properly interface with those applications, the website owner must ensure the application has the information needed to communicate with the website, and vice versa.  ¶¶3–4, 45, 47. The information that allows that

---

[1]     Should the Court find any deficiency in Entri's pleadings, Entri would respectfully seek to amend the FAC.

[2]     All citations to a paragraph (¶) are to the FAC.

communication is found in DNS records. ¶¶4–5, 48. But small business owners with websites (and others not versed in computer programming) struggle to update these records manually. ¶¶5, 49, 55. This frequently leads to broken and dysfunctional websites. ¶¶5, 49.

Entri was founded in 2021 to fix that problem. ¶¶1, 6. Entri's primary service, Entri Connect, is a "domain configuration service." Entri Connect "automates the process of updating a website owner's DNS settings." ¶6. Website owners can choose to authorize Entri Connect to update DNS records on their behalf, thereby ensuring that their websites interface with third-party applications correctly.  ¶¶6, 63, 65–68. "All a website owner needs to do is launch Entri Connect within the third-party application of his choice, authorize Entri to update his settings for him, and the settings are automatically configured correctly." ¶6. This helps not only website owners, but also SaaS companies that expend resources troubleshooting faulty manual DNS configurations. ¶¶7, 69. This value proposition led to significant demand for Entri. ¶¶6–7, 70, 72.

## II.    GODADDY ACTS TO EXCLUDE ENTRI AND PAD ITS OWN POCKETS.

GoDaddy is the United States's (and the world's) largest domain registrar. ¶¶10, 150–151. It is five times larger than its next closest competitor. ¶10. "GoDaddy's share of the U.S. domain registration market is greater than 40%." ¶151.  Domain registrars are "companies that sell and register custom web addresses, or 'domains.'" ¶¶8, 31. Domain registrars do not themselves own the custom domain names (e.g., "www.entri.com"); rather, they assist website owners in "registering" the name and ensuring it corresponds with an underlying Internet Protocol (IP) address (a list of numbers separated by periods). ¶¶31–32, 34. Domain registrars typically maintain the contact information for the domain name in DNS records. ¶¶48, 51. These are the same records that a website owner needs to access and "configure" to ensure their website interfaces with third party applications. ¶¶4, 49.

In general, domain registrars have been enthusiastic about Entri because "it allows their

customers to create a professional web presence with fewer headaches and to more easily integrate innovative third-party applications." ¶¶8–9. And though it is not required for Entri Connect to function, some registrars have even chosen to formally partner with Entri to ensure optimal support for Entri Connect. For example, "[s]hortly after Entri Connect's launch, GoDaddy saw the value of Entri Connect and the two companies entered a partnership together to allow thousands of users with GoDaddy-registered domains to update their DNS setting with a simple 3-click process." ¶¶11, 84.

However, as Entri Connect grew in popularity, GoDaddy saw an opportunity to compete with Entri in the domain configuration market and "use its tremendous size to its advantage." ¶12. In late 2023, "GoDaddy formulated and announced a new policy: customers who purchased their domains through GoDaddy would not be permitted to use Entri Connect to update and configure their DNS records." ¶100; *see also* ¶12. End users had little choice but to acquiesce to GoDaddy's ultimatum because they did not have good alternatives to GoDaddy and GoDaddy makes it difficult to switch to the smaller, existing alternatives. ¶¶18, 20.

GoDaddy took additional affirmative steps to make sure its customers could not use Entri Connect. ¶¶104–130. It introduced technological barriers disabling Entri Connect's operation for pretextual reasons. ¶¶106–110, 118–130. And it surreptitiously updated its Terms of Use to prohibit the use of Entri Connect (or any other similar competitor to GoDaddy's own domain configuration services). ¶¶12, 118–121. GoDaddy also engaged in a smear campaign targeting third-party SaaS companies—including █████████████████████████████████, █████, and others—that pressured them to not use Entri Connect. ¶¶111–17. At least once, GoDaddy intimated that "Entri Connect was illegal." ¶¶112

In addition to prohibiting its customers from using Entri Connect, GoDaddy also

announced that if those customers wanted automated domain configuration services, they would have to use GoDaddy's own product, Domain Connect. ¶¶14, 131–132. And, with demand for Entri Connect artificially stifled, GoDaddy immediately increased the price for Domain Connect—a protocol that it had previously maintained was free and open-source. ¶¶18, 133–134.

## STANDARD OF REVIEW

To prevail on a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter" to "'state a claim to relief that is plausible on its face.'" *McCleary-Evans v. Maryland Dep't of Transp.*, 780 F.3d 582, 583 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 545. Indeed, a complaint may survive even if ultimate success seems "improbable." *Id.* at 556. Rule 8 "requires only that the complaint's factual allegations . . . raise a right to relief above the speculative level.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).

Courts "accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff]." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (citation omitted). "[I]mportantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012).

## ARGUMENT

## I.   ENTRI HAS PLAUSIBLY ALLEGED A SHERMAN ACT VIOLATION.

GoDaddy requires that customers of its domain registration services not use Entri's domain configuration services. It communicates this prohibition openly and coerces SaaS

companies into helping GoDaddy enforce it. This conduct violates the antitrust laws: it harms competition, reduces output, increases prices, limits consumer choice, stifles innovation, and elevates an inferior product. More specifically, GoDaddy's conduct violates § 1 of the Sherman Act in two ways. 15 U.S.C. § 1. First, it constitutes an unlawful "negative tie." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir. 1994); *see* Section I.A, *infra*. And second, it constitutes a coerced agreement between GoDaddy and SaaS companies to restrain trade. *See* Section I.B, *infra*. Entri has plausibly pled the elements of both claims. And under either theory, Entri has plausibly alleged the requisite antitrust injury. *See* Section I.C, *infra*.

