IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ENTRI, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-00569 (AJT/WEF) |
| ) | |
| GODADDY.COM, LLC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Entri, LLC ("Entri") filed this civil action against GoDaddy.com, LLC ("GoDaddy") alleging (1) violations of Section 1 of the Sherman Antitrust Act, (2) Tortious Interference with Contract, and (3) Tortious Interference with Business Expectancy, together with a request for a declaratory judgment on multiple grounds. [Doc. No. 23] at 45-50. Before the Court is GoDaddy's Motion to Dismiss Entri's Amended Complaint Count I (violations of Section 1 of the Sherman Antitrust Act), Count V (Tortious Interference with Contract), and Count VI (Tortious Interference with Business Expectancy), [Doc. No. 42] (the "Motion"). A hearing was held on September 26, 2024, following which the Court took the Motion under advisement. Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, and for the reasons stated below, the Motion, [Doc. No. 42], is **DENIED**.

### I.   BACKGROUND

Entri alleges in its Amended Complaint the following:

Domain registrars, like GoDaddy, assist individuals with securing an Internet Protocol ("IP") address and leasing a domain name. [Doc. No. 23] ("the Amended Complaint") ¶ 31. When a user uses GoDaddy to lease a domain name, GoDaddy does not own the domain name, and the

1

user retains control over the domain's appearance throughout the lease period. *Id.* ¶¶ 10, 31, 33. GoDaddy is the "world's largest domain registrar" with more than "84 million domains" leased, *id.* ¶ 148, and has a 40% share in the United States domain registration market. *Id.* ¶ 151. Once the domain name is secured, the user can design, manage, and enhance the website's appearance and functionality either manually or by using a software-as-a-service provider ("SaaS"). *Id.* ¶¶ 35-43. If enhancements are completed within a SaaS, the user must then update the domain name system ("DNS") records so that the changes appear on the website's interface. *Id.* ¶¶ 4, 46-47, 49. Updating DNS records manually requires knowledge of coding or programming and can be complex. *Id.* ¶ 51; *see also id.* ¶¶ 52-54.

To address the complexity of updating DNS records and facilitate the integration of SaaS enhancements into a domain it has registered, GoDaddy created the Domain Connect protocol, which gives SaaS companies a standard for updating DNS records for GoDaddy-registered domains. *Id.* ¶¶ 16, 57. Domain Connect only functions if a DNS provider has adopted Domain Connect and only four have. *Id.* ¶¶ 59. Once a SaaS company receives the protocol, each SaaS must build an in-application user interface to assist the user in updating the DNS records. *Id.* ¶¶ 60, 75. Until August 2023, Domain Connect was an open standard license; that is, there was no charge for SaaS companies to use the protocol. *Id.* ¶¶ 58, 94.

In 2021, Entri launched Entri Connect, a software program that automatically configures DNS records. *Id.* ¶ 61. SaaS companies purchase and incorporate Entri Connect into their software for their users. *Id.* ¶¶ 61, 70. When a user is logged into their Entri-enabled SaaS account, they are guided through the DNS configuration process through an Entri Connect pop-up window. *Id.* ¶¶ 64-68. Entri Connect may be used with more than forty DNS providers, *id.* ¶ 78, and third-party SaaS software users prefer Entri Connect compared to Domain Connect 80% of the time. *Id.* ¶ 17.

Beginning in 2021, GoDaddy permitted its users to utilize Entri Connect to update DNS records for GoDaddy-registered domains. *Id.* ¶ 84. A user would log into their GoDaddy account through a pop-up window and authorize Entri Connect to update the user's DNS records. *Id.* ¶ 85. Once a user authorizes Entri to configure their DNS records, the user is guided through the DNS record configuration process through Entri pop-up windows. *Id.* ¶¶ 65-68. GoDaddy allowed its users to utilize Entri Connect from 2021 until January 2024. *Id.* ¶ 80.