**A.    Entri Has Plausibly Alleged GoDaddy's Unlawful Negative Tie.**

A negative tie is an "arrangement[] conditioning the sale of one product on an agreement not to purchase a second product from competing suppliers." *Data Gen. Corp.*, 36 F.3d at 1178. In a traditional tying case, a manufacturer of copiers with market power might require its customers to buy maintenance services from the manufacturer itself. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 455 (1992). But in the *negative* tying variant, that manufacturer would prohibit its customers from buying such services from the manufacturer's rivals. That is the theory alleged here. GoDaddy has conditioned its domain registration services on end users' *not* using Entri Connect for domain configuration. Hewing closely to facts that have survived dismissal in other cases, Entri's allegations plausibly establish each of the elements of a negative tying claim.

i.    *Courts Have Sustained Claims of Negative Tying on Similar Facts.*

Entri's allegations tell a familiar story. An upstart innovator identifies a market opportunity and successfully predicts robust demand. An entrenched incumbent in an adjacent market feels threatened and rues the missed opportunity. Yet rather than innovate itself, the incumbent leverages its control over the shared customer base to exclude the innovator. The

7

"core concern" behind tying is that it "prevents goods from competing directly for consumer choice on their merits." *United States v. Microsoft*, 253 F.3d 34, 87 (D.C. Cir. 2001). This is no less true of negative tying and courts have made clear such behavior violates § 1.

In *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1219 (C.D. Cal. 2012), for instance, the defendant (Yardi) provided landlords a popular back-office accounting software called Voyager. And in a separate market, the plaintiff (RealPage) provided cloud computing services that integrated with "multiple software applications . . . (including Yardi's Voyager)." *Id.* Noting RealPage's success in cloud computing, Yardi decided to enter that market as well; but "rather than innovate and invest in a superior cloud system, Yardi embarked on a campaign to leverage its powerful position in the . . . back office accounting software market . . . to stifle competition in the vertical cloud market . . . through customer interference and intimidation." *Id.* RealPage brought a "negative tying" claim under § 1, alleging that Yardi conditioned the use of its "Back Office Accounting Software (the tying product) on an agreement not to use the Vertical Cloud Services (the tied product) of competing property management software companies." *Id.* at 1225. And relying on the Supreme Court's decision in *Eastman Kodak*, the court denied Yardi's motion to dismiss. *Id.* at 1223–24, 1227.

*Crownalytics, LLC v. SPINS LLC*, No. 22-01275, 2023 WL 3071192 (D. Colo. Apr. 25, 2023), is similarly on point. There, the defendant (SPINS) compiled and sold consumer data to organic food manufacturers. *Id.* at *1. In a separate market, the plaintiff (Crownalytics) provided data analytics services, analyzing the data provided by companies like SPINS. *Id.* at *2. SPINS and Crownalytics originally had a collaborative relationship, aware that they shared customers. *Id.* That was until SPINS decided to enter the data analytics market itself and "coerced customers into contracts [] which operate as negative tying arrangements by conditioning the purchase and

use of [SPINS's] data on an agreement not to purchase or use the services" of Crownanalytics or other data analytics companies. *Id.* at *9. On these allegations, the court denied the motion to dismiss, allowing the negative tying claim to proceed. *Id.* at *9–10.

A similar fate met the defendant's motion in *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22-1648, 2024 WL 2785142 (N.D. Ill. May 30, 2024). The plaintiff there (Provi) created an "online alcohol platform that operates as a 'one-stop shop' for retailers to search for alcohol products across distributors and to communicate their orders to distributors for fulfillment." *Id.* at *1. The defendant (Southern) was a major alcohol distributor whose products were initially available for sale on Provi's platform. *Id.* But Southern soon decided to preference its own competitor to Provi, known as Proof. *Id.* at *22. Retailers were informed that they could only purchase alcohol products from Southern if they did so through Proof, and Southern took technological measures to enforce this policy by blocking orders made through Provi. *Id.* at *5, *22. Provi brought a negative tying claim, alleging that Southern was "condition[ing] sales of its alcohol products (the tying product) on retailers not using an Online Alcohol Marketplace (the tied product) offered by any other supplier to purchase those products," a claim the court sustained over Southern's motion to dismiss. *Id.* at *22.

And finally, the court countenanced the same theory in *Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331 (N.D. Ga. 2021). The defendant there (PowerPlan) dominated the market for utility management software, but its product had stagnated and functionality gaps had emerged. *Id.* at 1337–38. The plaintiff (Lucasys) was an upstart innovator that provided software solutions for those gaps—operating in a separate "supplemental market." *Id.* at 1338. Yet PowerPlan had its own supplemental product as well and soon announced a policy "condition[ing] customers' purchases of its main utility management software on an agreement

not to purchase/use products in the Supplemental . . . Markets that are provided by PowerPlan's perceived competitors." *Id*. at 1347. PowerPlan enforced this prohibition by threatening companies that sought to work with Lucasys. *Id.* at 1349–50. And so Lucasys sued, bringing a § 1 claim rooted in a "negative tying" theory. *Id.* at 1341. Noting the alleged conduct harmed competition, the court denied PowerPlan's motion to dismiss. *Id*. at 1358.

GoDaddy will no doubt try to distinguish these cases on their facts, but that is beside the point. Details will of course vary from product to product, market to market. What Entri's claim shares with these cases is the "essential characteristic of an invalid tying arrangement," and that is "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer . . . might have preferred to purchase elsewhere on different terms." *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 35, (2006) (citation omitted). That is the hallmark of GoDaddy's conduct here: exploiting its dominance as a domain registrar, GoDaddy seeks to prohibit its customers from using Entri Connect and to instead funnel them to GoDaddy's own, inferior product. That is a classic negative tie, and GoDaddy's attempts to demonstrate otherwise fall flat.

No more persuasive is GoDaddy's refrain that Entri had a prior business relationship with GoDaddy that fell apart. *See* Mot. 1 (deriding Entri's suit as an attempt "to compel a result it could not obtain through arms-length negotiation"); Mot. 7 ("Entri has resorted to the courts to accomplish what it could not through arms-length negotiations"). This is a common feature of negative tying claims, in which incumbents have previously partnered with innovative companies in adjacent markets before deciding to enter those adjacent markets themselves and determining that exclusion is quicker and cheaper than competing on the merits. *See, e.g.*, *Crownalytics*, 2023 WL 3071192, at *2 ("Crownalytics and SPINS had an extremely

collaborative relationship [before] SPINS suddenly [] moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases." (cleaned up)); *Tiz*, 2024 WL 2785142, at *3 ("Defendants accepted numerous orders through Provi over the course of nearly five years"). The existence of a prior contract does not provide a license to exclude via a negative tie. Nor is Entri suggesting that GoDaddy is required to contract or enter into a business relationship with it. *See* ¶80.  Entri seeks to compel only what the law requires: "free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

ii.    <u>*Entri's Allegations Plausibly Establish the Four Elements of a Negative Tying Claim.*</u>

As GoDaddy has recognized (Mot. 9), Entri must allege four elements to successfully state a claim for negative tying:

> (1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product . . . upon an agreement not to purchase the tied product from another party[], (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce.

*Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992).

GoDaddy does not challenge Entri's allegations with respect to elements one or four—and with good reason. Entri plausibly alleges two separate product markets: one for domain registration services (the tying product) and another for domain configuration services (the tied product). ¶¶140–142 (domain registration), 143–144 (domain configuration); *see also Eastman Kodak*, 504 U.S. at 462 ("two distinct products" element requires "sufficient consumer demand that it is efficient for a firm to provide [them] separately"). And Entri identifies multiple specific contracts that have been impacted by the tie, easily satisfying the low bar for interstate commerce. ¶¶155–159; *see also Falls Church Bratwursthaus, Inc. v. Bratwursthaus Mgmt.*

*Corp.*, 354 F. Supp. 1237, 1240 (E.D. Va. 1973).

That leaves the second and third elements, which GoDaddy does contest. To satisfy the second element, Entri must plausibly allege that GoDaddy required customers who purchased the tying product (domain registration services) "not to take the tied product [(domain configuration services)] from the defendant's competitor," i.e., Entri. *Crownalytics*, 2023 WL 3071192, at *8. And to satisfy the third element, Entri must plausibly allege that GoDaddy has sufficient "market power" in the market for domain registration services to restrain trade in the market for domain configuration services. *Serv. & Training*, 963 F.2d at 683. Entri has plausibly alleged both elements. The motion to dismiss Entri's tying claim should be denied.

1. Entri has plausibly alleged that GoDaddy conditions the use of its domain registration services on its customers not using Entri Connect.

Entri's allegations make clear that "GoDaddy has expressly conditioned its provision of domain registration services on its customers not being able to use Entri Connect for domain configuration." ¶160; *see also* ¶¶12, 100, 161. Entri alleges specifics about when this change in policy occurred (December 2023), ¶100, how GoDaddy communicated the policy change, including by identifying specific SaaS company targets, ¶101; how and why SaaS companies and end-users have been forced to acquiesce, ¶¶17–18, 20; and what commercial, ¶¶111–117, and technological, ¶¶106–110, 118–130, manners GoDaddy has used to enforce its new policy, including new changes to its software terms of use.

This plausibly alleges "an agreement conditioning purchase of the tying product . . . upon an agreement not to purchase the tied product from another party[]." *Serv. & Training*, 963 F.2d at 683; *see RealPage*, 852 F. Supp. 2d at 1223–24 (element plausibly alleged where "newly amended software license agreements condition licensees' use of [defendant's software] (the tying product) on an agreement not to use [plaintiff's services] (the tied product)"). GoDaddy

does not dispute that it prohibits its customers from using Entri Connect.  Instead, it tries to insulate that prohibition from scrutiny through two formalistic distinctions. Neither is persuasive.

        i.   *The same website owners use domain registration services as use domain configuration services.*

GoDaddy first argues that there can be no agreement between GoDaddy and its domain registration services customers (i.e., website owners) because Entri Connect is licensed by third-party application developers (SaaS companies) and not the website owners. Mot. 10. GoDaddy thus theorizes that there is no party being required to take the combination of the tying and tied products. *Id.* This ignores Entri's allegations about the dynamics of the at-issue markets, and it gets the law wrong to boot.

The essence of the alleged negative tie is GoDaddy's policy that its domain registration customers (i.e., website owners) *may not use* Entri Connect to configure their DNS settings. The consumers are the same in both markets: it is website owners who register their custom domains with GoDaddy, and it is website owners who, in a properly functioning market, use Entri Connect to automatically configure their DNS settings. *See* ¶¶6–7, 11, 61, 63–69, 130. Indeed, Entri Connect merely automates tasks that the website owner would otherwise have to stumble through manually.  Put another way, it is the *website owner's* choice to use automation that is artificially constrained by GoDaddy's negative tie.

GoDaddy well knows this. GoDaddy markets its own domain configuration offering, Domain Connect, directly to website owners. "We . . . know that customers buy services attached to their domain from multiple companies," GoDaddy tells website owners, "[s]o we pioneered the Domain Connect protocol," which "makes it easy to set up and configure these services with

a simple click, so you don't need to know the details of the records in the zone in DNS."[3] Indeed, GoDaddy directs its customers to "ask yourself" whether providers "support Domain Connect" when making a choice of domain registrar.[4] It is clear that GoDaddy recognizes that it is website owners that use domain configuration services. It is thus the website owners' choice that is diminished by GoDaddy's prohibition of Entri Connect.

Nonetheless, GoDaddy insists there can be no tie because SaaS companies "purchase" licenses for Entri Connect. Mot. 10. To be sure, Entri Connect has contracts with SaaS companies, pursuant to which they license Entri Connect and provide it to website owners via their applications. In fact, Entri *must* do this to ensure the Entri Connect modal is integrated and works seamlessly. *See* ¶¶63–70, 74. But this fact does nothing to erase the allegations that it is the website owners that *use* Entri Connect. Indeed, SaaS companies have no need to use Entri Connect, as it is not their domains that are being configured; Entri Connect solves a website owner problem, and it is website owner demand that has created this tied product market.

Retreating to formalism, GoDaddy argues that the tied and tying products must be *purchased* by the same *buyers* for a tying claim to survive. *See* Mot. 10–11. But this has never been the law. In *Heartland Payment Sys., Inc. v. MICROS Sys., Inc.*, No. 07-5629, 2008 WL 4510260, at *6 (D.N.J. Sept. 29, 2008), for instance, the defendant argued there was no tie because "the purchasers of the tying product[] are not required by defendants' agreement to *purchase*" the tied product (emphasis in original). The end-user—there, merchants using point-of-sale systems—received the tied product for free. *Id.* And like GoDaddy here, the defendant argued that "a tying claim requires that, as condition of purchasing the tying product, the

---

[3]    GoDaddy DNS and Domain Connect, GoDaddy, https://www.godaddy.com/resources/skills/dns-domain-connect (last visited Aug. 24, 2024). As GoDaddy itself notes, the Court may take judicial notice of public-facing websites.
[4] *Id.*

purchaser of the tying product must also purchase the tied product." *Id.* But the court rejected that argument, holding that "defendants' scheme clearly implicates the 'antitrust concern' underlying tying arrangements . . . [e]ven though merchants are forced to *use* rather than *purchase* [the tied] services." *Id.* at \*10 (emphases in original); *Crownalytics*, 2023 WL 3071192, at \*9 (negative tying arrangement involved "agreement not to purchase *or use* the services" of competitors) (emphasis added).