Beginning in April 2022, GoDaddy and Entri began negotiating over how they would work together in the future; and in April 2022, Entri and GoDaddy entered into an agreement with respect to how to onboard a new SaaS company that wanted to provide Entri Connect to its users. *Id.* ¶ 86. Under that agreement, Entri would send GoDaddy the required DNS settings in a format that complied with Domain Connect; and once received, GoDaddy would load them to the system, and Entri Connect could be utilized for that SaaS moving forward. *Id.* ¶¶ 86-87. Then, in August 2023, GoDaddy informed Entri that GoDaddy would not load any new requests due to the heavy workload for GoDaddy's DNS team. *Id.* ¶ 92. GoDaddy also proposed that Entri begin paying a license fee to continue its use of Domain Connect. *Id.* ¶ 94. GoDaddy and Entri negotiated paying a licensing fee, allegedly reaching a final agreement, before talks broke down. *Id.* ¶¶ 95-97. GoDaddy stopped responding to Entri in November 2023. *Id.* ¶¶ 97-98.

In December 2023, GoDaddy announced its revised terms of use, which no longer permitted users of a GoDaddy registered domain to use aggregator services like Entri Connect. *Id.* ¶¶ 100, 119. Specifically, the revised terms of use forbid "[u]sers or other entities" from "charg[ing] any fees, requir[ing] any payment or compensation, or otherwise offer[ing] a service behind a paywall that uses any part of GoDaddy API or offer any services that rely on GoDaddy API." *Id.* ¶ 121. In accordance with the revised terms of use, GoDaddy deleted all Domain Connect

3

templates that Entri submitted on behalf of SaaS companies,[1] *id.* ¶¶ 106, 124, informed SaaS companies that worked with Entri of its changed terms of use, *id.* ¶¶ 101, 111-16, and that under those changed terms, SaaS companies could only use Domain Connect to assist users with domain DNS configurations moving forward (or require users to complete manual configuration), and invoked a pricing structure for Domain Connect's use. *Id.* ¶ 133. GoDaddy also "implied that Entri Connect was illegal" to one SaaS and had a "scare tactic meeting where [GoDaddy] got aggressive with" another SaaS company. *Id.* ¶¶ 112, 116. In January 2024, GoDaddy informed Entri that their previous agreement was terminated effective immediately, *id.* ¶ 102; and Entri stopped using Domain Connect at this time. *Id.* ¶ 103.

Because GoDaddy has a 40% share of the United States domain registration market, GoDaddy's changed terms of use impacted Entri's business. *See id.* ¶¶ 151, 174-177. According to Entri, prospective business deals were lost, existing contracts were canceled, and Entri had to offer significant monetary concessions to other customers to keep their business. *Id.* ¶¶ 174-177. Even after Entri offered a 50% monetary concession to at least one SaaS, the SaaS still terminated the contract, citing that "the GoDaddy issue impacts far more than 25% of the domains for [us]." *Id.* ¶ 156.

On March 7, 2024, GoDaddy sent Entri a cease-and-desist letter, which demanded that Entri halt "its unauthorized efforts to utilize the GoDaddy Domain Connect web-based flow and API" and stated that Entri's continued use of GoDaddy's API violated "GoDaddy's API Terms of use ('API TOU'), Sections 32 and 43(a) of the Lanham Act, the Computer Fraud and Abuse Act, codified at 18 U.S.C. §1030 (the 'Computer Fraud and Abuse Act'), and GoDaddy's common law

---

[1] According to the Amended Complaint, because the templates were created using Domain Connect, they would have functioned without Entri Connect and would have continued to allow users to automatically configure DNS records. *Id.* ¶ 106.

4

rights." *Id.* ¶ 181. Entri disputes the allegations in GoDaddy's letter entirely, claiming that it stopped using Domain Connect immediately upon receipt of GoDaddy's notice. *Id.* ¶¶ 103, 183-210. Entri subsequently filed this action.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This does not require detailed allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "When a . . . complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof in order to withstand [a motion to dismiss]." *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 517 (2014) (quoting *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993)). The Court must accept all well-pled facts in the complaint as true and construe all facts in the light most favorable to Entri. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

## III. ANALYSIS

GoDaddy moves to dismiss Entri's Amended Complaint on the grounds that Count 1, Count V, and Count VI fail to state a claim upon which relief can be granted.