The cases cited by GoDaddy provide no reason to conclude otherwise. In *Serv. & Training*, the customers of the tying product neither purchased *nor used* the tied services (they performed those services themselves). 963 F.2d at 686. In other words, there was nothing to be tied in the first instance. This was a crucial fact, moreover, because *Serv. & Training* was an *affirmative* tying case, not a negative tying one. The plaintiff needed to show that customers were *forced* to use the tied product; they could not even show they used it all. That is a far cry from this case, where website owners were forced to forego use of Entri Connect.

Likewise, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931 (N.D. Ill. 2018), addressed different facts. That case involved a software company's policy prohibiting customers of its car dealership management software (DMS) program (the alleged tying product) from using the data integration services (the alleged negative-tied product) of its competitors. *Id.* at 959. The defendants—again, like GoDaddy here—argued that the tying claim failed because "dealers buy the tying product (DMS) but not the tied product (integration services)." *Id.* But in the end, it was not the mere fact of who *paid for* the product that mattered. Rather, it was the fact that while the dealers chose a DMS vendor, they did not select, engage with, or even *use* the integration services. That tied product was designed solely for the DMS vendor, and so the court held that the plaintiff did "not plausibly plead" that the dealers' "consumer choice" was

15

"improperly constrained by the alleged tied." *Id.* at 960. There was no choice for the dealers to make and thus no choice for the tie to constrain. The same is simply not true here. It is the website owners—the same ones who register their domains with GoDaddy—that use Entri Connect. And so, it is the website owners that "suffer the consequences" of the tie. *Id.* In a properly functioning market, website owners with GoDaddy-registered domains would be free to rely upon Entri Connect. Because of GoDaddy's unlawful behavior, they cannot.[5]

In the end, "§ 1 is concerned with competitive consequences not labels." *BookLocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 100 (D. Me. 2009). Entri's allegations set forth precisely how GoDaddy uses "power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 n.19 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). A tie violates § 1 not because someone is forced to *pay for* the tied product, but because "competition on the merits in the market for the tied item is restrained." *Id.* at 12. That is precisely what is alleged here.

ii. *GoDaddy's policy is a tying arrangement, not mere unilateral action.*

GoDaddy next argues that its prohibition does not satisfy the conditioning element because it "merely sets the terms on which others can access its platform, which is permissible." Mot. 11–12. But this argument relies on faulty analogies to inapt cases, and it gets the factual allegations wrong. GoDaddy's policy is aimed at controlling who website owners can choose to

---

[5] *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346 (7th Cir. 1982), is no more persuasive. That opinion concerned an exclusive dealing, not a tying, claim. And in a portion of the opinion that *In re Dealer Mgmt.* labeled *dicta*, *see* 313 F. Supp. 3d at 961, *Dos Santos* simply commented that "it might be" (language omitted by GoDaddy) "anomalous" to treat an end user (there, a patient) as the purchaser when they did not make an "economic decision" related to the product at issue (there, anesthesia). *Dos Santos*, 684 F.2d at 1354. Here, again, the FAC does repeatedly allege that end users were the economic decision makers. ¶¶6, 63–69, 129–130. *Dos Santos* is inapt.

use to configure the DNS settings underpinning their own websites. That is not unilateral action, and it is not merely setting terms to access a GoDaddy platform.

To begin, Entri's allegations distinguish this case from those relied upon by GoDaddy. As GoDaddy concedes, it does not own the website owners' domain names, let alone the websites themselves. Mot. 4; *see* ¶31. GoDaddy merely facilitates the leasing of domain names and then plays a "passive" role in registering those leases. Mot. 3–4. The website owners—and not GoDaddy—retain "the right to control the domain for the duration of [their] lease[s]," and can control "what users see when they navigate to that domain on the Internet." ¶33. The website owners manage their DNS records in the same way one manages their information in the "phone book" (GoDaddy's analogy). ¶48. As the domain registrar, GoDaddy is merely the "custodian" of its customers' domains. ¶¶31, 84.

A very different dynamic characterizes cases cited by GoDaddy in which courts allowed Facebook and Google to restrict how third parties used those platforms' *own content*. *Sambreel Holdings LLC v. Facebook*, *Inc.*, 906 F. Supp. 2d 1070, 1074 (S.D. Cal. 2012), for instance, concerned whether Facebook was required to allow the plaintiff to display advertisement banners *while users were viewing Facebook.com*. And *Dream Big Media Inc. v. Alphabet Inc.*, No. 22-02314, 2022 WL 16579322, at *3 (N.D. Cal. Nov. 1, 2022) (*Dream Big I*), concerned Google's efforts to restrict "how customers of its mapping services may use or display *Google's content*." (emphasis added). But GoDaddy's *content* is not at issue, as it neither generates nor owns the DNS records underpinning their customers' domains. And in all events, GoDaddy can hardly quibble with how Entri Connect updates those records, as Entri does only what GoDaddy already permits its domain registration customers to accomplish manually. *See* ¶129. Neither case support's GoDaddy contention that it can condition its provision of domain registration services

on the website owner's allowing only GoDaddy to configure their DNS records.

Just as importantly, the persuasive value of *Sambreel* has been all but eviscerated in recent months—ironically, by subsequent decisions in *Dream Big* itself. GoDaddy cites only the opinion dismissing the initial *Dream Big* complaint (*Dream Big I*). *See* Mot. 12, 19. But in an opinion considering an *amended* complaint, the court reexamined its reliance on *Sambreel*:

> *Sambreel*'s observations about Facebook's right to control the use of its platform, however, were made in a context where there were no allegations that the use restrictions had the intent or effect of increasing Facebook's share of a second, "tied" product or service market. Under Google's reading of *Sambreel*, it is difficult to imagine any circumstances under which a tying arrangement, positive or negative, could not be justified as merely an exercise of the defendant's "right" to "determine" or "dictate" the terms on which its own product or service is used.