### A. Count I – Violations of Section 1 of the Sherman Antitrust Act

Entri's Amended Complaint alleges two Section 1 violations: the imposition of a "negative tie" restriction on the use of a GoDaddy registered domain and an unlawful restraint of trade.

      i.    *Whether Plaintiff has sustained a cognizable antitrust injury*

For both theories, Entri must plausibly allege a cognizable antitrust injury. An antitrust injury is "the type [of injury] the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The injury must arise from "a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis omitted). At the pleading stage, the "plaintiff [must] allege[] that he was excluded from participation in a particular market, and the result was a decrease in competition in that market." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009). Beyond that, "an analysis of antitrust injury . . . [is] more properly conducted after discovery." *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 569 n.25 (E.D. Va. 2000) (citations omitted).

As outlined in the Amended Complaint, GoDaddy's changed terms of use eliminate *all* competition with Domain Connect by barring the use of aggregator services, like Entri Connect, on GoDaddy registered domains. [Doc. No. 23] ¶ 121. In the domain configuration market, Domain Connect is the only option (other than manual configuration) that can be used for 40% of United States registered domains. *See id.* ¶¶ 121, 151. As laid out in the Amended Complaint, these actions directly led to some SaaS companies refusing to enter contracts with Entri and prematurely ending already existing contracts. *Id.* ¶¶ 174-177. Even monetary concessions were insufficient for Entri to retain some company's business given the sheer number of domains that are registered with GoDaddy. *See id.* ¶ 156. Due to the 40% market power that GoDaddy possesses over the United States domain registration, these allegations plausibly allege that Entri's personal

participation in the market was reduced and that there is a broader decrease in competition within the entire market.[2]

For these reasons, Entri has plausibly alleged a cognizable antitrust injury.

ii. *Whether Plaintiff has alleged a negative tie*

Entri alleges that GoDaddy violated Section 1 of the Sherman Antitrust Act by creating a negative tying agreement that conditioned a user's ability to use GoDaddy's domain registration services (tying product) on an agreement to forgo the use of an aggregator service, like Entri Connect (tied product). *Id.* ¶¶ 137-138. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958). A *per se* illegal negative tie consists of four essential elements:

> (1) the existence of two separate products;
> (2) an agreement conditioning purchase of the tying product upon . . . an agreement not to purchase the tied product from another party[];
> (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and;
> (4) a not insubstantial impact on interstate commerce.

*Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992). "[A]ppreciable economic power" is generally inferred from a seller's predominant market share in the tying product's market. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992).

---

[2] In support of its position that no cognizable antitrust injury is adequately alleged, GoDaddy argues that only Entri has seen reduced demand "while the broader market for domain configuration services is unaffected." [Doc. No. 46] at 19. However, GoDaddy's terms of use do not just ban Entri; it bans all aggregator services and therefore leaves Domain Connect as the only option for users, other than manual configuration, and therefore impacts the entire market.

Entri's Amended Complaint plausibly alleges an unlawful negative tie. First, Entri plausibly alleges that there are two separate products: domain registration services (tying product) and domain configuration services (tied product). [Doc. No. 23] ¶¶ 140-144. Second, Entri plausibly alleged that in order to use GoDaddy's domain registration services (tying product), a consumer must agree not to use a third-party aggregator (tied product). *Id.* ¶¶ 100-01, 119, 131-133. Third, Entri plausibly alleges that GoDaddy's 40% market share in domain registration is sufficient economic power to force users to utilize Domain Connect, when third-party users prefer Entri Connect 80% of the time. *Id.* ¶¶ 17, 151, 174-177; *see also id.* ¶¶ 148-149. Fourth, Entri plausibly alleges that multiple contracts with customers have been impacted because of the negative tie, thereby demonstrating a not insubstantial impact on interstate commerce. *Id.* ¶¶ 155-159. Because GoDaddy only challenged the second and third element, the Court addresses these in turn below. *See* [Doc. No. 46] at 9.