*Dream Big Media Inc. v. Alphabet Inc.*, No. 22-02314, 2023 WL 8285808, at *1 (N.D. Cal. Nov. 30, 2023) (*Dream Big II*). And in a third opinion issued just last month, the court cautioned that "any rights Google may otherwise have to dictate the terms on which it will permit its customers to use and display its mapping services, do not insulate it from potential antitrust liability for improper tying practices," adding that "[t]o the extent *Sambreel* suggests otherwise, it is not persuasive." *Dream Big Media Inc. v. Alphabet Inc.*, No. 22-02314, 2024 WL 3416509, at *2, n.2 (N.D. Cal. July 15, 2024) (*Dream Big III*).[6]

A more instructive case is *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677 (D. Del. 2013). The plaintiff (Kickflip) was a provider of virtual-currency services to developers of games offered on social-game networks like Facebook. 2012 WL 5363763. Facebook was the dominant social-game network and soon sought to enter the virtual-currency market as well, creating its own virtual currency called Credits. *Id.* When Credits failed to beat out Kickflip on the merits,

---

[6] Indeed, the Department of Justice filed a Statement of Interest in the *Dream Big* litigation for the sole purpose of explaining why the plaintiffs' reading of *Sambreel* was flawed, stating "Google has no unqualified right to determine how its mapping products may be used or displayed; rather, it is subject to the normal operation of the antitrust laws, including those governing positive and negative tying."  *See* **Exhibit A.**

"Facebook exploited its social-game network and tied that control to its virtual-currency services." *Kickflip, Inc.*, 999 F. Supp. 2d at 689. Indeed, "Facebook blacklisted [Kickflip] under the false pretext of maintaining the integrity of its social network" and "prohibit[ed] social-game developers from accessing Facebook's social-game network unless they agreed to only use Facebook's virtual-currency services." *Kickflip, Inc.*, 12-cv-01369 (D. Del.) D.E. 1 at 2. Facebook moved to dismiss the tying claim, citing *Sambreel*, but the court found this reliance "misplaced" because Kickflip had alleged a "systematic elimination of competition" that was not present in *Sambreel. Kickflip*, 999 F. Supp. 2d at 685–86. Entri's allegations mirror Kickflip's. Using its power in the domain registration market, GoDaddy blacklisted Entri for pretextual reasons in order to advance its own product.

Finally, GoDaddy invites "[t]hose who do not like GoDaddy's terms of use" to "simply switch to a different domain registrar." Mot. 12. But that argument confuses the second and third elements of a tying claim, and it proves too much. Unless a defendant is the only provider of the tying product, there is *always* the option for customers to turn elsewhere. That option is illusory, however, when the tying defendant has sufficient market power—a distinct element plausibly alleged by Entri and discussed *infra*—and when switching costs are elevated. On the second element, Entri has plausibly alleged that GoDaddy "condition[s] . . . use of [GoDaddy's domain registration services] (the tying product) on an agreement not to use [domain configuration services] (the tied product) of competing . . . software companies." *RealPage*, 852 F. Supp. 2d at 1223–24; *see also* ¶¶12, 100, 160–161. GoDaddy's contrary arguments must be rejected.

### 2. Entri has plausibly alleged that GoDaddy has market power in the U.S. domain registration market.

Entri has also plausibly alleged element three: GoDaddy's market power in the U.S. market for domain registration services. A defendant must have "appreciable economic power in

the tying market" for a tying claim to proceed. *Eastman Kodak*, 504 U.S. at 464. Market power can be found based on direct evidence of a defendant's "power to force a purchaser to do something that he would not do in a competitive market" or based on an inference "from the seller's possession of a predominant share of the market." *Id.* Entri has plausibly alleged both.

Starting with the raw numbers, "GoDaddy is the undisputed market leader in the domain registration market," ¶148, and Entri alleges that its share of the relevant "U.S. domain registration market is greater than 40%," *id.* ¶151. Even this share understates GoDaddy's market power, as GoDaddy protects its dominant position by making it cumbersome for customers to switch to a different domain registrar. *Id.* ¶153. Indeed, GoDaddy's share among the users of some third-party applications eclipses 95%. *Id.* ¶154. Cases generally agree that a plaintiff must allege a tying defendant has more than a thirty percent share of the relevant market. *See Jefferson Par.*, 466 U.S. at 26–27 (suggesting something more than 30% would be needed to show power over a tying product market); *BookLocker.com*, 650 F. Supp. 2d at 104 ("[P]ost-*Jefferson Parish*, there seems to be a consensus building that thirty percent is a threshold."). GoDaddy's alleged share is more than ten percent above that threshold. ¶151.

GoDaddy's market power is independently demonstrated by direct evidence that GoDaddy can "force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co.*, 504 U.S. at 464. In particular, Entri alleges that Entri Connect is preferable to website owners, but they are coerced into foregoing the service because of their reliance on GoDaddy, the high switching costs, and GoDaddy's efforts to make switching painful. ¶¶17, 153, 155–159, 174–175. Courts hold that these sorts of discrete examples of market power defeat a motion to dismiss. In *RealPage*, for example, the plaintiff alleged "discrete examples in which [the defendant] has wielded its economic advantage" to actually force customers to agree to

forego the plaintiff's product. 852 F. Supp. 2d at 1227. The court denied the motion to dismiss the tying claim, holding "[t]hese allegations suffice to demonstrate that [the defendant] has . . . exerted [market] power over at least some buyers in the market to effect at least an appreciable restraint on competition." *Id.* This Court should reach the same conclusion here.