### Negative Tying Agreement

Though negative tying cases are limited in number, *see Aerotek Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (observing that negative tying cases are rare), several courts have, in fact, recognized that antitrust liability can be based on negative ties. For example, in *RealPage*, the Central District of California found that conditioning a licensing agreement for software on an agreement not to use a competitor's cloud services constituted an unlawful negative tie. *RealPage, Inc. v. Yardi Sys.*, 852 F. Supp. 2d 1215, 1224 (C.D. Cal. 2012). Similarly, in *Crownalytics*, the District Court of Colorado determined plausible allegations of a negative tie existed where the defendant conditioned the sale of data on an agreement that the user would not use third-party services. *Crownalytics, LLC v. SPINS LLC*, No. 22-cv-1275-NYW-SKC, 2023 WL 3071192, *9 (D. Colo. Apr. 25, 2023).

GoDaddy's changed terms of use require its users of its domain registration services (tying product) to forgo the use of any third-party aggregator services (tied product). [Doc. No. 23] ¶¶ 100-01, 119, 131-133. This restriction is a negative tying agreement, both by its very definition and when examined through the lens of the antitrust policy concerns and objectives that underlie why tying agreements are prohibited under antitrust law. *See United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001) ("The core concern is that tying prevents goods from competing directly for consumer choice on their merits."); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by* Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms."). GoDaddy's negative tie cuts off all aggregator services, including Entri Connect, from competing in the DNS records configuration market. Instead, the only option is choosing between GoDaddy's Domain Connect protocol or requiring users to manually update their DNS records. This deprivation of choice is precisely the kind of anticompetitive harm that the Sherman Act forbids. *See Jefferson Parish*, 466 U.S. at 14.

GoDaddy challenges Entri's negative tying claim on two principal grounds. The first is that purchasers of GoDaddy's domain names (domain registration users) and purchasers of Entri Connect (SaaS companies) are different, [Doc. No. 46] at 10-11; and in support of its position, GoDaddy cites to multiple cases that allegedly rejected tying claims on the grounds that the same individual must be the purchaser of both the tying and the tied product, including principally *Data General*.[3] *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992).

---

[3] GoDaddy also cites to *In re Dealer Management* and *Dos Santos* to support its argument that the purchaser of the tying and tied product must be the same. [Doc. No. 46] at 10. However, neither adequately supports its contentions in

9

In *Data General*, Data General offered a diagnostic software program ("MV/ADEX") and related repair services for MV computers. *Id.* at 682. Data General licensed MV/ADEX to two groups of customers. The first group of organizations signed a licensing agreement allowing Data General to install MV/ADEX on the computer and provide remote repair services. *Id.* at 337-38. The second group of customers ("CMOs") only licensed MV/ADEX and did not avail themselves of Data General's repair services. *Id.* STI provided maintenance and repair services for computer equipment, including MV computers. *Id.* Data General refused to license MV/ADEX to STI. *Serv. & Training, Inc. v. Data Gen. Corp.*, 737 F. Supp. 334, 338 (D. Md. 1990). STI alleged that Data General unlawfully tied access to MV/ADEX to the repair services. *Id.* at 342. The Fourth Circuit Court of Appeals determined there was "no evidence . . . that Data General agreed to license MV/ADEX to CMOs only on the condition that the CMOs also purchase Data General's repair services. CMOs do not even purchase repair services; by definition, these customers repair their own computers." *Data Gen.*, 963 F.2d at 686. Overall, *Data General* is remarkably different from the present matter. Although the CMOs did not use the tied product (repair services), Entri Connect users do, as it helps them configure their DNS records. Further, unlike the plaintiff in *Data General*, Entri has set forth sufficient factual allegations to support that a negative tying agreement exists. *See* ¶¶ 100-01, 119, 131-133.