GoDaddy's response is to fight with the FAC's allegations—instead of accepting them as true for purposes of the motion. GoDaddy claims that Entri alleges its market share is "between 19% and 24%." Mot. 13 (citing ¶¶148–150). That gets the FAC wrong. The 24% share that GoDaddy refers to is an explicitly "worldwide" share. ¶150. The next paragraph clearly alleges that "GoDaddy's share of the U.S. domain registration market is greater than 40%," and that this is "the relevant market here." ¶151. But GoDaddy never even addresses this allegation, and the primary case that it relies upon concerned a market share that was approximately half of this 40%. *See HCI Techs., Inc. v. Avaya, Inc.*, 446 F. Supp. 2d 518, 522 (E.D. Va. 2006) (relevant market share of "approximately 20%"); *Cf. Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1320 (D. Md. 1986) (share of tying market may be as low as 8.9%).

The remainder of GoDaddy's argument here is to take issue with the market shares that Entri alleges. Mot. 13 (arguing "Entri's allegations about GoDaddy's 'market share' are misleading"). This is not the time for this fight—GoDaddy is required to accept the FAC's allegations as true. What is more, cases have repeatedly noted that the calculation of market shares and the related task of market definition are "deeply fact-intensive" processes not suitable for determination on a motion to dismiss. *Eastman Kodak*, 504 U.S. at 466–467; *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011). In any event, Defendant's suggestion that users can freely switch between registrars, Mot. 14, is at odds with the FAC's allegations about GoDaddy's efforts to prevent switching, ¶153 ("GoDaddy protects

its share by making it very cumbersome for customers to switch to a different domain registrar."). GoDaddy cannot merely disregard the allegations that it does not like.

        iii.      *GoDaddy's Justifications for its Unlawful Conduct Are Outside the Pleadings and Irrelevant at this Stage.*

Through its briefing, GoDaddy offers several rationalizations for its conduct. GoDaddy cites Entri's "unreasonable demands," for instance, and the "technical complexity" of integration, as reasons why it began prohibiting its customers from using the service. Mot. 6–7. These arguments should be ignored at this stage, when GoDaddy is obligated to accept the allegations in the FAC as true. *Butler*, 702 F.3d at 752. This includes Entri's plausible allegations that GoDaddy's excuses were pretextual. ¶¶99, 117, 128. The time will come for GoDaddy to argue its actions were justified, at which point Entri will demonstrate that, even were this true, GoDaddy could have used less restrictive means. *See Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1040 (4th Cir. 1987) ("An asserted business justification cannot salvage a tying arrangement that is otherwise per se unlawful without proof that means less restrictive than the tie-in were not feasible to achieve the desired protection."); *cf.* ¶¶162–172. But GoDaddy's attempts to justify its unlawful conduct now are premature.

**B.    Entri Has Plausibly Alleged GoDaddy's Agreement in Restraint of Trade.**

GoDaddy's conduct violates § 1 under a second, independent theory. Section 1 prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1. To allege a violation, a plaintiff need only allege (1) an agreement that (2) unreasonably restrains trade. *Dickson v. Microsoft Corp.,* 309 F.3d 193, 202 (4th Cir. 2002). Plaintiffs often plead specific types of violations (tying, e.g.), but they need not do so. Entri has alleged that GoDaddy leveraged its dominance to coerce agreements from SaaS companies not to offer Entri Connect. ¶¶111–16. That is just as much a § 1 violation as Entri's tying claim.

i.   *GoDaddy Coerced Agreements with Third-Party Application Developers.*

Entri has plausibly alleged that GoDaddy has extracted agreements from unwilling SaaS companies not to offer Entri Connect to website owners with GoDaddy-registered domains. Entri alleges, for example, that in or around February 2024, GoDaddy reached out to multiple named application developers, pretextually asserted that Entri Connect was illegal, and told them that they would no longer be allowed to integrate with their end user customers' websites using Entri Connect. ¶¶111–117. One application developer described a "scare tactic meeting" where GoDaddy "got [] aggressive with" the developer. ¶116. These meetings had the effect of "forc[ing] certain SaaS companies . . . to deny their end users the ability to access automated domain configuration services via Entri Connect." ¶220. In short, GoDaddy demanded that SaaS companies no longer integrate with GoDaddy-registered domains using Entri Connect, and the developers acquiesced. That is sufficient to allege an agreement in this context.

GoDaddy's response is to argue that it "made the independent decision to prohibit its users from accessing" Entri, and so the FAC lacks the requisite "meeting of the minds" between GoDaddy and SaaS companies. Mot. 14–16. GoDaddy cites to traditional conspiracy cases for this proposition, including *Twombly* (horizontal market allocation) and *Monsanto* (price-fixing). And, to be sure, an agreement in those contexts requires a "conscious commitment to a common scheme." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). But GoDaddy overlooks that this "element is satisfied even where 'one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion.'" *Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.*, 158 F. App'x 413, 418 (4th Cir. 2005) (quoting *Dickson*, 309 F.3d at 205); *Systemcare, Inc. v. Wang Lab'ys Corp.*, 117 F.3d 1137, 1142 (10th Cir. 1997) ("[A] contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by the seller.");

*see also RealPage*, 852 F. Supp. 2d at 1220 (alleging defendant "coerced customer acquiescence to the prohibitive amendments by threatening to terminate its customers' . . . software licenses"). Entri's allegations plausibly set forth the requisite details about these coerced agreements.

      ii.    <u>GoDaddy's Coerced Agreements Unreasonably Restrained Trade in the Market for Domain Configuration Services.</u>

Entri has also plausibly alleged that GoDaddy's conduct satisfied the second element, which "requires a showing that the restraint on competition is unreasonable." *Imaging Ctr.*, 158 F. App'x at 418. Direct evidence of an unreasonable restraint of trade includes "increased prices," "decreased quality in the relevant market," "reduced output," and diminished choice. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018); *see also Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1207 (E.D. Mich. 1993) ("A restraint of trade is unreasonable if it adversely affects the price, quantity, quality or choice of goods or services available to consumers." (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986))).

All the hallmarks of an unreasonable restraint are present here. ¶179. GoDaddy has increased prices; GoDaddy began charging for Domain Connect only once it prohibited its customers from using Entri Connect. ¶¶133–36. GoDaddy's product is inferior; SaaS companies overwhelmingly prefer to offer Entri Connect. *See* ¶¶14, 16, 17, 22, 59.  There has been a reduction in choice; GoDaddy permits neither end users nor third-party applications to choose Entri Connect. And GoDaddy's anticompetitive actions have stifled innovation in a nascent technology market. ¶105. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 704d (4th ed. 2015) at 234 ("[A] dominant firm's restraints on the innovations of others goes to the heart of antitrust policy.").