---

this case. First, in *In re Dealer*, the Northern District of Illinois considered an alleged tying agreement regarding car dealership management software ("DMS"). *Id.* at 959. Dealerships owned the data that is stored in the DMS system, had no engagement with the data integrators (tied product), and only used the DMS software (tying product). *Id.* at 940. The court determined that no unlawful tying agreement existed, even though the DMS software providers required the use of their data integration software, because the dealer's "'consumer choice' is [not] improperly constrained by the alleged tie." *Id.* at 960. In sum, there was no tying agreement because the *users* of the tying and tied product were different. *Id.* Second, in *Dos Santos*, a case that did not directly involve a purported tying agreement, the Seventh Circuit remanded the case for the District Court to determine the relevant market, noting that the court should consider whether the patient or a hospital should be viewed as the purchaser of the tying product because an individual patient does not decide who provides their anesthesia services. *See Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir. 1982). There, the identity of the purchaser was relevant only for the purpose of defining the relevant market so that the district could properly analyze what barriers the medical centers faced in terms of finding new anesthesia services. *Id.* Here, GoDaddy has essentially eliminated the entire DNS configuration market for its registered domains so its product is the only remaining option.

10

The Sherman Act is "aimed at substance rather than form." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 760 (1984); *see also Kodak*, 504 U.S. at 466–67 ("[F]ormalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). Antitrust's core concern is deterring practices that "prevent[] goods from competing directly for consumer choice on their merits." *Microsoft Corp.*, 253 F.3d at 87 (citing *Jefferson Parish*, 466 U.S. at 13). Although the *purchaser* of Entri Connect differs from the *purchaser* of GoDaddy's services, the *user* of both products is the same. GoDaddy's revised terms of use distorts users' choice by preventing Entri Connect from competing on its merits against Domain Connect or other aggregator services. This scheme, as alleged, also embraces an essential characteristic of tying arrangements: "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all[] or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 2.

Other courts have recognized that "the same purchaser need not purchase both the tying and tied products in a tying arrangement, so long as the purchaser of the tying product is not permitted to purchase the tied product from other suppliers." *Heartland Payment Sys., Inc. v. MICROS Sys., Inc.*, No. 3:07-cv-5629-FLW, 2008 WL 4510260, at *8 (D.N.J. Sept. 29, 2008). In *Heartland*, the court focused, as does this Court, on the central inquiry: whether the "seller coerces the abdication of buyers' independent judgment as to the 'tied' products merits and insulates it from the competitive stresses of the open market." *Id.* at *9 (citing *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953)). This coercion over the customers is especially present because, as alleged in the Amended Complaint, SaaS companies prefer Entri Connect over Domain Connect 80% of the time, [Doc. No. 23] ¶ 17; and GoDaddy's actions restrain other aggregator services from accessing approximately 40% of all United States created domains, leaving

consumers with one option: Domain Connect. This alleged conduct is precisely the kind of market insulation that antitrust law addresses. In short, even though the user may not be the actual *purchaser* of Entri Connect, the user's "consumer choice" is constrained by no longer having the ability to use Entri Connect to update DNS configuration on a GoDaddy registered domain. *See In re Dealer Mgmt.*, 313 F. Supp. 3d at 960.

GoDaddy's other principal challenge is based on the notion that GoDaddy is not required under antitrust laws to integrate into its own product other products, and it has the right to set forth the terms in which a user may access its product or "platform." [Doc. No. 69] at 11-12. In support of this position, it cites to cases that have effectively ruled that a company has the right to protect its "platform." *See id; see also Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012); *Dream Big Media Inc. v. Alphabet Inc.*, No. 22-cv-023140JSW, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022).

As an initial matter, GoDaddy has a fundamentally different relationship to the "platform" it wishes to protect from the competitive market than a Google or a Facebook. In that regard, GoDaddy does not own or have any proprietary interest in the domain space it registers for a user, but nevertheless, is attempting to regulate its use through conduct outside of its role as a registrar, whose primary purpose is to obtain and record IP addresses in order to allow its customer to have a dedicated space on the internet. Although it has its technical challenges, the user does not necessarily need to use Domain Connect or any aggregator to integrate third-party software to its site, and GoDaddy is using its ability as a registrar to bolster its competitive advantage in essentially another line of business—simplified DNS record configuration by users.