In response, GoDaddy insists any restraint is not unreasonable because it has not yet succeeded in convincing SaaS companies to abandon Entri altogether. Mot. 17–18. This misses

the point and once again reflects a fundamental misunderstanding of who Entri Connect is *for*. Even if SaaS companies continue to offer Entri Connect to website owners that *do not* have GoDaddy-registered domains, competition is still unreasonably restrained because of the reduction in choice for those website owners that *do*. GoDaddy's goal is two-fold: a material reduction of output in the domain configuration market, and an equally material reduction in consumer choice. *See* ¶¶131–136. True, the reduction may not yield total foreclosure, but that is no defense—especially at the pleading stage. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions.").

Once again, GoDaddy simply ignores the allegations that do not fit its narrative. It argues, for example, that "no allegations support Entri's contention of price increases in the market for domain configuration services." Mot. 10. False; the FAC quotes GoDaddy itself as explaining that while it had "been providing Domain Connect for free for most service providers since inception," it had since "made the difficult decision to introduce a pricing structure for our services." ¶133; *see also* ¶15. GoDaddy next faults Entri for not specifying whether this increase is to a "supra-competitive" price or a price higher than Entri's. Mot. 18. That is beside the point, as Entri is not required to provide expert analysis concerning relative pricing at the pleading stage. Indeed, without discovery, Entri cannot be expected to know the details of GoDaddy's pricing. Entri's allegations plausibly establish that GoDaddy used to offer Domain Connect for free; after observing Entri's success, it prohibited its customers from using Entri Connect and then began to charge for its own service. ¶133. That price increase—from zero to something greater than zero—is a textbook indication of competitive harm and thus an unreasonable

restraint of trade. *See United States v. Apple, Inc.*, 791 F.3d 290, 330 (2d Cir. 2015) (evidence of agreement "to raise consumer-facing ebook prices" provided "'*actual* adverse effect' on competition in the relevant market").

### C.      Entri Has Plausibly Alleged Antitrust Injury.

In addition to pleading the specific elements of their claim, a § 1 plaintiff must allege antitrust injury, which is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *E.I. DuPont de Nemours*, 688 F. Supp. 2d at 460 (quoting *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007)). This element is satisfied "where [a] plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market." *Id.* "Beyond that, an analysis of antitrust injury" is "more properly conducted after discovery.'" *Id*.

The pleading standard for antitrust injury is far surpassed here. At the heart of the FAC is GoDaddy's scheme to "exclude" Entri from "participation" in the domain configuration services market. *E.I. DuPont de Nemours*, 688 F. Supp. 2d at 460. And the clear "result," as plainly alleged, is "a decrease in competition in that market." *Id.* Indeed, Entri alleges that GoDaddy's policy seeks to prevent its dominant share of website owners from using Entri Connect, or any other competitor to GoDaddy's own configuration service. ¶¶12, 100–101, 151, 160–161. This conduct has harmed not only GoDaddy's competitors, like Entri, but also the website owners that prefer to use Entri and the SaaS companies that prefer to offer it. ¶¶6–7, 11, 17, 61, 122–130. These allegations that GoDaddy "*actively excluded*" Entri "from participation" in the relevant market and that "the resulting 'damage to the competitive process' has significantly impacted both [Entri] and ordinary consumers" are more than enough to allege antitrust injury. *E.I. DuPont de Nemours*, 688 F. Supp. 2d at 460; *see also Tiz*, 2024 WL 2785142, at *25 ("[A]

competitor's exclusion from the market constitutes an antitrust injury" because it constrains "customers from exercising their individual choices."); *Lucasys*, 576 F. Supp. 3d at 1352 (harm to tying plaintiff "was damage to competition" because the tie "hampered innovation, reduced output, deprived consumers [of] choice . . . and ultimately raised prices").

GoDaddy offers only circular arguments in response. There is no antitrust injury, GoDaddy maintains, because "any harm to Entri flows from GoDaddy lawfully exercising its right to determine its terms of service." Mot. 19. But that presupposes GoDaddy's conduct is lawful, and Entri has plausibly alleged that it is not. *See* Section I.A–B, *supra*. Any "reduction in demand," GoDaddy continues, "may prove temporary, as GoDaddy users are free to change domain registrars." Mot. 19. This presupposes GoDaddy lacks market power and the ability to deter switching, and Entri has plausibly alleged the opposite. *See* Section I.A.2, *supra*. And finally, GoDaddy dismisses the competitive harms as too "attenuated" because they result from independent "economic decisions." Mot. 20. That argument presupposes the absence of any coercive conditioning, and Entri has plausibly alleged facts to support that dynamic. *See* Section I.A & I.B.i, *supra*.

## II.   ENTRI HAS PLAUSIBLY ALLEGED ITS TORTIOUS INTERFERENCE CLAIMS.

In addition to its antitrust claims, Entri brings claims for tortious interference with contract and business expectancy. GoDaddy's challenge to these claims fares no better.

### A.   Entri Has Plausibly Alleged Tortious Interference with Contract.

Under Virginia law, a plaintiff must allege four elements to state a claim for tortious interference with contract: "(i) a contract; (ii) knowledge of the contract; (iii) intentional interference with the contract causing a breach; and (iv) resulting damage." *Glob. Tel*Link Corp. v. JACS Sols. Inc.*, No. 23-0179, 2023 WL 8918281, at *10 (E.D. Va. Dec. 27, 2023).

Additionally, "[i]n certain contexts, including interference with prospective businesses and business expectancies, a plaintiff must also allege . . . 'that the defendant employed improper methods.'" *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 143 (4th Cir. 2014).

GoDaddy does not dispute the first four elements. Nor would it have any basis to do so, as Entri plausibly alleged: (1) The existence of contracts with many third-party SaaS companies, ¶¶101, 112–15, 156, 246, 248; (2) GoDaddy's awareness of these contractual relationships, ¶247; (3) GoDaddy's purposeful interference with these contracts, including through "scare tactics," legal threats, and coercion, ¶248; and (4) the resulting termination of contracts and significant monetary concessions, ¶¶249–50. Instead, GoDaddy argues that Entri failed to plausibly allege that GoDaddy acted with improper methods when interfering with the contracts. Mot. 20–23. As elsewhere, this argument gets the law and facts wrong.