Nor does GoDaddy's position sufficiently improve if the protected platform is Domain Connect itself and its protocols, given the context of its own actions to insulate the domains it

registers from aggregator services. In that regard, even though it had created Domain Connect for use by users of sites it had registered, GoDaddy did not initially require Entri to interface or otherwise integrate into Doman Connect in order to integrate a SaaS into a domain site. *See* [Doc. No. 23] ¶¶ 62, 80, 85. Then, beginning in April 2022, GoDaddy required Entri to use the Domain Connect protocol, without charge. *Id.* ¶ 86. It then attempted to impose a fee for Entri's use of the required Domain Connect protocol, *id.* ¶ 94, before prohibiting Entri's, and other aggregators' access to the DNS records altogether, thereby insolating GoDaddy's Domain Connect from any competition.

Although a company may have the right to establish the terms by which a customer may use its product or services, it cannot revise its terms of use in a way that violates antitrust laws. *See Alphabet*, 2021 WL 3416509, at *2 n.2 ("[A]ny rights Google may otherwise have to 'dictate the terms on which it will permit its customers to use and display its mapping services,' do not insulate it from potential antitrust liability for improper tying practices."); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 685 (D. Del. 2013) (noting a company may only "'freely exercise his own independent discretion as to parties with whom he will deal'" if it is "'in the absence of any purpose to create or maintain a monopoly.'" (citing *Sambeel*, 906 F. Supp. 2d at 1075-76). Here, Entri has plausibly alleged that GoDaddy has imposed a negative tie with the purpose of insulating itself from market competition in violation of the antitrust laws.

For these reasons, Entri has plausibly alleged a negative tying agreement exists.

### Sufficient Economic Power

To demonstrate the third element of a tying scheme, a plaintiff must demonstrate that the defendant has "appreciable economic power in the tying market." *Kodak*, 504 U.S. at 464. Market power is the power "to force a purchaser to do something that he would not do in a competitive

13

market" and can be inferred from a defendant's predominate share of the market. *Id.*; *Jefferson Parish*, 466 U.S. at 14. In a tying case, a 30% market share is "the minimum market share from which the market power . . . of a tying case can be inferred." *Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994); *see also BookLocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 104 (D. Me. 2009) ("[P]ost-*Jefferson Parish,* there seems to be a consensus building that thirty percent is a threshold.").

As alleged in the Amended Complaint, GoDaddy is the largest domain registrar and more than five times larger than its closest competitor. [Doc. No. 23] ¶¶ 10, 148. GoDaddy's market share for the United States domain name registration market is 40%, well above the 30% threshold. *Id.* ¶ 151; *see Hardy*, 39 F.3d at 767. GoDaddy's market power is also demonstrated based on its alleged ability to get multiple companies to terminate contracts or end business relationships with Entri following GoDaddy's changed terms of use. *Id.* ¶¶ 154-158. Even monetary concessions were insufficient for Entri to retain some company's business given the sheer number of domains that are registered with GoDaddy, *see id.* ¶ 156, even though SaaS companies preferred Entri Connect over Domain Connect 80% of the time. *Id.* ¶ 17.[4]

For the above reasons, Entri has plausibly alleged that GoDaddy has sufficient economic power in the tying product's market.

### ii. Restraint of Trade

To establish an impermissible restraint of trade, a plaintiff must demonstrate that there is an agreement that unreasonably restrains trade. *DataCell ehf. v. Visa, Inc.*, No. 1:14-CV-1658,

---

[4] GoDaddy's Motion argues that because domains are not products or services that GoDaddy owns and instead only leases, GoDaddy's alleged market share "is simply the result of free consumer choice and the popularity of GoDaddy's services." [Doc. No. 46] at 14. If anything, this argument only advances Entri's allegations that GoDaddy's popularity gives it sufficient economic power "to force a purchaser to do something that he would not do in a competitive market." *See Jefferson Parish*, 466 U.S. at 14. As alleged in the Amended Complaint, it can be difficult to switch to a new domain name registrar. [Doc. No. 23] ¶ 153.