To start, GoDaddy is wrong to suggest that a plaintiff's failure to specifically allege whether a contract is terminable at-will requires dismissal. In *Nortec Commc'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 232 (E.D. Va. 2008), which GoDaddy cites for this proposition, the court noted the plaintiff had "failed to allege whether or not the contract was at-will making it impossible for the Court to determine the applicable analysis." When "a contract is terminable at will," the court explained, the plaintiff must allege that the defendant "employed improper methods." *Id.* (cleaned up). But the court went on to assume, in the absence of any such allegation there, that the contracts at issue were at-will and then dismissed the claim for failure to plead improper methods. *Id.* This is the approach other courts have taken: where a complaint "does not contain sufficient facts for the Court to determine whether the [] contract was terminable at will," it requires "allegations of improper methods to allege a claim for tortious interference." *Constr. Engr. Consultants, Inc. v. Steel Sols., Inc.*, No. 08-0086, 2009 WL

10733733, at *11 (E.D. Va. May 13, 2009) ("even if the contract was terminable at will," complaint alleged improper methods); *Greater Divide, Inc. v. Lippe Taylor Grp., LLC*, No. 21-0137, 2022 WL 18671061, at *4 (E.D. Va. Sept. 26, 2022). It makes scant sense to default to dismissal.

Discovery will soon reveal whether the Entri contracts at issue were terminable at will (many were not). But the absence of an allegation is irrelevant here because Entri has met the heightened standard by pleading "improper methods." As courts have explained, "Virginia recognizes a wide range of 'improper methods,' including those means that are illegal or independently tortious, threats, or violations of an established standard of a trade or profession." *McMillan v. Dollarr Thrifty Auto. Group, Inc.*, No. 09-01195, 2010 WL 11566256, at *3 (E.D. Va. Feb. 23, 2010). They include "violations of statutes, regulations, or recognized common-law rules," as well as "misrepresentation or deceit, defamation, duress, undue influence," and "[s]harp dealing, overreaching, or unfair competition." *Duggin v. Adams*, 234 Va. 221, 227–28 (1987). The FAC meets this standard, alleging that GoDaddy's actions independently violated the antitrust laws, amounted to unfair competition, and exerted undue influence over third-party application developers. *See, e.g.*, ¶¶111–17, 248. Courts routinely hold that such allegations constitute "improper methods" adequately pleaded to survive dismissal. *See, e.g.*, *Nutrients Plus, LLC v. Huber*, No. 19-0102, 2019 WL 8888176, at *2 (E.D. Va. June 25, 2019). The Court should deny GoDaddy's motion to dismiss this claim.

B.     **Entri Plausibly Alleged Tortious Interference with Its Business Expectancies.**

GoDaddy's arguments with respect to the related tortious interference with business expectancies fail for much the same reasons. The elements for this claim are "quite similar" to those for tortious interference with contract, *Com. Funding*, 249 F.3d at 213, such that Entri has plausibly alleged a claim. Entri has alleged that it had contractual relations with at least seven

different, named third-party application developers and additionally identifies three other prospects in the FAC. ¶255. Entri reasonably expected these relations to continue based on the positive feedback it received from the developers. ¶73. But GoDaddy's actions delayed, harmed, or foreclosed these business opportunities. Entri has plausibly alleged the elements of this claim.

GoDaddy argues (again) that the claim fails because none of its alleged conduct was "improper." Mot. 23–24. But, as set forth above, Entri has alleged that GoDaddy's scheme was improper in multiple ways—it was unfair competition, violated the antitrust laws, and exerted undue influence. GoDaddy cannot immunize itself by characterizing its statements as "true." Mot. 24. A statement that GoDaddy intended to exclude Entri Connect, however true, is evidence of an antitrust violation and therefore sufficiently "improper" to sustain Entri's claim here.

GoDaddy next argues that it did not "kn[o]w about Entri's prospective expectancies." Mot. 24. But knowledge can be inferred from the rest of the allegations. Indeed, Entri alleges that GoDaddy reached out to SaaS companies to communicate its policy prohibiting Entri Connect, including several with whom Entri was negotiating. ¶¶111–17, 258; *see also* Mot. 16 ("GoDaddy communicated its new policy to the SaaS companies."). If GoDaddy affirmatively communicated its policy to these companies, it clearly had some expectation that they would partner with Entri—even more so because GoDaddy was familiar with Entri's business and the types of companies it targeted. ¶¶247, 254. GoDaddy's single citation to *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297–98 (4th Cir. 2021) provides no reason to find Entri's *pleadings* inadequate at this stage, as it concerned the requisite *evidence* for *summary judgment*.

## CONCLUSION

For these reasons, Entri respectfully submits that the Court should deny the motion to dismiss in its entirety.

Dated: August 27, 2024                          Respectfully submitted,

                                                 /s/ Nicholas J. Giles
                                                Nicholas J. Giles (Va. Bar No. 86584)
                                                Garrett H. Hooe (Va. Bar No. 83983)
                                                W. Cole. Geddy (Va. Bar No. 93511)
                                                Joshua D. Wade (Va. Bar No. 92588)
                                                Thomas C. Watson (*pro hac vice*)
                                                MCGUIREWOODS LLP
                                                Gateway Plaza
                                                800 East Canal Street
                                                Richmond, VA 23219
                                                Tel.: (804) 775-4760
                                                Fax.: (804) 698-2040
                                                ngiles@mcguirewoods.com
                                                ghooe@mcguirewoods.com
                                                cgeddy@mcguirewoods.com
                                                jwade@mcguirewoods.com
                                                twatson@mcguirewoods.com

                                                 /s/ Kieran McCarthy
                                                Kieran McCarthy (*pro hac vice*)
                                                McCARTHY LAW GROUP, LLC
                                                224 W. Rainbow Boulevard #115
                                                Salida, CO 81201
                                                Tel.: 720-635-5503
                                                kieran@mccarthylg.com

                                                *Counsel for Plaintiff Entri LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 27th day of August, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all counsel of record in this case.

 */s/ Nicholas J. Giles*
Nicholas J. Giles

*Counsel for Plaintiff Entri LLC*