2015 WL 4624714, at *8 (E.D. Va. July 30, 2015). However, Section 1's restrictions "applies only to concerted action . . . which requires evidence of a relationship between at least two legally distinct persons or entities" and does not apply to unilateral conduct. *Copperweld*, 467 U.S. at 768; *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 284 (4th Cir. 2012) (citations omitted). Nevertheless, it is sufficient to show that such an agreement was reached even though one party was "unwilling[], reluctant[], or only [did so] in response to coercion.". *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002).

First, Entri has plausibly alleged an agreement between GoDaddy and SaaS companies to no longer use Entri Connect. In that regard, GoDaddy's revised terms of use require that no aggregator service, including Entri Connect, may be used on any of the millions of domains that were registered with GoDaddy, [Doc. No. 23] ¶ 121; and GoDaddy informed the SaaS companies that they could only use Domain Connect directly with GoDaddy moving forward. *Id.* ¶ 132. In response to this notification, SaaS companies refused to continue negotiating for future business and canceled existing contracts with Entri, even when Entri tried to retain business through monetary concessions. *Id.* ¶¶ 176, 246-249, 255. These allegations, though limited, allege facts, when viewed most favorably to Entri, that plausibly allege that many SaaS companies effectively agreed, albeit reluctantly, to stop offering Entri Connect due to GoDaddy's revised policies.[5]

---

[5] GoDaddy argues that Entri has not plausibly alleged an agreement between GoDaddy and the SaaS companies because Entri failed to state "how GoDaddy coerced these companies to enter such an agreement, or when these companies approved this agreement." [Doc. No. 46] at 15 (emphasis omitted). However, Entri has alleged that following the announcement of this new policy, GoDaddy also "implied that Entri Connect was illegal" to one SaaS and had a "scare tactic meeting where [GoDaddy] got aggressive with" another SaaS, [Doc. No. 23] ¶¶ 112, 116, and named multiple companies that had canceled or modified contracts with Entri. *Id.* ¶¶ 174-176. Given Entri's limited ability to know of such discussions or agreements at this stage of the proceedings, these allegations are sufficiently detailed to put GoDaddy on notice of Entri's claims and plausibly allege the required agreements. *See Twombly*, 550 U.S. at 545 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

Second, Entri has plausibly alleged that this agreement was unreasonable. Unreasonableness is measured by examining "the ways in which a challenged restraint might possibly impair competition." *Dickson*, 309 F.3d at 206. To have an "anticompetitive effect," conduct "must harm the competitive *process* and thereby harm consumers." *Microsoft Corp.*, 253 F.3d at 58 (emphasis added). "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id.* (internal quotation marks omitted). The harms must be "likely and significant" based on the market conditions. *Id.* Evidence of an unreasonable restraint of trade may be pleaded through allegations of increased prices, decreased quality, diminished choice, and reduced output. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).[6]

Entri has plausibly alleged that trade has been unreasonably restrained. First, Entri alleged that there has been a decreased quality of domain configuration services as third-party users prefer Entri Connect over Domain Connect 80% of the time. *Id.* ¶ 17. There has also been diminished choice as users have no option for DNS record configuration other than Domain Connect or manual configuration. *See id.* ¶¶ 100-102. Further, given the makeup of the DNS configuration market, GoDaddy and other domain registrars are in a unique position to essentially terminate an entire market by revising their terms of use, precisely the kind of conduct that targets and harms the "competitive process" and consumers. *See Microsoft Corp.*, 253 F.3d at 58.

For the reasons stated above, Entri has plausibly alleged an unreasonable restraint of trade.

---

[6] Courts have adopted various analyses determining unreasonableness sufficient to impose liability under section 1: "(1) *per se* analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some pro-competitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine." *Id.* at 206 (citing *Cont'l Airlines*, 277 F.3d at 508).

### B. Count V - Tortious Interference with Contract

Where a contract is not terminable at will, a plaintiff only must establish four elements to plead a *prima facie* case of Tortious Interference with Contract: "(i) a contract; (ii) [Defendant's] knowledge of the contract; (iii) intentional interference with the contract causing a breach; and (iv) resulting damage." *Glob. Tel*Link Corp. v. JACS Sols. Inc.*, No. 23-0179, 2023 WL 8918281, at *10 (E.D. Va. Dec. 27, 2023). The "intentional interference" element does not require that a defendant "acts for the primary purpose of interfering with the performance of the contract." *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 146 (2009) (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. j (AM. L. INST. 1979)).

If a contract is terminable at will, the plaintiff must also show the defendant employed "improper methods" in causing the contract's termination, such as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Duggin v. Adams*, 234 Va. 221, 227 (1987). "Improper methods" can also be demonstrated through "illegal or independently tortious, threats, or violations of an established standard of a trade or profession." *McMillan v. Dollar Thrifty Auto. Grp.*, Inc., No. 09-01195, 2010 WL 11566256, at *3 (E.D. Va. Feb. 23, 2010); *accord Precision Piping & Instruments, Inc. v. E.I. duPont De Nemours & Co.*, 707 F. Supp. 225, 231 (S.D.W.V. 1989) ("While the Court believes that the record is not as clear as it could be as to the particular evidence with which the Plaintiff intends to prove its claim of tortious interference, the Court notes generally that the evidence upon which the Plaintiff will rely to prove its anti-trust claims could form the basis of its tortious interference claim.").

First, Entri alleges multiple contracts were entered into with SaaS companies for the use of Entri Connect to automatically configure DNS records. [Doc. No. 23] ¶¶ 112-117, 248.[7] Second, Entri has plausibly alleged that GoDaddy knew about these contracts due to the parties' close working relationship and because GoDaddy knew which SaaS companies to notify about its changed terms of use. *Id.* ¶¶ 112-117, 247. Third, GoDaddy's interference was plausibly intentional as demonstrated by its affirmatively reaching out to Entri's clients to notify them about the changed terms of use. *Id.* ¶¶ 112-117. Fourth, Entri has plausibly pleaded that some contracts were canceled, and others required "substantial monetary discounts" to existing contracts, because of GoDaddy's new policy. *Id.* ¶¶ 176, 246-249. Finally, because Entri has plausibly alleged that GoDaddy's changed terms of use violated Section 1 of the Sherman Antitrust Act, these actions also plausibly allege improper methods for this claim. *See McMillan*, 2010 WL 11566256, at *3.

For the above reasons, Defendant's Motion is denied as it relates to Count V.

### C. Count VI - Tortious Interference with Business Expectancy

To plead a *prima facie* case of Tortious Interference with Business Expectancy, a plaintiff must show: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy . . . (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 230 Va. 112, 120 (1985). The termination of an existing business relationship can serve as the basis for a Tortious Interference with Business Expectancy claim. *See Deane v. Mady*, 72 Va. 304, 304 (2006).

---

[7] Entri has not alleged whether its contracts were terminable at will or not. Nevertheless, the Court has considered the adequacy of the allegations based on whether Entri has sufficiently alleged the additional requirement, applicable to at-will contracts, that GoDaddy employed "improper methods." *See Nortec Communications, Inc. v. Lee-Llacer*, 548 F. Supp. 226, 233 (E.D. Va. 2008).

First, Entri has sufficiently alleged that it had ongoing contractual relationships with various SaaS companies. [Doc. No. 23] ¶ 253. Second, Entri adequately alleges that GoDaddy knew about these contracts based on the company's close working relationship and because GoDaddy knew to reach out to those companies to inform them of the changed policy. *Id.* ¶¶ 112-117, 247. Third, Entri sufficiently alleges that GoDaddy's changed terms led to the prematurely terminated contracts, loss of prospective business, lower business revenues, and significant monetary concessions to existing Entri customers. *Id.* ¶¶ 176, 246-249, 255, 256.

For these reasons, Entri has alleged facts that plausibly allege a Tortious Interference with Business Expectancy, and the Defendant's Motion is denied as it relates to Count VI.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendant's Motion to Dismiss, [Doc. No. 42] be, and the same hereby is, **DENIED** as to Counts I, V, and VI.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

October 10, 2024
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge